**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Kelsey J. Elling (SBN 337915)
*kelling@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BURAK OKSAYAN, JACK KESSLER, ANDREW ST. GEORGE, BRADFORD SCHLOSSER, ANDREW KARZ, and JAMI KANDEL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MATCHGROUP, INC.<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, ("CLRA") CAL. CIV. CODE SECTION 1750, *et seq*.<br>2. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW ("FAL"), BUSINESS AND PROFESSIONS CODE SECTION 17500, *et seq*.<br>3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq*.<br>4. VIOLATION OF NEW YORK GENERAL BUSINESS LAW SECTIONS 349, 350, *et seq*.<br>5. VIOLATION OF GEORGIA DECEPTIVE TRADE PRACTICE LAW OCGA SECTION 10-1-372, *et seq*.<br>6. VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FL. STAT. SECTION 501.201, *et seq*.<br>7. BREACH OF EXPRESS WARRANTY<br>8. UNJUST ENRICHMENT<br>9. STRICT PRODUCTS LIABILITY – FAILURE TO WARN<br>10. NEGLIGENCE – DESIGN<br>11. NEGLIGENCE – FAILURE TO WARN<br><br>**DEMAND FOR JURY TRIAL** |

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Plaintiffs Burak Oksayan, Jack Kessler, Andrew St. George, Bradford Schlosser, Andrew Karz, and Jami Kandel ("Plaintiffs"), individually, and on behalf of all other similarly situated consumers, as more fully described herein (the "Class"), bring this class action complaint against MatchGroup, Inc. ("Defendant" or "Match"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys.

## I.   SYNOPSIS

1.     Over the past decade, MatchGroup's application-based dating platforms (Tinder, Hinge, and The League, collectively "Dating Platforms" or "Platforms") have altered social reality. A millennium of traditional courtship has been replaced by technology. Striking up an in-person conversation with a stranger cannot compete with the convenience of swiping left or right on a profile, and no person could engage with a hundred potential partners in person in a matter of minutes.

2.     Convenience, however, comes at a price. Harnessing powerful technologies and hidden algorithms, Match intentionally designs the Platforms with addictive, game-like design features, which lock users into a perpetual pay-to-play loop that prioritizes corporate profits over its marketing promises and customers' relationship goals.

3.     In violation of consumer protection and other laws, the purposely addictive design of the Platforms is not disclosed to users. Instead, Match affirmatively represents the Platforms as effective tools for establishing off-app relationships while secretly doing everything in its power to capture and sustain paying subscribers and keep them on-app.

4.      The undisclosed defective design is intended to erode users' ability to disengage from the Platforms and turn users into addicts who will purchase ever-more expensive subscriptions to unlock unlimited and other 'special' features which are not designed to deliver on Match's marketing promises, but instead to further addict and forever entrench users in the app.

5.     Despite the Platform's purposely addictive qualities, Match continues to otherwise falsely market them. For example, Hinge's marketing promise brazenly claims the app was "Designed to be Deleted."

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

6.     The truth is the apps are *designed to be addictive*—and Match's motive and unlawful scheme is summarized as follows:  (1) Match's business model depends on generating returns through the monopolization of users' attention, and Match has guaranteed its market success by fomenting dating app addiction that drives expensive subscriptions and perpetual use, (2) Match employs recognized dopamine-manipulating product features to gamify the Platforms to transform users into gamblers locked in a search for psychological rewards that Match makes elusive on purpose, (3) to ensure users will purchase subscriptions, Match purposely manipulates them by inserting an artificial bottleneck and using a secret algorithm it designed to encourage and reward compulsive use, (4) simultaneously, Match misrepresents the design and makes false promises to consumers, to keep their guard against compulsive use down, while pressuring them into investing additional time and money into the Platforms based on the false promises (Match's **"Challenged Representation(s)"**) and (5) Match continues to distribute the Platforms without disclosing the harmful addictive use and attendant health risks for which Match in fact designed the Platforms to realize, and on which its business model depends (Match's **"Material Omission"**).

7.     ***First,*** **Match's business model ensures that addiction increases earnings.** Match's financial success is directly tied to their ability to convert non-paying users into paying customers. Match receives 98% of their revenue directly from end users, and according to their most recent SEC filing, that revenue is comprised of "subscriptions and in-app purchases."[1] In a letter to investors dated October 31, 2023, Match made it clear what their goals were for Tinder, "reach double-digit Direct Revenue growth," and they flaunted their success, with Tinder Direct Revenue growing 11% Y/Y, and Hinge Direct Revenue growing 44%.[2] In fact, in each of four letters to investors during FY '23, Match's "Quarter in Review" relays direct revenue information to the exclusion of total downloads. To Match and its shareholders, turning non-payers into payers is *the* metric used to gauge success.

---

[1] BamSEC. (2017, November 9). *United States Securities and Exchange Commission*. SECURITIES AND EXCHANGE COMMISSION, https://www.bamsec.com/filing/89110323000114?cik=891103 (Last visited February 14, 2024).
[2] BamSEC. (2023, October 31). *MatchGroup Letter to Shareholders,* SECURITIES AND EXCHANGE COMMISSION. https://www.bamsec.com/filing/89110323000109?cik=891103 (Last visited February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

8. Match sells subscription plans which remove all "like limits" from their Platforms, 100 likes per day on Tinder and 8 likes per day on Hinge.[3],[4] If users were content with these limits, they would not purchase subscriptions, and Match would generate no revenue. Instead, Match benefits from users who are unable to self-regulate and disengage from the Platforms once the daily "like limit" has been reached. Match is in the business of coercing its users into paying for continued, compulsive use.

9. **Second, consistent with this business model, Match has designed, developed, and advertised psychologically manipulative product features to drive user addiction.** Match has designed at least three targeted features to achieve these ends: (1) The Platforms' **Content Presentation Format** has "gamified" romance to manipulate dopamine response by introducing intermittent variable rewards; (2) **Push Notifications** prey on users' fear of missing out on any potential matches with a strategic notification system designed to capture and retain attention at all times of the day; (3) **Incentive Rewards** which punish users from disengaging and rewards compulsive users.

10. Match's manipulation has succeeded. Dating app addiction is now prevalent and awareness of the pervasive problem is growing. A survey conducted by eHarmony found that a shocking "nine in ten singles (90%) believe they are 'addicted' to dating apps," that "half (48%) [of users] admit to checking their apps last thing before going to bed and two-fifths (39%) check their apps against first thing when they wake up," and, "nearly a third (28%) confess to checking [dating apps] at work… and 12% have even checked dating apps while on a date."[5] Due to the purposely manipulative and addictive Platform design, no waking hour is safe from the allure of the Platforms, as underscored by users' incessant need to keep swiping.

---

[3] *Subscription Tiers*. TINDER. https://tinder.com/feature/subscription-tiers (Last visited February 14, 2024).
[4] Antonelli, W. (2021, November 26). *Hinge Is Free, but You Can Pay for Extra Features*. BUSINESS INSIDER. https://www.businessinsider.com/guides/tech/is-hinge-free (Last visited February 14, 2024).
[5] eHarmony Editorial Team (Feb. 6, 2023), *Why Singles are 'Addicted' to Dating Apps*, EHARMONY. https://www.eharmony.co.uk/labs/app-dicted-to-love/ (Last visited, February 14, 2024).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

11.     Another dating platform, Badoo, a competitor of Match's Platforms primarily operating in Europe and South America, also released user data. The initial publication has since been removed from Badoo's website, which looked at 5,000 18–30-year-olds living in the UK. Media coverage referencing the study remains; the sampling found male users spend 85 minutes every day on dating apps, while averaging 9.7 minutes per session, while women spend 79 and 7.9 respectively.[6] Users spend over 10 hours a week on dating apps. Match also has access to internal user data that demonstrates the compulsive use for which the Platforms were secretly designed.

12.     ***Third,*** **users are harmed by Match's predatory business model when they are coerced into purchasing a subscription to further enable compulsive use, thereby exacerbating a vicious cycle of addiction reinforcement.** Addiction itself is a physical manifestation of Plaintiffs' injury, but it is not the only end goal for Match. Match, consistent with their business model, seeks to monetize Plaintiffs' and the putative class's inability to disengage from the platforms by inserting artificial usage bottlenecks. Once addiction has been achieved, Plaintiffs are motivated to break through manipulatively designed bottlenecks, and they have to pay to keep playing the "game." Users are incentivized to take advantage of the "benefits" included in their subscriptions; for example, they are spurred to "like" more than 100 profiles a day on Tinder.

13.     Additional second-order consequences of Match's scheme manifest as a result of compulsive use: upward social comparisons, decreased self-esteem, dissatisfaction with current relationships, and feelings of loneliness and depression. These results are all at odds with Match's marketing promises.

14.     ***Fourth,*** **Match misrepresents the Platforms as effective tools for establishing and sustaining off-app relationships, when they are designed to coerce subscriptions and retain users forever with dangerously addictive yet undisclosed product features.** Platform users are in search of off-app relationships, while Match is in the business of retaining subscribers. Fundamentally at odds, Match markets the Platforms and their attendant subscription offerings misleadingly, concealing the known, intended, and dangerous design features which leave users

---

[6] Jack Peat, *Millennials 'Spend 10 Hours a Week on Dating Apps,'* THE INDEPENDENT (Jan. 23, 2018), https://www.independent.co.uk/life-style/dating-apps-millenials-10-hours-per-week-tinder-bumble-romance-love-a8174006.html (Last visited February 14, 2024)

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

addicted to the Platform. Users seeking to escape the Platforms by finding partnership are assured that their chances will improve with a subscription. But all they receive is more of the same addictive features that serve only to further entrench users in the app while lining Match's pockets with profits unjustly earned based on materially false promises and omissions.

15.     Users invest their time and money into the Platform, in reliance on Match's promises that the light at the end of the tunnel will be a sustainable relationship and, crucially, freedom from the Platform. Users further rely on Match's expertise as matchmakers to buy into Match's representations that subscriptions, alongside compulsive use, will improve their chances of freeing themselves from the Platforms. Hence the Platform's false marketing promise: "Designed to be Deleted." Users' continually growing financial investment plays further into Match's scheme: users will be disinclined to disengage to justify their prior financial investment, especially together with the emotional investment, which Match secured through deliberate psychological manipulation and addictive Platform design.

16.     ***Fifth,* Match continues to knowingly market an unreasonably dangerous product while failing to warn users of the risks of addiction and compulsive use, and despite these known risks, continues to claim that the Platforms are effective tools for establishing off-app relationships while implementing features to keep users on the app.** Despite the stark disconnect between Match's intent, business model, and design features and consumers' reliance on Match's representations and Material Omission, Match continues to market and advertise the Platforms as effective tools for establishing off-app relationships, endorsing the view that one day users will be free from the Platforms, and Match does so without adequate warning or qualification.

17.     Accordingly, Plaintiffs seek to hold Match accountable for their violations of consumer protection and products liability statutes, breaches of warranties, and deception. Match chose to market and advertise the Platforms to users seeking off-app relationships while simultaneously inuring their users to compulsive use, eroding their ability to self-regulate and disengage, and ultimately fomenting addiction to unlawfully extract continued monetary investment from users.

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

18. **Primary Dual Objectives**. Plaintiffs bring this action individually and on behalf of those similarly situated who purchased the Platform subscriptions during the relevant Class Period (Class defined *infra*), for dual primary objectives: *One*, Plaintiffs seek, on their behalf and on behalf of the Class, injunctive relief to stop Match's unlawful development, marketing, and sale of the Platform subscriptions as described herein to avoid or mitigate the risk of deceiving the public into believing the Platforms are designed and fit for their particular purpose, by requiring that Match change its business practices, which may include one or more of the following: provide adequate warning that the Platforms are prone to compulsive use and are designed to be addictive, discontinuation of falsely marketed unlimited use subscription plans designed only to foment addiction, or providing additional resources to encourage informed choice and healthy use. *Two*, Plaintiffs seek on their behalf and on behalf of the Class, monetary recovery of the premium consumers paid for the Platforms due to the false and deceptive marketing and advertising, consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted).

## II.   JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Section 1332, because: (i) the Class consists of 100 or more members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) minimal diversity exists because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

20. Venue is proper in this District under 28 U.S.C. Section 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims occur in this District. Defendant markets and sells the Platforms in this District, Defendant gains substantial revenue and profits from doing business in this District, and consumers pay Defendant in this District.

21. Defendant is subject to personal jurisdiction in California based upon sufficient minimum contacts that exist between Defendant and California. Defendant is authorized to do and is doing business in California, and Defendant advertises and solicits business in California.

CLASS ACTION COMPLAINT

Defendant has purposefully availed itself of the protections of California law and should reasonably expect to defend itself in court in California for harm arising out of its pervasive contacts with California.

### III.  **PARTIES**

22.  **Plaintiff Burak Oksayan.** The following is alleged based upon Plaintiff Oksayan's personal knowledge:

    a.  **Residence**. Plaintiff is, and at all relevant times was, a resident of California residing in the county of San Francisco.

    b.  **Purchase Details and Background Information.** Plaintiff purchased a Tinder Gold monthly membership on September 17, 2023 for $19.99 and a Tinder Platinum weekly membership on November 16, 2023 for $24.99. All of Plaintiff's purchases were made in California within the last two years.

23.  **Plaintiff Jack Kessler.** The following is alleged based upon Plaintiff Kessler's personal knowledge:

    a.  **Residence**. Plaintiff is, and at all relevant times was, a resident of California residing in the county of Los Angeles.

    b.  **Purchase Details and Background Information**. Plaintiff purchased a Hinge Quarterly Subscription on February 23, 2023, which he renewed on August 23, 2023 and November 23, 2023 for $59.99 per quarter. Plaintiff further purchased a one month subscription to Tinder Platinum on March 4, 2023 for $19.99, renewed at the lower Tinder Gold tier on May 7, 2023 for $14.99 and downgraded his subscription to Tinder Plus on July 12, 2023 for $9.99. All of Plaintiff's purchases were made in California within the last two years.

24.  **Plaintiff Andrew St. George.** The following is alleged based upon Plaintiff St. George's personal knowledge:

    a.  **Residence**. Plaintiff at all relevant times was a resident of California residing in the county of Los Angeles.

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

b. **Purchase Details and Background Information**. Plaintiff purchased several "roses" through Defendant's Hinge Platform for $3.99 per unit from September 2022 to May 2023. All of Plaintiff's purchases were made in California within the last two years.

25. **Plaintiff Jami Kandel.** The following is alleged based upon Plaintiff Kandel's personal knowledge:

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of New York residing in the county of New York.

b. **Purchase Details and Background Information**. Plaintiff purchased Tinder, Hinge, and The League monthly and/or quarterly subscriptions several times within the last two years. All of Plaintiff's purchases were made in New York within the last two years.

26. **Plaintiff Bradford Schlosser.** The following is alleged based upon Plaintiff Schlosser's personal knowledge:

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of Georgia residing in the county of Fulton.

b. **Purchase Details and Background Information**. Plaintiff purchased a Hinge Preferred Membership for $35 per month on December 18, 2022, and upgraded his subscription to a $50 per month version on October 14, 2023. Plaintiff Schlosser also purchased a one-month premium subscription to Tinder for $12.49 on October 26, 2022. All of Plaintiff's purchases were made in Georgia within the last two years.

27. **Plaintiff Andrew Karz.** The following is alleged based upon Plaintiff Karz's personal knowledge:

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of Florida residing in the county of Pinellas.

b. **Purchase Details and Background Information**. Plaintiff purchased a Tinder premium subscription for $14.99 per month on January 17, 2023 which he upgraded to a higher tier, paying $24.99 per month on February 24, 2023. Plaintiff held the $24.99 per month subscriptions from February 2023 to June 30, 2023. Plaintiff again

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

CLASS ACTION COMPLAINT

purchased a subscription on sale, for $18.98 on November 15, 2023, then held the subscriptions and was charged the same price on November 24, 2023 and December 1, 2023. All of Plaintiff's purchases were made in Florida within the last two years.

28.    **Reliance**. In making their purchases, Plaintiffs relied on Defendant's marketing and advertising claims, that the Platforms are effective tools for establishing off-app relationships and do not carry with them substantial risk of addiction. Further, Plaintiffs relied on Defendant's marketing and advertising claims as to their Platform subscriptions, namely that the subscriptions would increase their chances of establishing off-app relationships and, as such, improve the probability that they would be freed from the Platforms.

29.    **Causation/Damages**. Plaintiffs would not have purchased the Platform subscriptions, would not have paid as much for them, or would have engaged with the Platforms responsibility, had they known of the Platforms' inherent and intended risks of fomenting addiction and compulsive use.

30.    **Causation, Failure to Warn.** Further, Plaintiffs' compulsive use would not have been formed had they been armed with requisite awareness and knowledge of how to engage with the Platforms responsibly and had they been told the Platforms were designed to be addictive. As such, Defendant's failure to warn is the but-for cause of Plaintiff and the putative class's harms.

31.    **Desire to Repurchase**. Plaintiffs continue to see the Platform subscriptions available for purchase and would like to be able to purchase them again in the future, but only if they could be sure the Platforms were compliant with state and federal consumer protection and products liability laws—for example, if they were in fact designed to be deleted as advertised and not designed to be addictive as hidden from consumers.

32.    **Lack of Personal Knowledge and Expertise**. Plaintiffs are not personally familiar with, and do not possess any specialized knowledge skill, experience, or education, in the development of dating apps. Therefore, plaintiffs have no way of determining whether the Platforms can safely provide the advertised benefit of establishing off-app relationships, without attendant consequences of falling into addictive use, and without Defendant's pernicious efforts to addict users to the Platforms.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

33.   **Inability to Rely**. Plaintiffs are, and continue to be, unable to rely on the Platforms' representations, statements, or function as they are advertised.

34.   **Plaintiffs' Future Harm**. Defendant continues to market and sell the Platforms as safe and effective matchmaking tools. Plaintiffs want to purchase Platform subscriptions in the future if they can be sure the Platforms can safely provide the advertised benefits. However, Plaintiffs are average consumers who are not sophisticated in, for example, non-addictive and effective app features or algorithm development, and Plaintiffs cannot determine if the Platform subscriptions can achieve their advertised benefits. Since Plaintiffs would like to purchase the Platform subscriptions again—even though the Platforms currently cannot safely achieve the advertised benefits—Plaintiffs would likely and reasonably, but incorrectly, assume that the Platforms have introduced adequate warning or resources, or have reformulated features once designed to addict. Accordingly, Plaintiffs are at risk of reasonably, but incorrectly, assuming Defendant has fixed the Platforms such that Plaintiffs may buy them again, believing they can be used safely, armed with full knowledge of the Platforms' addictive features, and used effectively, so that the Platforms are truly "designed to be deleted." In this regard, Plaintiffs are currently and, in the future, deprived of the ability to rely on the Platforms' advertising and marketing. However, an injunction prohibiting use of the misleading representations unless true would enable Plaintiffs to rely confidently on the Platforms' advertising and marketing in making their future purchase decisions.

35.   **Defendant MatchGroup, Inc.** is a public corporation incorporated in Delaware with US headquarters in Dallas, Texas. Defendant, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the state of California. Defendant is the owner, manufacturer, and/or distributor of the Platforms, and is a company that created and/or authorized the false, misleading, and deceptive marketing and advertising for the Platforms. Defendant and its agents manufactured, advertised, marketed, and sold the Platforms at issue nationwide and in this judicial district. The unfair, unlawful, deceptive, and misleading false advertising claims regarding the Platforms were prepared, authorized, ratified, and/or approved by Defendant and its agents, and, accordingly, disseminated throughout the state of California and

10
CLASS ACTION COMPLAINT

nationwide by Defendant and its agents to deceive and mislead consumers into purchasing the Platforms.

36.     Defendant and its agents designed, developed, and incorporated all dangerous product features present in the Platforms which are available for download and thereby disseminated throughout the state of California and nationwide. Defendant and its agents exercised complete control over whether warnings or instructions are provided to users.

37.     Defendant manufactures and markets the following Platforms, whose dangers and misrepresentations give rise to this action: Tinder, Hinge, the League.

## IV.   FACTUAL ALLEGATIONS

### A.   Background on Dating Platforms

38.     **History of Online Dating**.   New technologies have always been employed in matchmaking. Early computing power was harnessed to form partnerships at Stanford in 1959, and the dawn of the internet ushered in the first modern dating website in 1994.[7] Defendant was an early pioneer, launching its namesake Match.com in 1995,[8] when only 25 million people in the United States were internet users.[9]

39.     **Dating Apps.** Born from the inexorable tide of technological advancement, smartphones enabled internet access in a compact portable device. Dating algorithms were no longer confined to web browsers; now everyone could access matchmaking services from anywhere, at any time. In 2007, MeetMoi launched as the first location-based dating application.[10] Just five years later, Defendant, already a powerful player in the matchmaking arena, launched Tinder and Hinge.

40.     Dating apps differ from dating websites in several ways. Primarily, they enable perpetual use, since cellphones are always on users' person, they facilitate unbounded engagement

---

[7] Morgan, A., Hussain, L., & Capestany, C. (2019, March 13). *Watch A Brief History of Online Dating*. BLOOMBERG. https://www.bloomberg.com/news/videos/2019-03-13/a-brief-history-of-online-dating-video (Last visited February 14, 2024).
[8] *Timeline: How Match.com Got Where it Is*. (2010, February 12). FOX BUSINESS. https://www.foxbusiness.com/features/timeline-how-match-com-got-where-it-is (Last visited February 14, 2024).
[9] *The rather petite Internet of 1995*. (2011, March 31). PINGDOM. https://www.pingdom.com/blog/internet-1995/ (Last visited February 14, 2024).
[10] *MeetMoi Location Based Dating*. (2012, October 24). BUSINESS INSIDER. https://www.businessinsider.com/meetmoi-location-based-dating-2012-10 (Last visited February 14, 2024).

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

relative to websites which require intentional visits through a web browser. They also differ in content presentation. While dating sites display several matches at once, leaning into the intentionality of browsing for a limited time by presenting many potential matches to choose from, dating apps show users one user at a time. Dating apps are unbounded, always displaying matches or potential matches, a never-ending game.

41.    Today, dating apps are omnipresent. In 2016, 15% of Americans reported that they have used online matchmaking services, both mobile and browser-based.[11] In 2023, dating apps alone are used by 20% of American adults, according to Statista.[12] Defendant's Platforms account for the lion's share of downloads, with Tinder and Hinge being the 6th and 18th highest grossing applications on the Apple App Store.[13]

**B.    Match's Business Model Ensures that Addiction Increases Earnings**

42.    **Monetizing Romance.** The Platforms' business model is predicated on their ability to turn non-paying users into paying customers. Defendant has ensured that the success of their company is wholly reliant on *direct revenue*; end users purchase subscriptions to the Platforms, accounting for 98% of Defendant's total revenue.[14]

43.    As indicated in a letter to investors, revenue growth is driven by "tailwind[s] from U.S. pricing optimizations and weekly subscription packages."[15] In the same letter, Defendant CEO Bernard Kim explicitly stated that "Tinder's goal [in 2023] was to reach double-digit Direct

[11] Smith, A. (2016, February 11). *15% of American adults use online dating sites or mobile apps*. PEW RESEARCH CENTER. https://www.pewresearch.org/internet/2016/02/11/15-percent-of-american-adults-have-used-online-dating-sites-or-mobile-dating-apps/ (Last visited February 14, 2024).
[12] Dixon, S. J. (2022, April 28). *U.S. smartphone dating app users 2023*. STATISTA. https://www.statista.com/statistics/274144/smartphone-dating-app-users-usa/ (Last visited February 14, 2024).
[13] *Top Charts*. (2017, November 9). SENSOR TOWER. https://app.sensortower.com/top-charts?category=0&country=US&date=2024-02-10&device=iphone&os=ios (Last visited February 14, 2024).
[14] BamSEC. (2023, November 2). *United States Securities and Exchange Commission*. U.S. SECURITIES AND EXCHANGE COMMISSION. https://www.bamsec.com/filing/89110323000114?cik=891103 (Last visited February 14, 2024).
[15] BamSEC. (2023, October 31). *MatchGroup Letter to Shareholders.* U.S. SECURITIES AND EXCHANGE COMMISSION. https://www.bamsec.com/filing/89110323000109?cik=891103 (Last visited February 14, 2024).

Revenue growth by Q4." Defendant achieved this in Q3. Below is a true and accurate table provided in Defendant's Form 10-Q filing, dated November 2, 2023:

| Percentage of Total Revenue: | |
|---|---|
| Direct Revenue: | |
| Americas | 52% |
| Europe | 28% |
| APAC and Other | 18% |
| Total Direct Revenue | 98% |
| Indirect Revenue | 2% |
| Total Revenue | 100% |

44.     Convincing users to purchase ongoing subscriptions for an app supposedly "designed to be deleted" is an onerous task, but one which Defendant must overcome to generate revenue. New downloaders are not guaranteed, and users who in theory might "succeed" on the Platforms could be expected, but for Defendant's manipulation, to delete the Platforms in favor of nascent off-app relationships. As such, Defendant must consistently deliver addictive product features to retain subscribers and stay in business, in lieu of building an app "designed to be deleted." In fact, Defendant has *increased their total revenue despite a decrease in downloads* over FY 2023.[16] Attracting new users with an effective product has proven to be less profitable than turning existing users into addicts.

**C.     Match has Developed Psychologically Manipulative Product Features to Foment Addiction**

45.     **Psychological Manipulation.**  The Platforms utilize three distinct product features to ensure users become addicted and purchase subscriptions: the Platforms' (1) **Content Presentation Format** has "gamified" romance to manipulate dopamine response by introducing intermittent variable rewards, (2) **Push Notifications** prey on users' fear of missing out on any potential matches with a strategic notification system designed to capture and retain attention at any time of the day, and (3) **Incentive Rewards** which punish users from disengaging and reward compulsive users.

---

[16] BamSEC. (2023, November 2). *United States Securities and Exchange Commission*. U.S. SECURITIES AND EXCHANGE COMMISSION. https://www.bamsec.com/filing/89110323000114?cik=891103 (Last visited February 14, 2024).

CLASS ACTION COMPLAINT

46.   **Content Presentation Format**. Intermittent variable rewards ("IVR") are a reinforcement schedule where unpredictability governs. Psychologist B.F. Skinner first put a name to the phenomenon that uncertain rewards trigger stronger psychological responses than expected, consistent ones. Skinner found that variable reinforcement produced the "slowest rate of extinction" compared to all other forms of psychological conditioning.[17]

47.   Jonathan Badeen, a Tinder co-founder, Defendant's Chief Science Officer, and inventor of the "swipe mechanic," admitted to journalist Nancy Jo Sales that he was "inspired" by Skinner's 1948 experiment where he "turned pigeons into gamblers" by introducing IVR to the birds' feeding schedule.[18] In this rare moment of candor, one of Defendant's chief officers laid the truth, as Match sees it, bare: just as pigeons can be conditioned to peck at determinable intervals, so can users be conditioned to endlessly swipe. Match thus centered the addictive design of all the Platforms around this psychologically manipulative experiment.

48.   The Platforms present potential matches one at a time. Users do not know what the next profile will bring, whether it will be better than the one they are currently viewing. There is also no telling which profiles will match back, doubling the incentive to view and engage with as many profiles as possible.

49.   By ensuring that users do not "swipe right" (the method of selection on the Platforms) on each profile, and because not every positive swipe leads to a match, Platform users receive a jackpot, matches with a sought-after profile, at irregular intervals. As one gambling blogger put it, explaining dating app addiction, "the promise that the next person will the 'the one,' or even just the promise of something even better, is similar to the next reel on the slots bringing you the big (or even bigger) jackpot."[19]

---

[17] Mcleod, S. (2024, February 2). *Operant Conditioning In Psychology: B.F. Skinner Theory*. SIMPLY PSYCHOLOGY. https://www.simplypsychology.org/operant-conditioning.html (Last visited February 14, 2024).
[18] Johnson, E. (2018, September 19). *Swiping on Tinder is addictive. That's partly because it was inspired by an experiment that 'turned pigeons into gamblers.'* VOX. https://www.vox.com/2018/9/19/17877004/nancy-jo-sales-swiped-hbo-documentary-tinder-dating-app-addictive-pigeon-kara-swisher-decode-podcast (Last visited, February 14, 2024).
[19] Keaton, B. (2020, February 12). *The Real Reasons You're Addicted To Your Dating Apps*. CASINO.ORG https://www.casino.org/blog/how-dating-apps-copied-slots/ (Last visited February 14, 2024).

14

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

50.     This purposely designed irregularity of rewards makes the Platforms addicting, eroding users' ability to self-regulate and disengage, as they chase the high that each profile view and attendant potential match may bring. It is fundamental at odds with the marketing promise "Designed to be Deleted."

51.     **Push Notifications.** All push notifications are powerful psychological triggers. These notifications are "pushed" when they are delivered as the recipient is not actively using the platform. Airship, a consulting and software-as-a-service firm which works with mobile apps, counts push notifications as the primary force generating 3.5x revenue from mobile app users compared to loyal customers on other platforms.[20]

52.     Push notifications allow Defendant to draw users back onto the Platforms at any time of the day, recalling them back to the platform in the event they can successfully extract themselves. Defendant invests in push notification copy, framing their notifications to maximize the chance that users open the app. One marketing blogger was particularly fond of this notification:[21]



● Tinder • 2m ⌄

**Tinder**
It's a crime to deprive the world of that beautiful face.....

53.     The above pictured notification prompted users to add more photos to their profile, generating more engagement and feeding into Defendant's overall strategy of eliciting investment into the Platforms. By flattering its userbase, Defendant imparts confidence; users believe that partnership will be forthcoming, if only they spend more time on the Platforms. Thus, this is yet another purposeful design feature at direct odds with the marketing promise: "Designed to be Deleted."

---

[20] *How to Master Mobile App Experiences,* (2022, July 14). AIRSHIP. https://grow.urbanairship.com/rs/313-QPJ-195/images/app-experience-platform-pov-booklet-en.pdf (Last visited February 14, 2024).
[21] Lam, W. (2020, May 22). *Tinder sends push notifications with prompts to update your profile with clever copy*. TAPLYTICS. https://taplytics.com/blog/tinder-sends-push-notifications-with-prompts-to-update-your-profile-with-clever-copy/ (Last visited February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

54.     In fact, Hinge has their own notification system which purportedly eliminates "ghosting" (failure to respond to a message from another user) but contributes to the incessant pulling of users back to the Platform. Hinge has dubbed this "Your Turn," which guilt-trips users into opening the app when they are disengaged because someone is waiting for them to respond.[22]

55.     Defendant knows that push notifications are powerful, and actively discourages users from disabling push notifications on Hinge, much less ever delete altogether the so-called designed-to-be-deleted app. Below is a true and correct screenshot of Hinge's "Account Setup" process when users elect to not receive push notifications:



56.     Defendant does not publicly itemize total expenses to note the amount spent on push notification copy.[23] However, upon information and belief, Defendant allocates substantial resources towards crafting push notifications with the intent to lure users back onto the Platforms.

---

[22] Middleton, A., & Mohta, A. (2020, May 21). *What Does the "Your Turn" Notification in Hinge Mean?* TECH JUNKIE. https://social.techjunkie.com/hinge-your-turn-notification/ (Last visited February 14, 2024).

[23] *See*, Defendant's FY 2022 10-K filing, which does not list notification copy or any development costs in itemized form: BamSEC. (2023, February 24). *United States Securities and Exchange Commission*. U.S. SECURITIES AND EXCHANGE COMMISSION. https://www.bamsec.com/filing/89110323000013?cik=891103 (Last visited February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Even when users are disengaged, Defendant actively hunts its users down, including those who might otherwise find satisfaction in their off-app relationships and delete the app, as Match supposedly intends.

57.    **Incentive Rewards**. Further underscoring Match's false marketing promises, it punishes users for disengaging and, on the other hand, it rewards compulsive use with zero regard for the health risks it knows and intends to materialize as a result. On Tinder, users will be tagged as "Top Picks," receiving a boost in the algorithm presenting them to other users. The designation is granted in part to "people who've been on Tinder recently," and this boost, "refresh[es] every 24 hours,"[24] Users who seek a boosted designation must be active every 24 hours, or they risk being left out of the premier match pool.

58.    Conversely, disengaging is punished. Working in tandem with coercive push notifications, Tinder makes sure its users are aware that their profiles will be removed from the potential match pool if they do not remain committed to the Platform:[25]



59.    The same blogger who touted the "beautiful face" notification also praised the above. In his words, "baked into the copy of this push notification is the fear of missing out. What if 'the one' is on there waiting for you, just a swipe away?"[26] This is the exact sentiment the Platforms are trying to invoke: users must re-engage for fear of missing out on the jackpot.

---

[24] Tinder FAQ, *Top Picks – Tinder*, TINDER. https://www.help.tinder.com/hc/en-us/articles/360005039092-Top-Picks (Last visited February 14, 2024).

[25] Lam, W. (2020, May 19). *Tinder sends a push notification to warn users their profile will be hidden if they don't engage*. TAPLYTICS. https://taplytics.com/blog/tinder-sends-a-push-notification-to-warn-users-their-profile-will-be-hidden-if-they-dont-engage/ (Last visited February 14, 2024).

[26] *Id.*

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

60.    **Addiction to the Platforms**. Defendant's product features elicit their desired effect: users are unable to turn away from the Platforms. One of only two publicly released studies by a matchmaking platform was published by Badoo, a competitor of Defendant's Platforms primarily operating in Europe and South America. The initial publication has since been removed from Badoo's website, which looked at 5,000 18–30-year-olds living in the UK. Media coverage referencing the study remains; the sampling found male users spend 85 minutes *every day* on dating apps, while averaging 9.7 minutes per session, while women spend 79 and 7.9 respectively.[27]

61.    In response to Badoo's study, Dr. Jess Carbino, a former in-house sociologist employed by Defendant, cautioned users to spend "15 minutes in the morning and 15 minutes at night" on dating platforms.[28] But despite Defendant's own sociologist's warnings, Match designed the Platforms with psychologically manipulative features that all but guarantee engagement with the Platforms for over an hour a day and in most cases much more. Defendant's internal studies will further demonstrate the addiction epidemic Match is knowingly and intentionally perpetuating while falsely promising otherwise.

62.    A survey conducted by eHarmony found that a shocking "nine in ten singles (90%) believe they are 'addicted' to dating apps," that "half (48%) [of users] admit to checking their apps last thing before going to bed and two-fifths (39%) check their apps against first thing when they wake up," and, "nearly a third (28%) confess to checking [dating apps] at work… and 12% have even checked dating apps while on a date."[29] Due to Match's intentionally manipulative and addictive design features, no waking hour is safe from the allure of the Platforms, as underscored by users' incessant need to keep swiping. Platforms "Designed to be Deleted" are instead designed to be addictive.

---

[27] Peat, J. (2018, January 23) *Millennials 'Spend 10 Hours a Week on Dating Apps,'* THE INDEPENDENT. https://www.independent.co.uk/life-style/dating-apps-millenials-10-hours-per-week-tinder-bumble-romance-love-a8174006.html (Last visited February 9, 2024)

[28] Lebowitz, S. and Walker, T. B. (2020, May 15) *A Scientist Who's Worked at Tinder and Bumble Shares How much Time to Spend on Dating Apps to find a Match and Avoid Wasting Your Energy*, BUSINESS INSIDER. https://www.businessinsider.com/tinder-bumble-scientist-time-spent-on-dating-apps-2018-5 (Last visited, February 14, 2024)

[29] eHarmony Editorial Team (Feb. 6, 2023), *Why Singles are 'Addicted' to Dating Apps*, EHARMONY. https://www.eharmony.co.uk/labs/app-dicted-to-love/ (Last visited, February 14, 2024).

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

D.    **Users are Coerced into Purchasing Subscriptions to Further Drive Compulsive Use**

63.    **Subscription Models.** Defendant profits off users' addiction by injecting artificial barriers to use. Tinder has an undefined like limit,[30] while Hinge allows a paltry 8 likes per day.[31] Tinder uses an algorithm to determine the number of likes given to a user, which is dependent on a variety of factors including gender expression and likes received, with more free likes granted to women then to men. The Tinder like limit is part of the Platforms' backend algorithm, and crucially, there *is always a limit which can be overcome by purchasing a subscription*.

64.    Defendant's Platforms (Tinder, Hinge, and The League) offer premium subscriptions to boost a user's profile so it will be favored by the algorithm and to unlock unlimited likes. Users purchase these subscriptions relying on Defendant's representations that the Platforms are designed to foster off-app relationships (not knowing the Platforms are designed to be addictive) and to seek unlimited usage to feed the addiction Defendant intentionally inflicted on them. This in turn further feeds the addiction, enabling Defendant to sell ever-increasingly expensive subscriptions.

65.    Below are true and correct screenshots taken from Defendant's Platforms, Tinder, Hinge, and The League, evidencing Defendant's offered tiers:

---

[30] *How many likes you can send on Tinder? ( Latest 2024 Guide).* (2023, September 23). DATEREVIEW.IO. https://blog.datereview.io/how-many-likes-you-can-send-on-tinder-latest-2023-guide/ (Last visited February 14, 2024).
[31] *How many likes can I send per day and when do they reset?* HINGE. https://hingeapp.zendesk.com/hc/en-us/articles/360036144774-How-many-likes-can-I-send-per-day-and-when-do-they-reset (Last visited February 14, 2024).

19

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28




CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com



**E.** **Match Misrepresents the Platforms as Safe and Effective Tools to Facilitate Off-App Relationships While Implementing Features Designed to Hold Users on the Platforms**

66.    **Challenged Representations.** Defendant trades on users' desire to establish and sustain off-app relationships while employing psychologically manipulative features to ensure they remain on the app perpetually as paying subscribers. To increase profits and gain an unfair advantage over its lawfully acting competitors, Defendant falsely and misleadingly markets, advertises, labels, and packages the Platforms with the Challenged Representations:

**Design/Purpose.** The Platforms are matchmaking services, which, by their very nature, convey to users that they were designed to facilitate off-app relationships.

**Tinder Challenged Representation**. Tinder's slogan, taken from their virtual app store homepage, states Tinder's purpose as "Match, Chat, and Date," conveying to users that the app is designed to effectively service users' desire to eventually "Date" off-app.

**Hinge Challenged Representation**. Hinge's marketing promise, taken from their virtual app store homepage, states that Hinge was, "Designed to be Deleted," conveying to users that the app is designed to effectively service users' desire to eventually "Delete" the platform, replacing it with an off-app relationship.

**The League Challenged Representation**. The League's slogan, taken from their virtual app store homepage, states The League's purpose as, "Meet & Date Ambitious People," conveying to users that the app is designed to effectively service users' desire to eventually "Date" off-app.

67.    **Tinder.** Pictured below is a true and correct example of the Tinder Challenged Representation seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[32]



68.    **Deception of the Tinder Challenged Representation.** Defendant represents that Tinder will enable users to "Meet & Date," fostering relationships off-app, while designing and implementing features, as outlined herein, with the express intent to drive compulsive use and keep users on the app.

---

[32] App Store Preview, *Tinder: Dating, Chat & Friends*. APPLE.
https://apps.apple.com/us/app/tinder-dating-chat-friends/id547702041 (Last visited, February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

69.     **The League**. Pictured below is a true and correct example of The League Challenged Representation seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[33]



70.     **Deception of The League Challenged Representation.** Defendant represents that The League will enable users to "Meet & Date," fostering relationships off-app, while designing and implementing features, as outlined herein, with the express intent to drive compulsive use and keep users on the app.

//
//
//
//
//
//
//
//
//
//
//

---

[33] App Store Preview, *The League: Intelligent Dating*. APPLE. https://apps.apple.com/us/app/the-league-intelligent-dating/id893653132 (Last visited, February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

71.   **Hinge.** Pictured below are true and correct examples of the Hinge Challenged Representations seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[34]



HINGE, DESIGNED TO BE DELETED
Hinge is the dating app for people who want to get off of dating apps. With profiles that show your personality through text, photos, video, and voice, you have unique conversations that lead to great dates. And it's working. Currently, people on Hinge go on a date every three seconds. Additionally, in 2022, we were the fastest-growing dating app in the US, UK, and Canada.

HOW WE GET YOU OFF HINGE
When it comes to online dating, people are so busy matching that they're not actually connecting, in person, where it counts. Hinge is on a mission to change that. So we built an app that's designed to be deleted. Here's how:

72.   **Deception of the Hinge Challenged Representation.** Hinge was not "Designed to be Deleted," but rather designed to be addictive and optimize extraction of subscription costs from compulsive users by keeping them on the app.

---

[34] App Store Preview, *Hinge Dating App: Match & Date*. Apple. https://apps.apple.com/us/app/hinge-dating-app-match-date/id595287172 (Last visited, February 14, 2024).

CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

73.    **Material Omissions.** Defendant misleadingly and materially, on all relevant advertising including web pages and virtual application store materials, and in direct opposition to the Challenged Representations, omits that the Platforms were designed, developed and implemented with features intended to facilitate addiction and compulsive use, thereby keeping users on the Platforms.

74.    **Match had Exclusive Knowledge of Material Facts Not Known to Plaintiffs.** Defendant has actual knowledge that the Platforms' features foster a substantial risk of addiction and compulsive use, as Defendant intended that the Platforms hold users captive to procure subscriptions. Plaintiffs and the putative class, lacking expertise in dating app development, are unaware of Defendant's inexorable psychological manipulations which turn those seeking an off-app relationship into compulsive, paying users. Defendant has superior and exclusive knowledge regarding both the attendant risks of the Platform to facilitate addiction and compulsive use, and the machinations of Defendant's psychological manipulations.

75.    **The Challenged Representations and Material Omissions are Central to Platforms' Function.** Dating app users rely on Defendant's Challenged Representations, bolstered by the Material Omissions, that the Platforms are effective tools at establishing and sustaining off-app relationships. Defendant's Challenged Representations, including Tinder's "Match, Chat & Date," Hinge's "Designed to be Deleted," and The League's "Meet & Date Ambitious People," all feed into Plaintiffs' and Class members' goal to "Meet," and "Date" and ultimately "Delete." Plaintiffs and Class members purchase subscriptions with the misguided belief that Defendant has designed algorithms and systems to effectuate this goal. Had Plaintiffs and Class members shared Defendant's knowledge that the Platforms were traps, not designed to foster off app relationships, but designed to hold them as captive subscribers, they would not have purchased, or would have paid substantially less for, the Platform subscriptions.

F.    **Match Fails to Warn or Instruct Consumers that the Platforms Pose a Foreseeable Risk of Addiction**

76.    **Failure to Warn.** Defendant has failed to warn consumers that the Platforms pose a foreseeable risk of compulsive use and harmful addiction despite Defendant's intentional design

development and marketing which foment addiction and obfuscate risk of harm. Further, Defendant fails to provide adequate instruction for responsible use of the Platforms, choosing instead to conceal this information because its business model depends on and benefits from the compulsive use for which it in fact designed the Platforms. At all relevant times, Defendant had a duty to disclose the risks associated with Platform use, especially because it knowingly designed the Platforms to realize these risks.

77.    **Material Omission**. Furthermore, Defendant's failure to warn manifests doubly as a fact concealed to boost profits. Users are coerced into purchasing Platform subscriptions to unlock unlimited use, not realizing that the Platforms carry a substantial risk of fomenting addiction. At all relevant times, Defendant had a duty to disclose the risks associated with Platform use.

78.    **Injury.** Users suffer proximate harm from Defendant's false representations, material omissions, and failure to warn by becoming addicted to the Platforms, impacting their everyday wellbeing and mental health, and by being coerced and manipulated financially into purchasing subscriptions to chase the purposely elusive high of receiving a match and to unlock unlimited access which serves only to further the compulsive use.

79.    **Harms to Mental Health.** Addiction in any form is harmful, but there are second order impacts of excessive Platform use directly catalyzed by Defendant's failure to warn. A study in 2020 found that excessive use increases likelihood of "ghosting" or "breadcrumbing," phenomenon born from dating apps whereby users are ignored or sent meaningless, non-committal messages to keep matches engaged while failing to build relationships.[35] Users with unlimited swipes will chase the elusive high of matching, match more often, and fall victim to ghosting and breadcrumbing at higher rates. The study found that this would "significantly increase the likelihood of experiencing less satisfaction with life, and of having more feelings of loneliness and helplessness."[36]

//

---

[35] Navarro, R., Larrañaga, E., Yubero, S., & Víllora, B. (2020). *Psychological Correlates of Ghosting and Breadcrumbing Experiences: A Preliminary Study among Adults*. INT'L. J. ENV. RES. AND PUB. HEALTH, *17*(3), 1116. https://doi.org/10.3390/ijerph17031116 (Last visited February 9, 2024).
[36] *Id*.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

80.     Another study, from March 2023, found several adverse correlates in excessive swiping, the very behavior Defendant invented and actively encourages with manipulative design features. The study found that first, all dating app use eventually blossomed into excessive swiping, which in turn, "linked to a) upward social comparison, b) fear of being single, and c) partner choice overload."[37] In each case, these phenomena are drastically exacerbated by addictive, compulsive use.

81.     Upward social comparison diminishes self-esteem by comparing oneself to perceived "superiors."[38] Mass availability of partner options also induces fear of being single, where users believe themselves deficient for their failure to form meaningful relationships despite the proverbial bounty available to them.[39] Rather than recognize the Platforms are designed to keep users on the app, not forming off-app relationships, users incorrectly blame themselves, furthering diminishing self-esteem.[40] Finally, users are confronted with self-doubt regarding the off-app relationships the Platforms are supposedly designed to foster: they are manipulated into feeling dissatisfied with their relationships with other options waiting and being actively "pushed" on the Platforms, introducing constant counterfactual thinking. This leaves users exactly where Defendant wants and leads them, asking themselves, "what if."[41]

82.     **Economic Injury.** Users are further deprived of their hard-earned money when they are coerced into purchasing subscriptions to unlock unlimited access and feed the addictive behavior that Defendant intentionally perpetuates.

//

---

[37] Thomas, M., et al., (2023*). 99+ Matches But A Spark Ain't One: Adverse Psychological Effects of Excessive Swiping on Dating Apps*. 78 TELEMATICS AND INFORMATICS. https://www.sciencedirect.com/science/article/pii/S0736585323000138 (Last visited February 14, 2024).

[38] Festinger, L. (1954). *A Theory of Social Comparison Processes*. 7(2) HUM. REL. 117–140. https://doi.org/10.1177/001872675400700202 (Last visited February 14, 2024).

[39] Thomas, M., et al., (2022). *The agony of partner choice: The effect of excessive partner availability on fear of being single, self-esteem, and partner choice overload*. COMPUTERS IN HUMAN BEHAVIOR. https://doi.org/10.1016/j.chb.2021.106977 (Last visited February 14, 2024).

[40] Spielmann, S. S., MacDonald, G., Maxwell, J. A., Joel, S., Peragine, D., Muise, A., & Impett, E. A. (2013). *Settling for less out of fear of being single*. 105(6) J. PERS. SOC. PSYCH. 1049–1073. https://doi.org/10.1037/a0034628 (Last visited February 14, 2024).

[41] Schwartz, B. (2000). *Self-determination: The tyranny of freedom*. 55(1) AM. PSYCH. 79–88. https://doi.org/10.1037/0003-066X.55.1.79 (Last visited February 14, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

### G.   Plaintiffs and Reasonable Users Were Misled by the Challenged Representations

83.   **Advertising and Marketing Misrepresentation of the Platforms**. Defendants manufacture, market, advertise, and sell Platform subscriptions as effective tools to improve users' chances at finding off-app relationships.

84.   Consumers reasonably understand these statements to mean the Platforms are intentionally designed to foster off-app relationships, when in reality they are designed to addict users, drive compulsive use, and procure subscriptions at ever-increasing levels (and prices).

85.   Like Plaintiffs, other consumers have been misled by the Platforms' Challenged Representations. Below are true and correct screenshots of some consumer reviews of the Platforms:[42]



★☆☆☆☆

**J. S.**  Meridian, ID

Tinder was not a positive experience. I felt the app is addictive and unfair based on how much is paid

4 years ago



★☆☆☆☆   February 6, 2024

It's been about two years since I've used it but the experience has significantly gotten worse. There's more options but it's all so monetized and paywalled that it just feels like it there's no point using it. They're motto is that it's the dating app made to be deleted and right now it's pretty true but in the wrong ways. It's designed to keep you on as long as possible to get you to buy the subscription. I'd say don't bother or get off the app before you're sucked in.



[–] LycanZo  6 points 1 year ago

damn I feel guilty of the Hinge addiction syndrome you described here... I just cant let go of the fact that there might be someone behind the next swipe. Ive only ever paid for one month of tinder plus in my life(6bucks I think) and Ive been on the apps for 5+ years... Thanks for the wake up call. yea its "your fault" for getting addicted but dating apps work as a whole to ensure you get addicted. Pretty similar to casino imo, people who have low self control are very vulnerable

permalink  embed  save  report

---

[42] *Tinder Reviews*, Trust Pilot (Jan. 28, 2024), https://www.trustpilot.com/review/tinder.com?stars=1; *Tinder Reviews*, BestCompany (2020), https://bestcompany.com/online-dating/company/tinder?review_filter=1#reviews; *Getting Hinge Premium Unmasked the Fact That I Was Addicted to Dating Apps*, Reddit (2023), https://www.reddit.com/r/dating/comments/xswsda/getting_hinge_premium_unmasked_the_fact_t hat_i/; *Hinge Dating App Reviews*, Google Play (Jan 21, 2024, Jan. 28, 2024, Feb. 6, 2024), https://play.google.com/store/apps/details?id=co.hinge.app&hl=en_US&gl=US&pli=1; *The League Reviews*, Trust Pilot (Apr. 9, 2023), https://www.trustpilot.com/review/theleague.com?stars=1.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

**★** ☆ ☆ ☆ ☆                                                    Jan 28, 2024

**Just a total money rinse**

Just a total money rinse. Full of fake profiles. Before you actually pay you'll get dozens of "likes" and messages that all instantly disappear when you subscribe. Pay for the Gold subscription but get absolutely nothing for the money. You have to upgrade to Platinum to interact...then there are "add-ons" and boosts, etc, that all cost extra. Never actually managed to interact directly with anyone despite my best efforts. Avoid at all costs

★★★ ☆ ☆    January 8, 2024

This app is the same as all the rest at the end of the day: keeping you on the hook for a membership to gain any exposure on the app whatsoever. The whole "made to be deleted" thing may have been the intention at first but it certainly doesn't function that way now. Perhaps the people who gravitate towards dating apps are the problem but the execution of this app could certainly be better. I imagine there are some great potential matches that are just lost in the fog of a non-premium membership.



**★** ★ ★ ★ ★    January 21, 2024

Designed to take your money, not to be deleted.

**★** ☆ ☆ ☆ ☆                                                    Apr 9, 2023

**Total scam**

Total scam. They try to suck money out of you at every turn. Disgusting abuse of peoples emotions.

86.    **Material**. The Challenged Representations and Omissions are material to reasonable consumers, including Plaintiffs, because they have the potential to influence consumers' decision to purchase the Platform subscriptions, as set forth herein. Plaintiffs would not have purchased the Platform subscriptions or would have paid significantly less for them if they had known that the Platform's advertising and marketing claims were false, misleading, and materially incomplete, that the Platforms were not designed to be effective or ever "deleted" but instead to foment addiction,

1   and that the Platform subscriptions are intended only to increase time spent on the Platforms and

2   further compulsive use, rather than decrease on-app time in favor of successfully building off-app

3   relationships as advertised.

4       87.   **Reliance.** Reasonable consumers, including Plaintiffs, reasonably rely on the

5   Platforms' Challenged Representations and Omissions in deciding to purchase the Platform

6   subscriptions.

7       88.   **Falsity.** The Platforms' Challenged Representations are false and deceptive because

8   the Platform subscriptions do not provide the advertised benefits.

9       89.   **Consumers Lack Knowledge of Deception/Fraudulence.** Consumers, including

10  Plaintiffs, who purchased the Platform subscriptions, did not know, and had no reason to know, at

11  the time of purchase, that the Platforms were incapable of providing the advertised benefits.

12      90.   **Defendant's Knowledge.** Defendants knew, or should have known, that their

13  Platforms' Challenged Representations were false, misleading, deceptive, and unlawful at the time

14  that Defendant manufactured, marketed, advertised, and sold the Platform subscriptions using the

15  Challenged Representations to Plaintiffs and the Class. Defendants intentionally and deliberately

16  used the Challenged Representations to cause Plaintiff and similarly situated consumers to purchase

17  the Platform subscriptions. Defendants, as manufacturers, have exclusive control over how the

18  Platforms were marketed and advertised, and Defendants readily and easily could have remedied

19  the deception by stopping the use of the Challenged Representations. Instead, Defendants

20  deliberately chose to market the Platforms with the Challenged Representations, thereby misleading

21  consumers into buying or overpaying for the Platform subscriptions. Thus, Defendants knew, or

22  should have known, at all relevant times, that the Challenged Representations mislead reasonable

23  consumers, such as Plaintiffs, into buying the Platform subscriptions to attain the product attributes

24  that Defendant falsely advertised and warranted.

25      91.   **Detriment.** Plaintiffs and similarly situated consumers would not have purchased the

26  Platform subscriptions if they had known the Platform subscriptions could not provide the

27  advertised benefits or would not have overpaid a price premium for the Platform subscriptions, if

28  they had known that the Challenged Representations were false claimed, promised, warranted,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

advertised, marketed, and represented. Accordingly, based on Defendants' material misrepresentations and omissions, reasonable consumers, including Plaintiffs, purchased the Platforms to their detriment.

## V.   CLASS ALLEGATIONS

92.   **Class Definition**. Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. The Classes Plaintiffs seeks to represent are defined as follows:

> All residents of the United States, within four years prior to the filing of this Complaint, purchased one or more of the Platform subscriptions (the "Nationwide Class").

> All residents of California who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "California Class")

> All residents of New York who, within three years prior to the filing of this Complaint, purchased a Platform subscription (the "New York Class")

> All residents of Georgia who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Georgia Class")

> All residents of Florida who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Florida Class")

93.   **Class Definition Exclusions**. Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any

1  judicial officer presiding over this matter and person within the third degree of consanguinity to

2  such judicial officer.

3      94.    **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserve the right to

4  amend or otherwise alter the class definition presented to the Court at the appropriate time in

5  response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

6      95.    **Numerosity.** The Class is so numerous that their individual joinder herein is

7  impracticable. On information and belief, members of the Class number in the thousands or

8  hundreds of thousands throughout California.   The precise number of Class members and their

9  identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class

10  members may be notified of the pendency of this action by mail and/or publication through the

11  distribution records of Defendants and third-party retailers and vendors.

12      96.    **Common Questions Predominate.** Common questions of fact and law predominate

13  over questions which may affect individual class members, including the following:

14      a.    Whether Defendant intentionally or knowingly designed addictive Platforms;

15      b.    Whether Defendant marketed the Platforms as safe and effective tools at facilitating

16  off-app relationships;

17      c.    What measures Defendant took to conceal the true nature, i.e., addictive qualities, of

18  the Platforms;

19      d.    Whether Defendant had a duty to disclose the risks associated with the Platforms, i.e.,

20  their risk of addiction;

21      e.    Whether Defendant misrepresented the Platform subscriptions as effective tools for

22  facilitating off-app relationships while encouraging perpetual use and not decreasing time spent on

23  the Platforms;

24      f.    Whether Defendant's conduct constitutes a breach of warranty;

25      g.    Whether Defendant was unjustly enriched by its deceptive conduct;

26      h.    Whether Plaintiff and the Class paid more money or a premium amount for the

27  Platform subscriptions than they actually received; and

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

i.       How much more money or premium amount Plaintiff and the Class paid for the Platform subscriptions than they actually received.

97.    **Typicality.** Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained competent and experienced counsel in class action and other complex litigation. Plaintiffs suffered damages as a direct and proximate result of the same wrongful practices in which Defendant engaged to harm the class.

98.    **Adequacy.** Plaintiffs are an adequate representative of the Class they seeks to represent because his interests do not conflict with the interests of the Class Members Plaintiffs seek to represent. Plaintiffs will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

99.    **Superiority and Substantial Benefit.** A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

100.    **Manageability.** The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

101.    **Injunctive/Equitable Relief.** Defendant has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

102.    **Inconsistent Rulings.** Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any,

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

103.  **Plaintiffs and the Class have suffered injury in fact and have lost money because of Defendant's false representations.** Plaintiffs and the Class purchased Platform subscriptions under the false belief that the Platform subscriptions could provide the advertised benefits. Plaintiffs and the Class relied upon Defendant's advertising and marketing claims and would not have purchased the Platform subscriptions or would have paid significantly less for them if they had known that the Platform subscriptions could not provide the advertised benefits.

104.  **Plaintiffs and the Class have suffered injury in fact and have lost money because of Defendant's failure to provide adequate warning or instruction for responsible use of the Platforms.** Plaintiffs and the Class engaged with the Platforms to their detriment and in a harmful manner, which could and should have been avoided by Defendant's adequate warning and instruction.

## CAUSES OF ACTION

### COUNT ONE

### Violation of California Consumers Legal Remedies Act,

### (California Civil Code 1750, *et seq.*)

### (*On Behalf of the California Class*)

105.  **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

106.  **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

107.  **Goods/Services.** The Platform subscriptions are "goods," as defined by the CLRA in California Civil Code §1761(a).

108.  **Defendant.** Defendant is a "person," as defined by the CLRA in California Civil Code

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

§1761€

109.   **Consumers.** Plaintiffs and members of the Class are "consumers," as defined by the CLRA in California Civil Code §1761(d).

110.   **Transactions.** The purchase of the Platform subscriptions by Plaintiffs and members of the Class are "transactions" as defined by the CLRA under California Civil Code section 1761€

111.   **Violations of the CLRA.** Defendant violated the following sections of the CLRA by advertising and selling the Platform subscriptions to Plaintiffs and the Class through the false, misleading, deceptive, and fraudulent Challenged Representation and Material Omission:

   a.   Section 1770(a)(5) by representing that the Platforms have "characteristics, . . . uses [or] benefits . . . which they do not have."

   b.   Section 1770(a)(7) by representing that the Platforms "are of a particular standard, quality, or grade . . . [when] they are of another."

   c.   Section 1770(a)(9) by advertising the Platforms "with [the] intent not to sell them as advertised."

112.   **Knowledge.** Defendant's uniform material representations regarding the Platform subscriptions were likely to deceive, and Defendant knew or should have known that its representations were untrue and misleading.

113.   **Malicious.** Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sales of the Platform subscriptions.

114.   **Plaintiffs Could Not Have Avoided Injury.** Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiffs and members of the Class would not have purchased the Platforms and/or would have purchased them on different terms had they known the truth.

115.   **Causation/Reliance/Materiality.** Plaintiffs and the Class suffered harm as a result of Defendant's violations of the CLRA because they purchased the Platform subscriptions relying on the Challenged Representations and Material Omissions in deciding to purchase the Platform

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

subscriptions. The Challenged Representations and Material Omissions were substantial factors. The Challenged Representations and Material Omissions were material because a reasonable consumer would consider them important in deciding whether to purchase the Platform subscriptions.

116. **Injunction.** Given that Defendant's conduct violated California Civil Code section 1780, Plaintiff and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA. Plaintiffs have no adequate remedy at law. Without equitable relief, Defendants' unfair and deceptive practices will continue to harm Plaintiffs and the Class.

117. Plaintiffs presently seek injunctive relief only under the CLRA, pursuant to Cal. Civ. Code § 1782(d). Plaintiffs intend to amend and seek damages and restitution under the CLRA.

<u>**COUNT TWO**</u>

**Violation of California False Advertising Law,**

**(Business & Professions Code 17500, *et seq*.)**

(***On Behalf of the California Class***)

118. **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

119. **California Class.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George bring this claim individually and on behalf of the California Class who purchased Platform subscriptions within the applicable statute of limitations.

120. **FAL Standard.** The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

121. **False & Material Challenged Representation and Material Omission Disseminated to Public**. Defendant violated § 17500 when it advertised and sold the Platform subscriptions through unfair, deceptive, untrue, and misleading Challenged Representation and Material Omission disseminated to the public through the Platforms' marketing and advertising. These representations were false because the Platforms did not conform to them. The

37

representations were material because they are likely to mislead a reasonable consumer into purchasing a Platform subscription.

122.   **Knowledge.** In making and disseminating the Challenged Representations with the Material Omissions alleged herein, Defendant knew or should have known that the representations were untrue or misleading and acted in violation of § 17500.

123.   **Intent to sell.** Defendant's conduct was specifically designed to induce reasonable consumers, like Plaintiffs and the Class, to purchase the Platform subscriptions.

124.   **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Platform subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

## COUNT THREE

**Violation of California Unfair Competition Law,**

**(Business & Professions Code Section 17200,** *et seq***.)**

**(*On Behalf of the California Class*)**

125.   **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

126.   **California Class.** This cause of action is brought pursuant to Business and Professions Code Section 17200, et seq., on behalf of Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George, and the California Class who purchased any Platform subscription within the applicable statute of limitations.

127.   **The UCL.** California Business & Professions Code, sections 17200, et seq. (the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

"UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

128. **False Advertising Claims.** Defendant, in its advertising and marketing of the Platform, made misleading statements and fraudulent omissions regarding the quality and characteristics of the Platform—specifically, Defendant advertised and marketed the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," thereby efficiently facilitating off-app relationships, when in fact the Platforms are designed to extract subscription costs from captive users, causing them to remain on the app.

129. **Defendant's Deliberately Fraudulent Marketing Scheme.** Defendant does not have any reasonable basis for the claims about the Platforms made in Defendants' advertising and marketing of the Platforms because the Platforms do not provide the advertised benefits. Defendant knew and continues to know that the Platforms cannot provide the advertised benefits (i.e., rapid formation of off-app relationships), though Defendant intentionally advertised and marketed the Platforms to deceive reasonable consumers into believing that they could achieve the advertised benefits.

130. **Misleading Advertising and Marketing Cause Purchase of Platforms.** Defendant's advertising and marketing of the Platforms using the Challenged Representations and Material Omissions continues to lead reasonable consumers, including Plaintiffs, to believe the Platforms are "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," thereby efficiently facilitating off-app relationships, when they cannot.

131. **Injury in Fact.** Plaintiffs and the Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's Challenged Representation and Material Omission—namely, Plaintiffs and the Class lost the money they paid for the Platform subscriptions they purchased from Defendant.

132. **Conduct Violates the UCL.** Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include

unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

133. **No Reasonably Available Alternatives/Legitimate Business Interests**. Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

134. **Business Practice**. All the conduct alleged herein occurred and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue daily until Defendant voluntarily alters its conduct or Defendant is otherwise ordered to do so.

135. **Injunction**. Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as ""Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," when they are not. Plaintiffs and the members of the Class also seek an order requiring Defendant to disclose such information and/or precluding Defendant from selling the Platform subscriptions.

136. **Causation/Restitution**. As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiffs and the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Plaintiffs and the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

"***Unfair*** " ***Prong***

137.   **Unfair Standard**. Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." Camacho v. Auto Club of Southern California, 142 Cal. App. 4th 1394, 1403 (2006).

138.   **Injury**. Defendant's false marketing and advertising of the Platforms with the Challenged Representations and Material Omissions does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive subscription benefits commensurate with their reasonable expectations, and receive subscription benefits of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendant's deceptive marketing and advertising of the Platforms. The injuries caused by Defendant's deceptive marketing and advertising outweigh any benefits.

139.   **Balancing Test**. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

140.   **No Utility**. Under this test, Defendant's conduct of falsely marketing and advertising the Platform subscriptions "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," has no utility and rather, harms purchasers. Thus, the utility of Defendant's conduct is substantially outweighed by the gravity of harm.

141.   **Legislative Declared Policy**. Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th  Cir. 2007).

142.   **Unfair Conduct**. Defendant's marketing and advertising of the Platforms, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's representations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

143.   **Reasonably Available Alternatives**. Defendant had reasonably available alternatives

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Platform subscriptions.

144.    **Defendant's Wrongful Conduct**. All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

145.    **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date."

146.    **Causation/Restitution**. Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for subscriptions to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships when the apps were designed to ensnare users and keep them subscribing.

147.    Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Fraudulent" Prong*

148.    **Fraud Standard**. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

149.    **Fraudulent & Material Challenged Representation & Material Omission**. Defendant marketed and advertised the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." These representations were deceptive, and Defendant knew or should have known of its deception. The representations are likely to mislead consumers into purchasing the subscriptions because they are material to the average, ordinary, and reasonable consumer. Defendant used the Material Omission to with the intent to sell the Platform subscription to users. The Material Omission is deceptive, and Defendant knew, or should have known, of its

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

deception. The omission is likely to mislead consumers into purchasing Platform subscriptions because they are material to the average reasonable Platform user.

150.   **Fraudulent Business Practice**. As alleged herein, the representations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

151.   **Reasonable and Detrimental Reliance**. Plaintiffs and the Class reasonably and detrimentally relied on the marketing and advertising on the Platforms to their detriment in that they purchased the Platform subscriptions without receiving the advertised benefits.

152.   **Reasonably Available Alternatives**. Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Platform subscriptions.

153.   **Business Practice**. All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

154.   **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," and employ its practice of labeling the Platforms with the Material Omission.

155.   **Causation/Restitution**. Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for a subscriptions to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships, when the apps were designed to ensnare users and keep them subscribing.

156.   Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

//

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1

*"Unlawful" Prong*

2    157.   **Unlawful Standard**. The UCL identifies violations of other laws as "unlawful

3    practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC*

4    *Mortg. Corp*., 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

5    158.   **Violations of CLRA and FAL**. Defendant's marketing and advertising of the

6    Platforms, as alleged herein, violates California Civil Code sections 1750, *et seq*. and California

7    Business and Professions Code sections 17500, *et seq*. as set forth below in the sections regarding

8    those causes of action.

9    159.   **Fraud**. Additionally, Defendant's use the Material Omission to the sell Platform

10   subscriptions violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud),

11   1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

12   160.   **Additional Violations**. Defendant's conduct in making the deceptive representations

13   and omission described herein constitutes a knowing failure to adopt policies in accordance with

14   and/or adherence to applicable laws, as set forth herein, all of which are binding upon and

15   burdensome to their competitors. This conduct engenders an unfair competitive advantage for

16   Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under

17   California Business & Professions Code sections 17200-17208. Additionally, Defendant's

18   representations of material facts, as set forth herein, violate California Civil Code sections 1572,

19   1573, 1709, 1710, and 1711, as well as the common law.

20   161.   **Unlawful Conduct**. Defendant's marketing and advertising of the Platforms, as

21   alleged herein, is deceptive, misleading, and unreasonable, and constitutes unlawful conduct.

22   Defendant knew or should have known of its unlawful conduct.

23   162.   **Reasonably Available Alternatives**. Defendant had reasonably available alternatives

24   to further its legitimate business interests, other than the conduct described herein. Defendant could

25   have refrained from selling the Platform subscriptions.

26   163.   **Defendant's Wrongful Conduct**. All the conduct alleged herein occurs and

27   continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or

28   generalized course of conduct repeated on thousands of occasions daily.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

164. **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date."

165. **Causation/Restitution.** Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for a subscription to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships, when the apps were designed to ensnare users and keep them subscribing.

166. Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT FOUR

### Violation of New York General Business Law

### (GBL 349, 350, *et seq*)

### (*On Behalf of the New York Class*)

167. **Incorporation by Reference**. Plaintiff Jami Kandel re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

168. **New York Class.** Plaintiff Kandel brings this claim on behalf of herself and the New York Class against Defendant.

169. **Jurisdiction**. Defendant does business in New York, sells and distributes the Platform in New York, and engages in deceptive acts and practices in its development, selling, and marketing of the Platform in New York.

170. **GBL § 349 Standard.** NY GBL 349, *et seq* provides "deceptive acts or practices in the conduct of any business, trade or commerce… are hereby declared unlawful."

171. **Deceptive Act or Practice**. Defendant's uniform material representations and omissions of the Platform were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

untrue or misleading. Defendant intended that Plaintiff and the New York Class rely on the misleading representations and omissions in their making their purchase decision.

172.   As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each New York Class member as a subscription to platforms "Designed to be Deleted," and/or with promises to "Match, Chat and Date" and "Meet and Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

173.   **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading.

174.   **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

175.   Defendant therefore engaged in unfair methods of competition and unfair or deceptive acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platforms and Platform subscriptions. Defendant therefore violated the New York General Business Law 349, *et seq*.

176.   **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to NY GBL 349(b) and 350(d).

## COUNT FIVE

### Violation of Georgia Deceptive Trade Practices Act

### (O.C.G.A. Section 10-1-372, *et seq*)

### (*On Behalf of the Georgia Class*)

177.   **Incorporation by Reference**. Plaintiff Bradford Schlosser re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

178.   **Georgia Class.** Plaintiff Schlosser brings this claim on behalf of themselves and the Georgia Class against all Defendants.

179.   **Jurisdiction**. Defendant does business in Georgia, sells and distribute the Platform in Georgia, and engaged in deceptive acts and practices in its development, selling, and marketing of the Platform in Georgia.

180.   **O.C.G.A. § 10-1-372 Standard.** O.C.G.A. § 10-1-372, *et seq* prohibits "deceptive trade practice… in the course of business, vocation or occupation."

181.   **Violations of O.G.C.A § 10-1-372.** Defendant violated the following sections of the O.G.C.A. by advertising and selling the Platform subscriptions to Plaintiffs and the Class through the false, misleading, deceptive, and fraudulent Challenged Representations:

a.   Section 10-1-372(a)(5) by representing that the Platforms have "characteristics, . . . uses [or] benefits . . . which they do not have."

b.   Section 10-1-372(a)(7) by representing that the Platforms "are of a particular standard, quality, or grade . . . [when] they are of another."

c.   Section 10-1-372(a)(9) by advertising the Platforms "with [the] intent not to sell them as advertised."

182.   **Deceptive Act or Practice**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were untrue or misleading. Defendant intended that Plaintiff and the Georgia Class rely on the misleading representations in their making their purchase decision.

183.   As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each Georgia Class member as a subscription to platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

184.   **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

or misleading.

185.  **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

186.  Defendant therefore engaged in unfair methods of competition and unfair or deceptive acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platforms and Platform subscriptions. Defendant therefore O.C.G.A § 10-1-372, *et seq*.

187.  **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to O.G.C.A. § 10-1-373.

**COUNT SIX**

**Violation of Florida Deceptive and Unfair Trade Practices Act**

**(Florida Stat. Section 501.201 *et seq*)**

**(*On Behalf of the Florida Class*)**

188.  **Incorporation by Reference**. Plaintiff Andrew Karz re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

189.  **Florida Class.** Plaintiff Karz brings this claim on behalf of themselves and the Florida Class against all Defendants.

190.  **Jurisdiction**. Defendant does business in Florida, sells and distributes the Platforms in Florida, and engaged in deceptive acts and practices in its development, selling, and marketing of the Platform in Florida.

191.  **FS § 501 Standard.** Florida Stat. § 501, *et seq* prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.204(1). Defendant participated in unfair, unconscionable and deceptive trade practices that violated Florida's Deceptive and Unfair Trade

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Practices Act.

192.   **Deceptive Act or Practice**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were untrue or misleading. Defendant intended that Plaintiff and the Florida Class rely on the misleading representations in their making their purchase decision.

193.   As alleged herein, Defendant sold the Platform subscription to Plaintiff and each Florida Class member as a subscription to a platform "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the apps to extract more revenue from subscriptions.

194.   **Unconscionable Act or Practice.** Furthermore, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Karz and the Florida Subclass at the time they purchased Platform subscriptions, including the fact that Defendant's Platforms carry a substantial risk of, and was intentionally designed to be effective at, fomenting dangerous addiction and compulsive use

195.   **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading. Defendant's omission of a material fact, that the Platforms carry a substantial risk of fomenting dangerous addiction, was likely to induce users to purchase the Platform subscriptions, as otherwise users would refrain from doing so.

196.   **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

197.   Defendant therefore engaged in unfair methods of competition and unfair, deceptive, or unconscionable acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platform and Platform subscriptions. Defendant therefore violated Florida Stat. § 501, *et seq*.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

198. **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to Florida Stat. § 501.2105.

**COUNT SEVEN**

**Breach of Express Warranty**

(***On Behalf of the Nationwide Class***)

199. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

200. **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class who purchased the Platform subscriptions within the applicable statute of limitations.

201. **Implied Warranty of Merchantability.** By advertising and selling the Platform subscriptions at issue, Defendant, merchants of goods, made promises and affirmations of fact that the Platform subscriptions are merchantable and conform to the promises or affirmations of fact made through its marketing and advertising, as described herein. This marketing and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs and members of the Class and Defendant—to wit, that the Platforms, among other things, could provide the advertised benefits.

202. **Breach of Warranty.** Contrary to Defendant's warranties, the Platform does not conform to the Platform's representation that it was "Designed to be Deleted," and attendant expectation arising thereof, as described herein. Therefore, Defendant breached its warranties about the Platform and its qualities.

203. **Causation/Remedies.** As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscription. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

paid for the Platform subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

## COUNT EIGHT

### Unjust Enrichment/Restitution

### (*On Behalf of the Nationwide Class*)

204. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

205. **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of members of the Class who purchased the Platform subscriptions within the applicable statute of limitations.

206. **Plaintiff/Class Conferred a Benefit.** By purchasing the Platform subscriptions, Plaintiffs and members of the Class conferred a benefit on Defendant in the form of the purchase price of the subscriptions.

207. **Defendant's Knowledge of Conferred Benefit.** Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the subscriptions, Defendant would not generate revenue, as more fully described herein.

208. **Defendant's Unjust Receipt Through Deception.** Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations and material omissions.

209. **Causation/Restitution.** As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

1   for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing

2   and future harm that will result.

3                                   **COUNT NINE**

4                    **Strict Products Liability – Failure to Warn**

5                        (*On Behalf of the Nationwide Class*)

6          210.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all

7   allegations contained in this complaint, as though fully set forth herein.

8          211.   **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of members

9   of the Class who purchased the Platform subscriptions within the applicable statute of limitations.

10         212.   **Duty.** At all relevant times, Defendant owed Plaintiffs and the Nationwide Class a

11  duty to warn users about risks and dangers associated with the use of the Platforms, namely, that

12  the Platforms carry a substantial risk of fomenting addiction.

13         213.   **Failure to Provide Adequate Warning.** Defendant fails to provide any warning

14  whatsoever concerning the Platforms' addictive qualities and further does not provide any

15  instruction or guidance which would help users engage with the Platform responsibly.

16         214.   **Unreasonably Dangerous.** The lack of sufficient warning or instruction render the

17  Platforms unreasonably dangerous when used in a foreseeable manner. The Platforms carry

18  substantial risk of fomenting addiction, and compulsive use of the Platforms is linked to a number

19  of deleterious consequences to users' mental health.

20         215.   **Plaintiffs and Members of the Nationwide Class Suffered Foreseeable Harms.**

21  Purchasing a subscription to unlock unlimited access foreseeably results in availing oneself of

22  unlimited access. Without warning, users are left with no opportunity to regulate Platform use before

23  Defendant's intentionally enticing features ensnare them. As such, Plaintiffs and the Nationwide

24  Class engaged with the Platforms in a manner foreseeable to, and as fully described herein, a manner

25  encouraged by, Defendant.

26         216.   **Causation.** If not for Defendant's failure to warn, users would have the opportunity

27  to self-regulate platform use, instead, their ability is intentionally eroded by Defendant's carefully

28  developed product features.

**CLASS ACTION COMPLAINT**

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

217.   **Injury.** Plaintiffs and Nationwide Class members are harmed by Defendant's failure to warn as they become addicted to using the Platforms. Furthermore, they suffer from the attendant consequences of compulsive Platform use such as reduction in self-esteem and other deleterious effects on users' mental health.

218.   **Knowledge.** Defendant's failure to warn users of the Platform's substantial risks and dangers was and continues to be likely to induce addiction. Such risks are evident to Defendant, or alternatively, reasonable investigation into Defendant's own Platforms would reveal such risks and dangers.

219.   **Defective Product,** The Platforms, as currently constructed without adequate warning or instruction on responsible use, are therefore defective, as they are rendered unreasonably dangerous.

**COUNT TEN**

**Negligence – Design**

**(*On Behalf of the Nationwide Class*)**

220.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

221.   **Control.** At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its Platforms used by Plaintiffs and Class members.

222.   **Uniform Defect.** Each of Defendant's Platforms included in this cause of action were designed and intended to be a dating platform. The software and architecture of each Platform is the same for every user that logs in or creates an account. The Platforms are uniformly defective and pose the same danger to each user.

223.   **Knowledge**. Defendant knew, or by the exercise of reasonable care, should have known, that the Platforms were dangerous, harmful, and injurious when used in a reasonably foreseeable manner by Plaintiffs and Class members.

224.   Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the

Platforms. Those risks of harm include, but are not necessarily limited to, addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries. These risks were, and remain to be, known or knowable considering Defendant's own internal data and knowledge regarding the Platforms and their usage.

225. Plaintiffs and Class members were the foreseeable and intended users of the Platforms.

226. **Duty.** Defendant owed Plaintiffs and Class members a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of the Platforms not to create an unreasonable risk of harm from and in the use of the Platforms (including, but not necessarily limited to, unreasonable risks of addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries).

227. **Defendant Failed to Exercise Reasonable Care in Designing the Platforms.** Defendant breached its duty by failing to use reasonable care in the design of the Platforms by negligently designing them with features that are intentionally, or would be reasonably foreseeable to be, specifically injurious. The Platforms are less safe to use than an ordinary user would expect when used in an intended and foreseeable manner, as ordinary users would not expect the features described herein to create or increase the risk of abuse and addiction and resulting cascade of negative consequences.

228. **Defendant Could Have Avoided Plaintiffs' Injuries.** Defendant could have utilized cost-effective, reasonably feasible alternative designs, including cessation, or redesigning, of the specific features outlined herein, or by employing safety measures to ensure or encourage responsible use of the Platforms. Reasonable alternatives were available to Defendant which would have reduced the gravity and severity of the Platforms' dangers.

229. **Plaintiffs Were Directly Injured by Defendant's Conduct in Providing Plaintiffs with the Use of Defendant's Platforms.** As a direct and proximate result of Defendant's breached duties, Plaintiffs and Class members were harmed. Plaintiffs and Class members would not have been harmed but for the development and institution of dangerous features.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

230. **Ongoing Harm.** The safety concerns arising from Defendant's negligent and unlawful acts are not immediately apparent to Platform users. Many putative Class members are continuing to use Defendant's Platforms every day, and Plaintiffs lack the requisite knowledge to independently verify whether the Platforms continue to pose unreasonable risks. Plaintiffs and Class members are therefore unable to rely of Defendant's future representation as to the safety of the Platforms.

231. **Relief.** Plaintiffs and Class members seek judgement against Defendant for injunctive relief alongside compensatory damages and all other damages prescribed by law, including treble and punitive damages, together with interest, costs of suit, attorneys' fees, and all other relief as the Court deems proper.

## COUNT ELEVEN

### Negligence – Failure to Warn

### (*On Behalf of the Nationwide Class*)

232. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

233. **Control.** At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its Platforms used by Plaintiffs and Class members.

234. **Uniform Defect.** Each of Defendant's Platforms included in this cause of action were designed and intended to be a dating platform. The software and architecture of each Platform is the same for every user that logs in or creates an account on a respective Platform. The Platforms are uniformly defective and pose the same danger to each user.

235. **Knowledge.** Defendant knew, or by the exercise of reasonable care, should have known, that the Platforms were dangerous, harmful, and injurious when used in a reasonably foreseeable manner by Plaintiffs and Class members.

236. Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Platforms. Those risks of harm include, but are not necessarily limited to, addiction, compulsive

55

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries. These risks were, and remain to be, known or knowable considering Defendant's own internal data and knowledge regarding the Platforms and their usage.

237. Plaintiffs and Class members were the foreseeable and intended users of the Platforms.

238. **Duty.** Defendant owed Plaintiffs and Class members a duty to provide adequate warnings or instructions about the known and foreseeable risks associated with using the Platforms, or those risks which Defendant should have known through the exercise of reasonable care (including, but not necessarily limited to, unreasonable risks of addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries).

239. **Defendant Failed to Exercise Reasonable Care by Not Providing Warning or Instruction to Combat Known Risks of Harm.** Defendant breached its duty by failing to use reasonable care in providing adequate warning regarding, or instruction for the responsible use of, the Platforms by negligently omitting any warning which would mitigate the gravity and severity of foreseeable harms associated with Platform engagement.

240. **Defendant Could Have Avoided Plaintiffs' Injuries.** Defendant could have utilized cost-effective, reasonably feasible alternative designs, including adoption of warning or instruction, or by employing safety measures to ensure or encourage responsible use of the Platforms. Reasonable alternatives were available to Defendant which would have reduced the gravity and severity of the Platforms' dangers.

241. **Plaintiffs Were Directly Injured by Defendant's Conduct in Providing Plaintiffs with the Use of Defendant's Platforms.** As a direct and proximate result of Defendant's breached duties, Plaintiffs and Class members were harmed. Plaintiffs and Class members would not have been harmed had Defendant provided reasonable and adequate warning.

242. **Ongoing Harm.** The safety concerns arising from Defendant's negligent and unlawful acts are not immediately apparent to Platform users. Many putative Class members are continuing to use Defendant's Platforms every day, and Plaintiffs lack the requisite knowledge to

independently verify whether the Platforms continue to pose unreasonable risks. Plaintiffs and Class members are therefore unable to rely of Defendant's future representation as to the safety of the Platforms.

243.   **Relief.** Plaintiffs and Class members seek judgement against Defendant for injunctive relief alongside compensatory damages and all other damages prescribed by law, including treble and punitive damages, together with interest, costs of suit, attorneys' fees, and all other relief as the Court deems proper.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment and relief on all causes of action as follows:

a.   **Certification**: For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives of their respective state's Classes, and appointing Plaintiffs' Counsel as Class Counsel;

b.   **Declaratory Relief**: For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

c.   **Injunction**: For an order requiring Defendant to immediately cease and desist from selling the unlawful subscriptions in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the subscriptions in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Platforms resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d.   **Damages/Restitution/Disgorgement**: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e.   **Attorneys' Fees & Costs**: For an order awarding attorneys' fees and costs,

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

consistent with permissible law and pursuant to only those causes of action so permitted;

f.    **Pre-/Post-Judgment Interest**: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and,

g.    **All Just & Proper Relief**: For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues and causes of action so triable.

DATED: February 14, 2024                **CLARKSON LAW FIRM, P.C.**


/s/ *Ryan J. Clarkson*
Ryan J. Clarkson
Bahar Sodaify
Kelsey J. Elling

*Counsel for Plaintiffs and the Proposed Classes*

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

CLASS ACTION COMPLAINT