Amy P. Lally, SBN 198555
alally@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars, 17th Floor
Los Angeles, CA 90067
Tel: (310) 595-9662
Fax: (310) 595-9501

*Attorney for Defendant Match Group, Inc.*

[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BURAK OKSAYAN, JACK KESSLER, ANDREW ST. GEORGE, BRADFORD SCHLOSSER, ANDREW KARZ, and JAMI KANDEL, individually and behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>    v.<br><br>MATCH GROUP, INC.,<br><br>            Defendant. | Case No. 3:24-cv-00888-LB<br><br>Magistrate Judge Beeler<br><br>**DEFENDANT MATCH GROUP, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND DISMISS OR STAY PROCEEDINGS AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Filed concurrently herewith:<br>- Declaration of Jennifer Flashman<br>- Declaration of Ethan Greenspan<br>- Declaration of Marko Krosnjar<br><br>Hearing date: May 23, 2024 at 9:30 AM |

PLEASE TAKE NOTICE that on May 23, 2024 at 9:30 AM, or as soon thereafter as it may be heard before the Honorable Laurel Beeler of the United States District Court for the Northern District of California in Courtroom B – 15th Floor, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Match Group, Inc.[1] ("MGI") will and hereby does move for an order dismissing or staying this action and compelling Plaintiffs Burak Oksayan, Jack Kessler, Andrew St. George, Bradford Schlosser, Andrew Karz, and Jami Kandel (collectively, "Plaintiffs") to pursue their claims, if at all, in arbitration and on an individual basis only, on the grounds that each Plaintiffs' claims are subject to an arbitration agreement and class waiver in the Terms of Use that govern their respective use of the online dating platforms at issue in this case.

Specifically, MGI moves this Court for an order compelling individual arbitration of all of the claims in the Complaint (ECF No. 1, "Compl."), including: First Cause of Action (Violation of California's Consumers Legal Remedies Act), Second Cause of Action (Violation of California's False Advertising Law), Third Cause of Action (Violation of California's Unfair Competition Law), Fourth Cause of Action (Violation of New York's General Business Law), Fifth Cause of Action (Violation of Georgia's Deceptive Trade Practices Act), Sixth Cause of Action (Violation of Florida's Deceptive and Unfair Trade Practices Act), Seventh Cause of Action (Breach of Express Warranty), Eighth Cause of Action (Unjust Enrichment/Restitution), Ninth Cause of Action (Strict Products Liability – Failure to Warn), Tenth Cause of Action (Negligence – Design), and Eleventh Cause of Action (Negligence – Failure to Warn).

This motion is brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, Federal Rule of Civil Procedure 12(b)(1), and well-settled law on the grounds that each Plaintiff agreed to arbitrate on an individual basis all disputes related to their respective use of Tinder, Hinge, and/or The League when each Plaintiff agreed to the Terms of Use and continued to access and use those platforms respectively.

---

[1] MGI disputes that it is the proper defendant in this matter, as it does not own or operate any of the platforms that form the basis of Plaintiffs' claims. Nevertheless, as explained in more detail below, MGI is entitled to enforce the arbitration agreement in the platforms' Terms of Use.

1    This motion is based on this Notice of Motion and Motion, the accompanying Memorandum

2    of Points and Authorities, and the Declarations of Jennifer Flashman, Ethan Greenspan, and Marko

3    Krosnjar filed concurrently herewith, the record in this action, and any oral argument permitted by

4    the Court.

5    Dated: April 15, 2024                          SIDLEY AUSTIN LLP

6                                                   By: */s/ Amy P. Lally*
                                                    Amy P. Lally
7                                                   Angela C. Zambrano
                                                    Chelsea A. Priest
8                                                   Kathrine Maldonado

9                                                   *Attorneys for Defendant Match Group, Inc.*

# **TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     BACKGROUND .............................................................................................................. 2

        A.      Platform Users Must Accept the Terms of Use. ........................................... 2

        B.      The TOU Include Conspicuous Arbitration Agreements. ............................ 5

        C.      Plaintiffs Agreed to Arbitration When They Created Accounts on the
                Platforms, When They Purchased a Subscription, Every Time They
                Accepted the Updated TOU, and Even When They Signed In to Their
                Accounts. ...................................................................................................... 9

                1.      Burak Oksayan ................................................................................. 9

                2.      Jack Kessler ................................................................................... 10

                3.      Andrew St. George ........................................................................ 12

                4.      Jami Kandel ................................................................................... 13

                5.      Bradford Schlosser ........................................................................ 15

                6.      Andrew Karz .................................................................................. 17

III.    LEGAL STANDARD .................................................................................................... 17

IV.     ARGUMENT ................................................................................................................. 19

        A.      Under Settled Contract Principles, Plaintiffs Agreed to Arbitrate Their
                Claims. ......................................................................................................... 19

        B.      MGI Can Enforce the Arbitration Agreement. .......................................... 21

        C.      The Scope of the Arbitration Agreement Is for the Arbitrator to Decide. ................. 23

        D.      In Any Event, the Agreements to Arbitrate Clearly Encompass These
                Claims. ......................................................................................................... 23

        E.      This Case Must Be Dismissed or Stayed Pending Completion of Arbitration. ......... 24

V.      CONCLUSION .............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                **Page(s)**

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011).................................................................................................................18

*Brennan v. Opus Bank*,
   796 F.3d 1125 (9th Cir. 2015) ...............................................................................................18

*Capps v. JPMorgan Chase Bank, N.A.*,
   No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023) ......................21

*Caremark, LLC v. Chickasaw Nation*,
   43 F.4th 1021 (9th Cir. 2022) ................................................................................................23

*Carnival Cruise Lines, Inc. v. Shute*,
   499 U.S. 585 (1991).................................................................................................................20

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
   207 F.3d 1126 (9th Cir. 2000) ...............................................................................................18

*Cordas v. Uber Techs., Inc.*,
   228 F. Supp. 3d 985 (N.D. Cal. 2017) ...................................................................................20

*Datel Holdings Ltd. v. Microsoft Corp.*,
   712 F. Supp. 2d 974 (N.D. Cal. 2010) ...................................................................................20

*Edwards v. Verizon*,
   No. CV 14-09394 BRO, 2015 WL 13654015 (C.D. Cal. Jan. 26, 2015) ...............................24

*Estrella v. Freedom Fin.*,
   No. C 09-03156 SI, 2011 WL 2633643 (N.D. Cal. July 5, 2011) ..........................................24

*Gonzalez-Torres v. Zumper, Inc.*,
   No. 19-cv-02183-PJH, 2019 WL 6465283 (N.D. Cal. Dec. 2, 2019)....................................19

*Graf v. Match.com, LLC*,
   No. 15-CV-3911-PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) .....................................20

*Hajibekyan v. BMW of N. Am., LLC*,
    839 Fed. App'x 187 (9th Cir. 2021) ......................................................................22

*Harris v. Pacific Gas & Electric Co.*,
    No. 21-CV-04096-JCS, 2022 WL 16637987 (N.D. Cal. Nov. 2, 2022)...................24

*Hays v. HCA Holdings, Inc.*,
    838 F.3d 605 (5th Cir. 2016) ...............................................................................22

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019)................................................................................18, 23

*Herrera v. Cathay Pac. Airways Ltd.*,
    94 F.4th 1083 (9th Cir. 2024) ..........................................................................22, 23

*Johnmohammadi v. Bloomingdale's, Inc.*,
    755 F.3d 1072 (9th Cir. 2014) .............................................................................18

*Kahl v. Plentyoffish Media, ULC*,
    No. 23-cv-00985-AGT (N.D. Cal.), Dkt. No. 19 ...................................................21

*Kaselitz v. hiSoft Tech. Int'l, Ltd.*,
    No. C-12-5760 MMC, 2013 WL 622382 (N.D. Cal. Feb. 15, 2013) ......................22

*Kim v. Tinder, Inc.*,
    No. 18-CV-03093-JFW (AS), 2018 WL 6694923 (C.D. Cal. July 12, 2018) .................20, 21

*Laver v. Credit Suisse Securities (USA), LLC*,
    No. 18-CV-00828-WHO, 2018 WL 3068109 (N.D. Cal. June 21, 2018) *aff'd*, 976
    F.3d 841 (9th Cir. 2020) ...................................................................................24

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020) ...............................................................19, 20, 21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*,
    473 U.S. 614 (1985).........................................................................................19

*Oberstein v. Live Nation Ent., Inc.*,
    60 F. 4th 505 (9th Cir. 2023) .........................................................................20, 21

*Rainey v. A Place for Rover, Inc.*,
 No. 2:22-cv-00403-RGK-E, 2022 WL 16942849 (C.D. Cal. July 18, 2022)..........................21

*Rent-A-Ctr., West, Inc. v. Jackson*,
 561 U.S. 63 (2010)............................................................................................................23

*Robbins v. Mscripts, LLC*,
 No. 23-cv-013810-LB, 2023 WL 5723220 (N.D. Cal. Sept. 5, 2023) ...................................20

*Shearson/Am. Express, Inc. v. McMahon*,
 482 U.S. 220 (1987)..........................................................................................................19

*Simula, Inc. v. Autoliv, Inc.*,
 175 F.3d 716 (9th Cir. 1999) .............................................................................................18

*Song v. Charter Commc'ns, Inc.*,
 No. 17CV325 (JLB), 2017 WL 1149286 (S.D. Cal. Mar. 28, 2017) ...................................19

*Sweeney v. Tractor Supply Co.*,
 390 F. Supp. 3d 1152 (N.D. Cal. 2019) ...............................................................................24

*Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*,
 497 Fed. App'x 740 (9th Cir. 2012) ...................................................................................24

**Statutes**

9 U.S.C. § 2 .............................................................................................................17, 18

9 U.S.C. § 3 .......................................................................................................19, 24, 25

California's Consumers Legal Remedies Act .................................................................1

California's False Advertising Law ...............................................................................1

California's Unfair Competition Law ............................................................................1

Federal Arbitration Act  ...........................................................................17, 18, 19, 25

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ...............................................................1

Florida's Deceptive and Unfair Trade Practices Act .....................................................1

Georgia's Deceptive Trade Practices Act ......................................................................1

New York's General Business Law ................................................................................1

**Court Rules**

Federal Rule of Civil Procedure 12(b)(1) ............................................................1, 24, 25

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Plaintiffs sued Match Group, Inc. ("MGI") claiming that Tinder, Hinge, and The League online dating platforms operated by subsidiaries of MGI (collectively, the "Platforms") are "addictive" and engender "compulsive use."[2] These allegations are preposterous. Countless people have used the Platforms to find relationships and then deleted their accounts, and the features Plaintiffs complain about—like "present[ing] potential matches one at a time," Compl. ¶ 48, "flattering" their users by "impart[ing] confidence," *id.* ¶ 53, and warning inactive users that their profiles will be hidden, *id.* ¶ 58—are actions of a responsible Platform taking into consideration its users' needs, not evidence of a nefarious plan to cause addiction.

But the baseless nature of these claims is an issue for another day. For now, this case should be dismissed because each Plaintiff agreed multiple times to resolve any disputes related to the Platforms exclusively through individual arbitration. To create an account on each of the Platforms—which Plaintiffs admittedly did—Plaintiffs were required to agree to each Platform's respective Terms of Use ("TOU"), which contain an arbitration agreement and class action waiver. Thus, by creating accounts on the Platforms and thereby agreeing to the TOU, each Plaintiff entered into a binding, mutual arbitration agreement and agreed to the class action waiver. Plaintiffs then reconfirmed their consent to the TOU, and therefore the arbitration agreement and class action waiver again, when purchasing subscriptions on the Platforms, when consenting to updated TOU

---

[2] Plaintiffs bring their claims against MGI, but MGI does not actually own or operate any of the Platforms at issue in the Complaint. Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4; Krosnjar Decl. ¶ 4. Rather, MGI is the non-operating, parent holding company of the entities that operate the Platforms. Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4; Krosnjar Decl. ¶ 4. Tinder is operated by Match Group, LLC, Flashman Decl. ¶ 4; Hinge is operated by Hinge, Inc., Greenspan Decl. ¶ 4; and The League is operated by The League App, Inc., Krosnjar Decl. ¶ 4. As explained more fully below, while MGI at no time operated any of the Platforms at issue in this case, it is still entitled to benefit from the arbitration provisions contained in the Terms of Use governing Plaintiffs' use of the Platforms, which Plaintiffs agreed to on numerous occasions. All rights, claims, and defenses are expressly reserved and not waived.

1    via pop-up screens that require consent for continued use of the Platforms, and, in some cases, when

2    signing back in to the Platforms.

3            What is more, the TOU's arbitration agreement contains a delegation provision, meaning

4    that any disagreement about whether the underlying disputes are arbitrable must be decided by an

5    arbitrator. So, the only question this Court needs to decide is whether an arbitration agreement exists;

6    it clearly does. But even if the Court were to reach the question of whether the arbitration agreement

7    applies to the disputes in this case (it should not), the answer is clear. The broad language of the

8    arbitration agreements plainly encompasses Plaintiffs' claims.

9            Under controlling Supreme Court and Ninth Circuit precedent, Plaintiffs must submit their

10   claims to arbitration on an individual basis, and this action must be dismissed or at least stayed.

11   **II.    BACKGROUND**

12       **A.  Platform Users Must Accept the Terms of Use.**

13           Tinder, Hinge, and The League are online dating platforms that can be accessed through

14   a mobile application. Flashman Decl. ¶ 3; Greenspan Decl. ¶ 3; Krosnjar Decl. ¶ 3. Tinder can also

15   be accessed through a website. Flashman Decl. ¶ 3. All users of these Platforms must create an

16   account and agree to the Platforms' TOU before accessing any of the Platforms' services. Flashman

17   Decl. ¶ 5; Greenspan Decl. ¶ 5; Krosnjar Decl. ¶ 5.

18           For example, before creating a Tinder account, a user must tap a button adjacent to a

19   notice informing them that by tapping that button and creating an account, the user agrees to the

20   Tinder TOU. Flashman Decl. ¶ 6. The Tinder TOU are easily accessible and available for review

21   through a conspicuous hyperlink in contrasting font in the notice. *Id.* Once a Tinder user creates an

22   account, the user may use the platform for free without purchasing a subscription. *Id.* ¶ 8. If the user

23   chooses to purchase a subscription, the user reconfirms their consent to the TOU (including the

24   arbitration agreement and class action waiver). Specifically, the purchase confirmation page alerts

25   the user that the purchase is subject to agreement to the TOU, which are hyperlinked, and users

26   complete the purchase only if they tap a button after being presented with the notice. *Id.* Examples

27   of the Tinder purchase confirmation pages that Plaintiffs encountered are attached as Exhibits 5–6

28   and 9–15 to the Flashman Declaration. Tinder users again reconfirm their consent to the TOU *every*

*time* they sign in, via a screen informing them that "[b]y tapping Sign In, you agree to our **Terms**." Flashman Decl. ¶ 7. Examples of the Tinder sign-in pages that Plaintiffs encountered are attached as Exhibits 7–8 to the Flashman Declaration.

As with Tinder, all Hinge users must create an account before accessing any Hinge services. Greenspan Decl. ¶ 5. And before creating a Hinge account, a user must tap a button to "Create account," which is adjacent to a notice informing users that by creating an account, the user agrees to the Hinge TOU. *Id.* ¶ 6. As with Tinder, the Hinge TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting font in the notice. *Id.* For those Hinge users who choose to purchase a subscription, they reconfirm their consent to the TOU (including the arbitration agreement and class action waiver). Specifically, the purchase confirmation page alerts the user that the purchase is subject to agreement to the TOU, which are hyperlinked, and users complete the purchase only if they tap a button after being presented with the notice. *Id.* ¶ 8. Examples of the Hinge purchase confirmation pages that Plaintiffs encountered are attached as Exhibits 18 and 21–22 to the Greenspan Declaration. Hinge users again reconfirm their consent to the TOU *every time* they sign in, via a screen informing them that "[b]y tapping 'Sign in' / 'Create account', you agree to our **Terms of Service**." *Id.* ¶ 7. Examples of the Hinge sign-in pages that Plaintiffs encountered are attached as Exhibits 19–20 to the Greenspan Declaration.

Accessing The League's services also requires creating an account. Krosnjar Decl. ¶ 5. Before creating an account with The League, a user must check a box acknowledging that by signing up for The League, the user agrees to The League TOU. *Id.* The League TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting font. *Id.* An example of the account creation page is attached as Exhibit 23 to the Krosnjar Declaration. If a user on The League does not check the box acknowledging agreement to The League TOU, a pop-up blocker screen appears with a message in bold, capitalized letters: "**TO[U] ACCEPTANCE REQUIRED**," followed by a notice that the user must agree to The League TOU and Privacy Policy to continue with the account creation process. *Id.* An example is attached as Exhibit 28 to the Krosnjar Declaration.

In addition to the TOU agreement processes described above, users accessing the Platforms between 2022 and the present (who had existing accounts) would have encountered *at least one* pop-up "blocking modal" requiring them to accept an updated version of the TOU to continue using the Platforms. A blocking modal is a pop-up that appears on a user's screen when they attempt to access the Platform. Flashman Decl. ¶ 11; Greenspan Decl. ¶ 10; Krosnjar Decl. ¶ 9. When a blocking modal appears, the user cannot continue to use the app without agreeing to the TOU by tapping a button (here, "Agree" or "I accept," as explained in more detail below). Flashman Decl. ¶ 11; Greenspan Decl. ¶ 10; Krosnjar Decl. ¶ 9. If the user leaves the app without tapping the required button, the blocking modal will appear again when the user attempts to access the app again. Flashman Decl. ¶ 11; Greenspan Decl. ¶ 10; Krosnjar Decl. ¶ 10. In other words, users cannot bypass the modal; if they want to use the services, they must accept the updated TOU. *See* Flashman Decl. ¶ 11; Greenspan Decl. ¶ 10; Krosnjar Decl. ¶ 9. However, as described in more detail below, the operative versions of the TOU gave users the right to opt out of retroactive application of changes to the updated TOU's arbitration provision (though not the arbitration agreement in whole), which was disclosed in the TOU conspicuously linked from the blocking modal and sometimes even in the blocking modal itself. *See* Ex. 1 § 15e; (February 28, 2022 Tinder TOU); Ex. 16 § 15e (February 28, 2022 Hinge TOU); Ex. 25 § 15e (June 22, 2023 The League TOU); Ex. 2 § 15e (January 31, 2024 Tinder TOU).

In 2022, existing Tinder and Hinge users encountered a pop-up blocking modal screen when they first attempted to access Tinder or Hinge after respective updated TOU were released on February 28, 2022. The blocking modal screens contained a hyperlink to the updated TOU and required the user to tap "Agree" before they were able to navigate away from the blocking modal. Flashman Decl. ¶ 11; Greenspan Decl. ¶ 10; Exs. 3, 17. The blocking modals stated that "By tapping Agree, you agree to our updated **Terms**." These blocking modals are attached as Exhibit 3 to the Flashman Declaration and Exhibit 17 to the Greenspan Declaration. Further in 2024, after Tinder released updated TOU effective January 31, 2024, a blocking modal appeared the next time a Tinder user attempted to access Tinder. Flashman Decl. ¶ 12. As with the previous blocking modal, the 2024 blocking modal contained a hyperlink to an updated TOU and required the user to tap "Agree"

in order to navigate away from the blocking modal, and stated that "By tapping Agree, you agree to our updated **Terms**." *Id.* ¶ 12; Ex. 4. This blocking modal is attached as Exhibit 4 to the Flashman Declaration.

In 2022, existing users of The League encountered a pop-up blocking modal screen with the full version of the updated TOU, effective January 24, 2022, when they tried to access the Platform after the updated TOU was released. Krosnjar Decl. ¶ 8. Users could not navigate within the app until they tapped "I accept." *Id.* This blocking modal is attached as Exhibit 26 to the Krosnjar Declaration. In 2023, The League users encountered another pop-up blocking modal screen with the full version of the updated TOU, effective June 22, 2023. *Id.* ¶ 9. This blocking modal is attached as Exhibit 27 to the Krosnjar Declaration.

The February 28, 2022 Tinder TOU, the February 28, 2022 Hinge TOU, the June 22, 2023 The League TOU, and the January 31, 2024 Tinder TOU each allowed users the opportunity to opt out of retroactive application of changes to the updated TOU's arbitration provision, though not the arbitration agreement itself. Flashman Decl. ¶ 13; Greenspan Decl. ¶ 11; Krosnjar Decl. ¶ 11; Exs. 1, 16, 25, and 2, respectively. None of the Plaintiffs in this action exercised their right to opt out. Flashman Decl. ¶ 13; Greenspan Decl. ¶ 11; Krosnjar Decl. ¶ 11. Also, and as explained more fully below, each Plaintiff claims to have made purchases on at least one of the Platforms "within the last two years," Compl. ¶¶ 22–27, which, if true, necessarily means that they would have had to reconfirm their acceptance of the TOU when purchasing subscriptions *and* upon encountering the blocking modal(s) during that time, which (like the earlier TOU) contained an arbitration agreement and class action waiver. Thus, even if Plaintiffs had opted out of retroactive application of changes to the updated TOU's arbitration provision (they did not), that would make no difference to the arbitrability of their claims because they previously agreed to arbitrate claims arising out of their purchases on and usage of the Platforms when they created accounts.

**B.  The TOU Include Conspicuous Arbitration Agreements.**

As described in more detail below, all named Plaintiffs agreed to the February 28, 2022 Tinder TOU or February 28, 2022 Hinge TOU, and one named Plaintiff further agreed to the January

31, 2024 Tinder TOU.[3] And if Plaintiff Jami Kandel used The League within the last two years, as she alleges, Compl. ¶ 25, she would have encountered at least one blocking modal requiring her to accept the January 24, 2022 and/or June 22, 2023 The League TOU. Krosnjar Decl. ¶ 15. Each of these TOU—all of which are attached hereto as Exhibits 1, 2, 16, 24, and 25 to the Flashman, Greenspan, and Krosnjar Declarations—includes dispute resolution provisions that require individual arbitration of Plaintiffs' claims.

The arbitration provisions in the February 28, 2022 Tinder and Hinge TOU are substantially similar to the June 22, 2023 The League TOU and the January 31, 2024 Tinder TOU. Each of these TOU clearly requires Plaintiffs to resolve their claims through individual arbitration—not a class action in federal court—and includes in the first section of the TOU a paragraph in bold, all capital letters advising users to carefully review the dispute resolution provisions. That paragraph specifically warns that the TOU include an arbitration agreement, class action waiver, and jury trial waiver. Ex. 1 § 1; Ex. 16 § 1; Ex. 25 § 1; Ex. 2 § 1.

Section 15 of the February 28, 2022 Tinder and Hinge TOU provides that "[a]ny dispute, claim, or controversy, between you and [the Platform] . . . that arises from or relates in any way to this Agreement (including any alleged breach of this Agreement), the Service[s], or our relationship with you (collectively, 'Dispute'), shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION." Ex. 1 § 15c; Ex. 16 § 15c. The same section further provides that "'Dispute' as used in this Agreement shall have the broadest possible meaning and include claims that arose before the existence of this or any prior Agreement and claims that arise during the term of this Agreement or after the termination of this Agreement." Ex. 1 § 15c; Ex. 16 § 15c. Other than a carve-out for disputes in small claims court, the arbitration agreement further contains a delegation provision,

---

[3] Plaintiffs Oksayan, Kessler, Schlosser, and Karz agreed to the February 28, 2022 Tinder TOU, and Kessler, St. George, Kandel, and Schlosser agreed to the February 28, 2022 Hinge TOU. Flashman Decl. ¶¶ 15, 17–18, 20, 22–23, 28–31, 33; Greenspan Decl. ¶¶ 13, 15–16, 18–19, 21, 24, 26. Karz further agreed to the January 31, 2024 Tinder TOU. Flashman Decl. ¶ 34. Although Plaintiffs agreed to the TOU on multiple occasions, including previous versions, the argument section, *infra*, focuses on the most recent versions they agreed to for each Platform (*i.e.*, the February 28, 2022 Tinder and Hinge TOU, the June 22, 2023 The League TOU, and the January 31, 2024 Tinder TOU) because the TOU, by their terms, supersede previous agreements. Ex. 1 §§ 15e, 19; Ex. 16 §§ 15e, 20; Ex. 25 §§ 15e, 20; Ex. 2 §§ 15e, 20, respectively.

1    which provides that all issues "are exclusively for the Arbitrator to decide, including but not limited

2    to scope and enforceability of this Dispute Resolution Section." Ex. 1 § 15c; Ex. 16 § 15c. Finally,

3    the TOU warn, in all caps, that the parties "WAIVE THE RIGHT TO A JURY TRIAL AND THE

4    RIGHT TO LITIGATE DISPUTES IN COURT IN FAVOR OF INDIVIDUAL ARBITRATION,"

5    and further warn that the parties "EACH WAIVE THE RIGHT TO FILE OR PARTICIPATE IN A

6    CLASS ACTION AGAINST THE OTHER OR OTHERWISE TO SEEK RELIEF ON A CLASS

7    BASIS." Ex. 1 § 15b; Ex. 16 § 15b.

8         The January 31, 2024 Tinder TOU is virtually identical. Section 1 of the January 31,

9    2024 Tinder TOU contains practically the same bold, all-capital paragraph advising users of the

10   dispute resolution provision as the February 28, 2022 Tinder TOU.[4] Ex. 2 § 1. Section 15 of the

11   January 31, 2024 Tinder TOU similarly provides that "[a]ny Dispute . . . shall be exclusively

12   resolved through BINDING INDIVIDUAL ARBITRATION," where "Dispute" is defined as "any

13   dispute, claim, or controversy between [the user] and Tinder that arises from or related in any way

14   to this Agreement (including any alleged breach of this Agreement), the Service, or our relationship

15   with you." *Id.* §§ 15a, 15c. Again, the section provides that "'Dispute' as used in this Agreement

16   shall have the broadest possible meaning and include claims that arose before the existence of this

17   or any prior Agreement and claims that arise during the term of this Agreement or after the

18   termination of this Agreement." *Id.* § 15a. And like the 2022 version, the 2024 version provides that,

19   other than small claims court disputes, all issues "are exclusively for the Arbitrator to decide,

20   including but not limited to scope and enforceability of this Dispute Resolution Section and

21   including questions of arbitrability." *Id.* § 15c. The 2024 version also warns in bold and all caps that

22   the parties "**EACH WAIVE THE RIGHT TO A JURY TRIAL AND THE RIGHT TO**

23   **LITIGATE DISPUTES IN COURT**," as well as "**EACH WAIVE THE RIGHT TO FILE OR**

24

25

26

27   ─────────────────

28   [4] The only difference is that the word "CLAIM" in the February 28, 2022 version changed to
     "DISPUTE" in the January 31, 2024 version. *Compare* Ex. 1 § 1, *with* Ex. 2 § 1.

1  **PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER OR OTHERWISE TO**
2  **SEEK RELIEF ON A CLASS BASIS.**" *Id.* § 15b.

3        The League's TOU over the last two years are similar. Both the January 24, 2022 and
4  June 22, 2023 versions contain bold, all-capital paragraphs near the beginning of the TOU, advising
5  users of the dispute resolution provision. Ex. 24 p. 2; Ex. 25 § 1. Section 14 of the January 24, 2022
6  version states that the parties "agree that every dispute arising in connection with these Terms will
7  be resolved by binding arbitration," and continues that "[t]his agreement to arbitrate disputes
8  includes all claims arising out of or relating to any aspects of these Terms." Ex. 24 § 14.1. If there
9  is an arbitrability dispute, Section 14.3 contains a delegation clause, providing that "[t]he arbitrator
10 has exclusive authority to resolve any dispute relating to the interpretation, applicability, or
11 enforceability of this binding arbitration agreement." *Id.* § 14.3. Section 14.1 warns in all caps that
12 the parties "ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE
13 IN A CLASS ACTION." *Id.* § 14.1.

14        Section 15 of the June 22, 2023 version similarly requires arbitration of "any dispute,
15 claim, or controversy between you and The League that arises from or relates in any way to this
16 Agreement (including any alleged breach of this Agreement), the Service, or our relationship with
17 you." Ex. 25 § 15a. Like the Tinder and Hinge TOU, the June 22, 2023 The League TOU reinforce
18 that "'Dispute' as used in this Agreement shall have the broadest possible meaning and include
19 claims that arose before the existence of this or any prior Agreement and claims that arise during the
20 term of this Agreement or after the termination of this Agreement." *Id.* And like the January 31,
21 2024 Tinder TOU, the June 22, 2023 The League TOU provide that, other than small claims court
22 issues, all issues "are exclusively for the Arbitrator to decide, including but not limited to scope and
23 enforceability of this Dispute Resolution Section and including questions of arbitrability." *Id.* § 15c.
24 The TOU also warn in bold caps that the parties "**EACH WAIVE THE RIGHT TO A JURY**
25 **TRIAL AND THE RIGHT TO LITIGATE DISPUTES IN COURT IN FAVOR OF**
26 **INDIVIDUAL ARBITRATION,**" and specifically warn that the parties "**EACH WAIVE THE**

27
28

1   **RIGHT TO FILE OR PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER OR**
2   **OTHERWISE TO SEEK RELIEF ON A CLASS BASIS.**" *Id.* § 15b.

3          The arbitration agreement in the February 28, 2022 Tinder TOU, February 28, 2022
4   Hinge TOU, January 31, 2024 Tinder TOU, and June 22, 2023 The League TOU expressly applies
5   to disputes with the Platform's affiliates. In each TOU, Section 15a notes, "[f]or purposes of this
6   Dispute Resolution Process and Arbitration Procedures set forth in Section 15, '[the Platform]' shall
7   include our affiliates, employees, licensors, and service providers." Ex. 1 § 15a; Ex. 16 § 15a; Ex. 2
8   § 15a; Ex. 25 § 15a, respectively. MGI, as the indirect parent company of the Platforms' operating
9   companies, is plainly an affiliate.

10          **C.  Plaintiffs Agreed to Arbitration When They Created Accounts on the Platforms,**
11          **When They Purchased a Subscription, Every Time They Accepted the Updated**
           **TOU, and Even When They Signed In to Their Accounts.**
12          Each Plaintiff's allegations and account data confirm that Plaintiffs, like all other
13   Platform users, agreed to the Platforms' TOU, including the arbitration agreement and class action
14   waiver.

15          **1.  Burak Oksayan**

16          Mr. Oksayan alleges that he "purchased a Tinder Gold monthly membership on
17   September 17, 2023 for $19.99 and a Tinder Platinum weekly membership on November 16, 2023
18   for $24.99," which form the gravamen of Mr. Oksayan's Complaint. Compl. ¶ 22. Taking these
19   allegations as true, he would have agreed to the February 28, 2022 Tinder TOU upon each of these
20   purchases. Specifically, when Mr. Oksayan initiated those purchases, he would have encountered a
21   screen stating "[b]y tapping Continue, . . . you agree to our **Terms**." Flashman Decl. ¶ 16 and Ex. 5.
22   This notice underscored and bolded a hyperlink to the February 28, 2022 Tinder TOU and was
23   displayed directly above the button Mr. Oksayan tapped to continue with his purchase. Flashman
24   Decl. ¶ 16. Mr. Oksayan could not have completed these purchases without tapping the "Continue"
25   button. Flashman Decl. *Id.*

26          Beyond these allegations, though, Mr. Oksayan's account history demonstrates that he
27   accepted the Tinder TOU on other occasions. Tinder's database shows that Mr. Oksayan created a

9

Tinder account in 2014. *Id.* ¶ 15. Mr. Oksayan continued using that account throughout 2022. When Mr. Oksayan accessed his account on April 20, 2022, he encountered a pop-up blocking modal requiring him to agree to the February 28, 2022 Tinder TOU if he wanted to continue using Tinder. *Id.* ¶ 18. The pop-up blocking modal informed users of the updated version of the TOU and explained that assent to the updated TOU was necessary to continue using Tinder's service. *Id.* and Ex. 3. The modal further informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. 3. This notice was directly above the "Agree" button, and the word "**Terms**" was displayed in contrasting bold blue font and underscored, which hyperlinked to the updated February 28, 2022 Tinder TOU. Ex. 3. Mr. Oksayan could not have continued using the Tinder service without tapping "Agree." Flashman Decl. ¶ 18.

Tinder's database also shows that Mr. Oksayan created another Tinder account in 2023, which required him to agree to the February 28, 2022 Tinder TOU as a condition of account creation. *Id.* ¶ 15. Tinder's database confirms that Mr. Oksayan purchased Tinder subscriptions in 2023, as alleged in the Complaint. *Id.* ¶ 17. As noted above, when Mr. Oksayan initiated those purchases, he again agreed to the February 28, 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**." *Id.* ¶ 17 and Ex. 5.

### 2. Jack Kessler

Mr. Kessler alleges that he "purchased a one-month subscription to Tinder Platinum on March 4, 2023 for $19.99," which purchase forms the gravamen of his claim as to Tinder, and that he "renewed at the lower Tinder Gold tier on May 7, 2023 for $14.99 and downgraded his subscription to Tinder Plus on July 12, 2023 for $9.99." Compl. ¶ 23. Taking those allegations as true, each time Mr. Kessler initiated a purchase, he agreed to the February 28, 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 21 and Ex. 6. Mr. Kessler could not have completed his purchases without tapping the "Continue" button. Flashman Decl. ¶ 21.

As with Mr. Oksayan, review of Tinder's database confirms that Mr. Kessler agreed to the Tinder TOU on a number of other occasions. Mr. Kessler first created a Tinder account on July

15, 2016 and agreed to the then-effective TOU. Flashman Decl. ¶ 19. Mr. Kessler continued to use his original Tinder account throughout 2022. When Mr. Kessler accessed his account on March 30, 2022, he encountered a pop-up blocking modal requiring him to agree to the February 28, 2022 Tinder TOU if he wanted to continue using Tinder. *Id.* ¶ 20. The pop-up blocking modal informed users of the updated version of the TOU and explained that assent to the updated TOU was necessary to continue using Tinder's service. *Id.* and Ex. 3. The modal further informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. 3. This notice was directly above the "Agree" button, and the word "**Terms**" was displayed in contrasting bold blue font and underscored, which hyperlinked to the updated February 28, 2022 Tinder TOU. Ex. 3. Mr. Kessler could not have continued using the Tinder service without tapping "Agree." Flashman Decl. ¶ 20.

Tinder's database also confirms that Mr. Kessler purchased Tinder subscriptions in 2023, as alleged in the Complaint. Flashman Decl. ¶ 22. Each time Mr. Kessler initiated a purchase during this time, he again agreed to the February 28, 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**." *Id.* and Ex. 6.

Further, when Mr. Kessler last signed in to Tinder on October 31, 2023, he once again agreed to the February 28, 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' you agree to our Terms," with an underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 23 and Ex. 7. Mr. Kessler could not have signed in without tapping the "Sign in" button. Flashman Decl. ¶ 23.

Mr. Kessler also alleges that he "purchased a Hinge Quarterly Subscription on February 23, 2023," which forms the basis for his claim related to Hinge, and that "he renewed on August 23, 2023 and November 23, 2023 for $59.99 per quarter." Compl. ¶ 23. Assuming those allegations are true, when Mr. Kessler initiated his purchase, he agreed to the February 28, 2022 Hinge TOU when he was presented with a screen stating, "[b]y tapping Continue, you agree to our Terms," with an underscored hyperlink to the February 28, 2022 Hinge TOU. Greenspan Decl. ¶ 14 and Ex. 18. Mr. Kessler could not have completed this purchase without tapping the "Continue" button. Greenspan Decl. ¶ 14.

1        Hinge's database confirms that Mr. Kessler agreed to the Hinge TOU on a number of

2   other occasions as well. Mr. Kessler created a Hinge account on April 16, 2022, which required him

3   to agree to the February 28, 2022 Hinge TOU. Greenspan Decl. ¶ 13. Hinge's database confirms Mr.

4   Kessler purchased Hinge subscriptions in 2023. *Id.* ¶ 15. Each time Mr. Kessler initiated a purchase

5   during this time, he again agreed to the February 28, 2022 Hinge TOU when he was presented with

6   a screen stating, "[b]y tapping Continue, you agree to our <u>Terms</u>," with an underscored hyperlink to

7   the February 28, 2022 Hinge TOU. *Id.* ¶ 15 and Ex. 18.

8        Further, when Mr. Kessler last signed in to Hinge on August 9, 2023, he again agreed to

9   the February 28, 2022 Hinge TOU when he was presented with a screen stating "[b]y tapping 'Sign

10   in' / 'Create account', you agree to our **<u>Terms of Service</u>**" with an underscored and bolded hyperlink

11   to the February 28, 2022 Hinge TOU. Greenspan Decl. ¶ 16 and Ex. 19. Mr. Kessler could not have

12   signed in without tapping the "Sign in" button. Greenspan Decl. ¶ 16.

13       **3. Andrew St. George**

14        Mr. St. George claims that he purchased "roses" from Hinge between September 2022

15   and May 2023, which form the basis for his claims. Compl. ¶ 24. Assuming those allegations are

16   true, Mr. St. George necessarily agreed to the February 28, 2022 Hinge TOU at least via a pop-up

17   blocking modal, as he would not have been able to navigate within the app to purchase roses without

18   having encountered the blocking modal. Greenspan Decl. ¶ 18. Indeed, Hinge's database reflects

19   that on March 3, 2022, Mr. St. George accepted the February 28, 2022 Hinge TOU when he

20   encountered a pop-up blocking modal informing him that the TOU had been updated and explaining

21   that assent to the updated TOU was necessary to continue using Hinge. *Id.* and Ex. 17. The pop-up

22   blocking modal informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. 17.

23   This notice was directly above the "Agree" button and the word "**Terms**" was displayed in

24   contrasting bold purple font, which hyperlinked to the updated February 28, 2022 Hinge TOU. *Id.*

25   Mr. St. George could not have continued using the Hinge service, and purchased his "roses," without

26   tapping "Agree," thereby expressing his consent to the February 28, 2022 Hinge TOU. Greenspan

27   Decl. ¶ 18.

28

Additionally, when Mr. St. George last signed in to his Hinge account on June 22, 2023, he again agreed to the February 28, 2022 Hinge TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' / 'Create account', you agree to our **Terms of Service**," with a bolded and underscored hyperlink to the February 28, 2022 Hinge TOU. *Id.* ¶ 19 and Ex. 20. Mr. St. George could not have signed in without tapping the "Sign in" button. Greenspan Decl. ¶ 19.

### 4. Jami Kandel

Jami Kandel alleges that she "purchased Tinder, Hinge, and The League . . . subscriptions within the last two years." Compl. ¶ 25. Assuming those allegations are true, Ms. Kandel would have agreed to one or more versions of the TOU on each Platform.[5]

As to Tinder, if Ms. Kandel created a Tinder account in 2022, she would have agreed to the February 28, 2022 Tinder TOU during account creation when she was presented with a screen stating "[b]y tapping Create Account or Sign In, you agree to our <u>Terms</u>" with an underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 25. Ms. Kandel could not have created a Tinder account in 2022 without tapping the "Create Account" button. *Id.* ¶¶ 6, 25. If Ms. Kandel made subscription purchases on Tinder within the last two years, as she alleges, when she initiated those purchases, she again agreed to the February 28, 2022 Tinder TOU when she was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**." *Id.* ¶ 26 and Ex. 9. This notice underscored and bolded a hyperlink to the February 28, 2022 Tinder TOU and was displayed directly below the button Ms. Kandel pressed to continue with her purchase. Ex. 9. Ms. Kandel could not have completed these purchases without tapping the "Continue" button. Flashman Decl. ¶ 26.[6] Further, if Ms. Kandel was active on Tinder since 2022, she could not have continued using her account, and making her alleged purchases, without agreeing to the February 28, 2022 Tinder TOU after encountering a pop-up blocking modal informing her of the updated

---

[5] With currently available information, Tinder, Hinge, and The League did not identify any accounts believed to belong to Ms. Kandel with purchases within the last two years. Flashman Decl. ¶ 24; Greenspan Decl. ¶ 22; Krosnjar Decl. ¶ 13.

[6] If Ms. Kandel made her purchases between January 31, 2024 and February 14, 2024 (the date the Complaint was filed), Ms. Kandel would have agreed to the January 31, 2024 Tinder TOU instead. Flashman Decl. ¶ 26. But as described above, there is no practical difference between the 2022 and 2024 TOU for purposes of this Motion.

version of the TOU and explaining that assent to the updated TOU was necessary to continue using Tinder's service. *Id.* ¶ 27 and Ex. 3. The pop-up blocking modal informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. 3. This notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold blue font and underscored, which hyperlinked to the updated February 28, 2022 Tinder TOU. *Id.* Ms. Kandel could not have used the Tinder services from 2022 until the present, as she alleges she did, without tapping "Agree." Flashman Decl. ¶ 27.[7]

As to Hinge, if Ms. Kandel purchased Hinge subscriptions within the last two years, she would have agreed to the February 28, 2022 Hinge TOU when she was presented with a screen stating, "[b]y tapping Continue, you agree to our Terms," with an underscored hyperlink to the February 28, 2022 Hinge TOU. Greenspan Decl. ¶ 23 and Ex. 18. Ms. Kandel could not have completed this purchase without tapping the "Continue" button. Greenspan Decl. ¶ 23.

Aside from those allegations, Hinge's database confirms that Ms. Kandel agreed to the Hinge TOU. Ms. Kandel created a Hinge account on March 18, 2021 and agreed to the then-effective TOU. *Id.* ¶ 20. On March 3, 2022, Ms. Kandel agreed to the February 28, 2022 Hinge TOU after encountering a pop-up blocking modal informing her of the updated version of the TOU and explaining that assent to the updated TOU was necessary to continue using Hinge. *Id.* ¶ 21 and Ex. 17. The pop-up blocking modal informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. 17. This notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold purple font, which hyperlinked to the updated February 28, 2022 Hinge TOU. *Id.* Ms. Kandel could not have continued using the Hinge service without tapping "Agree." Greenspan Decl. ¶ 21.

As to The League, if Ms. Kandel created an account on The League since 2022, she would have been required to check a box agreeing to The League TOU before creating an account. Krosnjar Decl. ¶ 14 and Ex. 23. The TOU are easily accessible and available for review through a

---

[7] If Ms. Kandel attempted to access her account between January 31, 2024 and February 14, 2024, she would have encountered a pop-up blocking modal informing her of the January 31, 2024 TOU update. Flashman Decl. ¶ 27.

conspicuous hyperlink in contrasting blue font. *Id.* ¶ 5. If Ms. Kandel did not check the box acknowledging her agreement to The League TOU, a pop-up blocker screen would appear with a message in bold, capitalized letters: "TO[U] ACCEPTANCE REQUIRED," followed by a notice that she must agree to The League's TOU and Privacy Policy to continue in the account creation process. *Id.* ¶ 14 and Ex. 28.

Additionally, if Ms. Kandel was active on The League since 2022, she could not have continued using her account, and making her alleged purchases, without encountering at least one pop-up blocking modal screen requiring acceptance of the updated The League TOU. Krosnjar Decl. ¶ 15. If Ms. Kandel was active on The League after January 24, 2022, she would have encountered a pop-up blocking modal screen with the full version of the January 24, 2022 The League TOU. If Ms. Kandel continued to be active on The League after June 22, 2023, she would have encountered a pop-up blocking modal screen with the full version of the updated June 22, 2023 The League TOU. *Id.* ¶ 9. The pop-up blocking modal informed users that "[b]y tapping "I accept", you agree to our updated Terms of Service below." Ex. 27. Ms. Kandel could not have continued using The League service after June 2023 without tapping "I accept." Krosnjar Decl. ¶ 15.

### 5. Bradford Schlosser

Mr. Schlosser claims that he "purchased a one-month premium subscription to Tinder for $12.49 on October 26, 2022," upon which he bases his claims as to Tinder. Compl. ¶ 26. Assuming that allegation is true, when Mr. Schlosser made that purchase, he agreed to the February 28, 2022 Tinder TOU, as he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **<u>Terms</u>**," with a bolded and underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 29 and Ex. 12. Mr. Schlosser could not have completed this purchase without tapping the "Continue" button. Flashman Decl. ¶ 29.

Tinder's database confirms that Mr. Schlosser agreed to the Tinder TOU on other occasions as well. Mr. Schlosser created multiple Tinder accounts between 2016 and 2022 and agreed to the then-effective TOU each time. *Id.* ¶ 28. When Mr. Schlosser created his most recent account on October 23, 2022, he agreed to the February 28, 2022 Tinder TOU during account creation when he was presented with a screen stating "[b]y tapping Create Account or Sign In, you

agree to our <u>Terms</u>" with an underscored hyperlink to the February 28, 2022 Tinder TOU. *Id.* and Ex. 8. Mr. Schlosser could not have created his Tinder account without tapping the "Create Account" button. Flashman Decl. ¶¶ 6, 28.

Tinder's database confirms that Mr. Schlosser purchased a subscription in late 2022, as alleged in the Complaint. *Id.* ¶ 29. When Mr. Schlosser made that purchase, he again agreed to the February 28, 2022 Tinder TOU, as he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **<u>Terms</u>**," with a bolded and underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 29 and Ex. 12.

Additionally, when Mr. Schlosser last signed in to his Tinder account on December 9, 2023, he again agreed to the February 28, 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' you agree to our <u>Terms</u>," with an underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 30 and Ex. 7. Mr. Schlosser could not have signed in without tapping a "Sign in" button. Flashman Decl. ¶ 30.

Mr. Schlosser also alleges that he purchased Hinge subscriptions in December 2022 and October 2023, which form the basis for his Complaint as to Hinge. Compl. ¶ 26. Assuming the truth of those allegations, when Mr. Schlosser made each of those purchases, he agreed to the February 28, 2022 Hinge TOU, as he was presented with a screen stating, "[b]y tapping Continue, you agree to our <u>Terms</u>," with an underscored hyperlink to the February 28, 2022 Hinge TOU. Greenspan Decl. ¶ 25 and Exs. 21–22. Mr. Schlosser could not have completed these purchases without tapping the "Continue" button. Greenspan Decl. ¶ 25.

Hinge's database confirms that Mr. Schlosser agreed to the February 28, 2022 Hinge TOU on other occasions as well. Mr. Schlosser created a Hinge account on September 25, 2022 and agreed to the February 28, 2022 Hinge TOU upon account creation. *Id.* ¶ 24. Hinge's database confirms that Mr. Schlosser purchased subscriptions in late 2022 and in 2023. *Id.* ¶ 26. As noted above, when he made each of those purchases, Mr. Schlosser again agreed to the February 28, 2022 Hinge TOU, when he was presented with a screen stating, "[b]y tapping Continue, you agree to our <u>Terms</u>." Greenspan Decl. ¶ 26 and Exs. 21–22.

### 6.  Andrew Karz

Mr. Karz alleges that he purchased Tinder subscriptions in January 2023, February 2023, and November 2023, which form the basis for his claims. Compl. ¶ 27. Assuming those allegations are true, when Mr. Karz made those purchases, he agreed to the February 28, 2022 Tinder TOU, as he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the February 28, 2022 Tinder TOU. Flashman Decl. ¶ 32 and Exs. 13, 14, and 11 respectively. Mr. Karz could not have completed these purchases without tapping the "Continue" button. Flashman Decl. ¶ 32.

Tinder's database confirms that Mr. Karz agreed to the Tinder TOU on multiple occasions. Mr. Karz created multiple Tinder accounts. *Id.* ¶ 31. Upon creation of these accounts, Mr. Karz encountered an account creation screen that stated that by creating an account, he accepted the then-effective TOU. *Id.* He most recently created an account on November 14, 2023, and at that time he agreed to the February 28, 2022 Tinder TOU. *Id.*

Tinder's database also confirms that Mr. Karz purchased Tinder subscriptions in 2023. *Id.* ¶ 33. When Mr. Karz initiated a purchase, he again agreed to the February 28, 2022 Tinder TOU, when he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the February 28, 2022 Tinder TOU. *Id.* and Exs. 13, 14, and 11, respectively.

Finally, Tinder's database shows that Mr. Karz purchased another Tinder subscription on January 31, 2024. Flashman Decl. ¶ 34. When doing so, Mr. Karz encountered a screen that informed him, "[b]y tapping Continue, . . . you agree to our **Terms**." The word "**Terms**" was a hyperlink to the January 31, 2024 Tinder TOU. *Id.* and Ex. 15. By tapping "Continue," Mr. Karz agreed to the January 31, 2024 Tinder TOU. Flashman Decl. ¶ 34.

## III.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the parties' agreements to arbitrate. *See* 9 U.S.C. § 2 (the FAA applies to any "contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [or]

17

1 transaction"). Furthermore, the TOU expressly state that the FAA applies to "any Dispute" such as

2 the one in this lawsuit. *See* Ex. 1 § 16; Ex. 16 § 16; Ex. 2 § 16; Ex. 25 § 16.

3     Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable,

4 save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

5 The FAA reflects both a "liberal federal policy favoring arbitration" and the "fundamental principle

6 that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)

7 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Rent-A-Ctr.,*

8 *West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). In considering a motion to compel arbitration, the

9 two issues for the court are: "(1) whether there is an agreement to arbitrate between the parties; and

10 (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th

11 Cir. 2015).

12     Pursuant to the FAA's strong policy favoring arbitration, a court's role is strictly

13 circumscribed when ruling on a motion to compel arbitration. As the Ninth Circuit explained, the

14 "[FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that

15 district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration

16 agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th

17 Cir. 2000) (citations omitted) (emphasis in original). "The standard for demonstrating arbitrability

18 is not high," and agreements to arbitrate "are to be rigorously enforced." *Simula, Inc. v. Autoliv, Inc.*,

19 175 F.3d 716, 719 (9th Cir. 1999).

20     Further, where (as here) an arbitration agreement "delegates the arbitrability issue to an

21 arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales,*

22 *Inc.*, 139 S. Ct. 524, 530 (2019). "[P]arties may agree to have an arbitrator decide not only the merits

23 of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties

24 have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 529

25 (citation omitted). Accordingly, such provisions must be enforced according to their terms. *Id.*

26     Finally, where an entire action is subject to arbitration, "a district court may either stay

27 the action or dismiss it outright." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073–

28

18

1    74 (9th Cir. 2014); 9 U.S.C. § 3; *see also Song v. Charter Commc'ns, Inc.*, No. 17CV325 (JLB),

2    2017 WL 1149286, *3 (S.D. Cal. Mar. 28, 2017).

3    **IV.    ARGUMENT**

4              The FAA requires enforcement of the arbitration agreements at issue here because the

5    Plaintiffs entered into valid agreements to arbitrate on an individual basis, and the TOU plainly

6    encompass Plaintiffs' claims and prayers for relief. This case must be dismissed, and the parties'

7    dispute compelled to arbitration.

8              **A.   Under Settled Contract Principles, Plaintiffs Agreed to Arbitrate Their Claims.**

9              Plaintiffs entered into binding arbitration agreements when they consented to the TOU

10   (containing a section requiring individual arbitration of disputes) when creating accounts, any time

11   they accepted updated TOU on the blocking modal screen, when they purchased a subscription, and,

12   in some instances, when they signed in to the Platforms. Arbitration agreements governed by the

13   FAA, such as the agreements here, are presumed to be valid and enforceable. *Shearson/Am. Express,*

14   *Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*

15   *Inc.*, 473 U.S. 614, 626–27 (1985). Plaintiffs bear the burden of proving otherwise. *Gonzalez-*

16   *Torres v. Zumper, Inc.*, No. 19-cv-02183-PJH, 2019 WL 6465283, at *3 (N.D. Cal. Dec. 2, 2019).

17             As explained above, on multiple occasions, Plaintiffs were notified that by using the

18   Platforms—whether by creating an account, purchasing a subscription, agreeing to updated TOU, or

19   signing in—they agreed to the TOU. Flashman Decl. ¶¶ 15, 17–18, 20, 22–23, 28–31, 33–34;

20   Greenspan Decl. ¶¶ 13, 15–16, 18–19, 21, 24, 26; Krosnjar Decl. ¶¶ 14–15. The word "Terms" (or

21   similar) was hyperlinked to the full text of the TOU.[8] Flashman Decl. ¶¶ 6–8, 11–12; Greenspan

22   Decl. ¶¶ 6–8, 10; Krosnjar Decl. ¶ 5. And the TOU contained clear and conspicuous arbitration

23   agreements, including class action waivers.

24             Courts consistently enforce arbitration agreements when consumers create an account or

25   complete a purchase knowing the transaction is subject to terms and conditions. *See Lee v.*

26   *Ticketmaster L.L.C.*, 817 F. App'x 393, 394–95 (9th Cir. 2020) (enforcing arbitration agreement

27

28   ---
     [8] The League's 2022 and 2023 blocking modals displayed the full text of the TOU rather than a
     hyperlink. Krosnjar Decl. ¶¶ 8–9 and Exs. 26–27.

where website provided "sufficient notice for constructive assent" by displaying the advisory, "[b]y continuing past this page, you agree to our Terms of Use"); *Robbins v. Mscripts, LLC*, No. 23-cv-013810-LB, 2023 WL 5723220, at *4–5 (N.D. Cal. Sept. 5, 2023) (enforcing arbitration agreement where "the plaintiff inputted data and clicked a button to create the account directly below a statement that he agreed to the terms (and featuring a bright blue hyperlink to the terms)"); *cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587, 593–95 (1991) (enforcing forum selection clause consumers would not have seen unless the consumer obtained a copy of terms and conditions referenced on the back of tickets); *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 989 (N.D. Cal. 2010) (enforcing limited warranty agreement contained within product packaging).

Similarly, courts consistently enforce the type of agreement used by the Platforms. *See Oberstein v. Live Nation Ent., Inc.*, 60 F. 4th 505, 515–16 (9th Cir. 2023). For example, the Ninth Circuit upheld an order compelling arbitration where, three lines below the "Sign In" button, a website displayed the phrase, "[b]y continuing past this page, you agree to our Terms of Use" and where a similar advisory appeared above the "Place Order" button at checkout. *See Ticketmaster*, 817 F. App'x at 394–95. Accordingly, users who are notified that they are agreeing to terms of service by creating an account or completing a purchase are bound to the terms of service, even where the platform does not require users to click an "I agree" button. *See, e.g.*, *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (compelling arbitration where the mobile application displayed the notice, "[b]y creating an Uber account, you agree to the Terms & Conditions and Privacy Policy").

Indeed, courts in this Circuit have previously compelled arbitration based on similar agreements leading to Tinder's previous TOU and TOU of other affiliates. *See Kim v. Tinder, Inc.*, No. 18-CV-03093-JFW (AS), 2018 WL 6694923, *2–*3 (C.D. Cal. July 12, 2018) (compelling arbitration where "Plaintiff logged in to her Tinder account through a login screen on her phone which stated that tapping the Log In button would constitute consent to the [terms of use]"); *Graf v. Match.com, LLC*, No. 15-CV-3911-PA (MRWX), 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (compelling arbitration where user was "required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button" and where it was explained that "by

20

1   clicking on that button, the user was affirming that they would be bound" by the terms); *Kahl v.*

2   *Plentyoffish Media, ULC*, No. 23-cv-00985-AGT (N.D. Cal.), Dkt. No. 19 (compelling arbitration).

3           The Platforms' account creation, checkout for purchases, blocking modal pages, and/or

4   sign-in screens during the relevant time period contained "explicit textual notice that continued use

5   will act as a manifestation of the user's intent to be bound." *Ticketmaster*, 817 Fed. App'x at 394;

6   *see* Flashman Decl. ¶¶ 6–8, 11–12; Greenspan Decl. ¶¶ 6–8, 10; Krosnjar Decl. ¶¶ 5, 8–9. 14–15.

7   Plaintiffs manifested consent to the TOU each time they tapped "Continue," "Create account," "Sign

8   in," "Agree," or "I accept" adjacent to a disclosure that clearly explained that tapping that button

9   constituted agreement to the TOU—made accessible via a conspicuously displayed hyperlink.[9] "This

10   method of consent is fully enforceable." *Kim*, 2018 WL 6694923 at *2 (citations omitted). Therefore,

11   Plaintiffs accepted the Platforms' TOU, including the provisions compelling individual arbitration

12   of any dispute and waiving the right to a jury trial and to pursue a class action. *See Oberstein*, 60

13   F.4th at 515–16 (affirming order compelling arbitration where user clicked a "Sign In" button above

14   language stating "[b]y continuing past this page, you agree to the Terms of Use"); *Capps v.*

15   *JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal.

16   Apr. 21, 2023) (compelling arbitration where account creation page had a hyperlink to the terms of

17   use); *Rainey v. A Place for Rover, Inc.*, No. 2:22-cv-00403-RGK-E, 2022 WL 16942849, at *2 (C.D.

18   Cal. July 18, 2022) (same). Accordingly, Plaintiffs entered into a binding agreement to arbitrate their

19   claims on an individual basis.

20        **B.  MGI Can Enforce the Arbitration Agreement.**

21           MGI is not a signatory to the TOU, but it can enforce the arbitration agreement against

22   Plaintiffs, who are signatories. As noted above, the arbitration agreement in the operative versions

23   of the TOU (February 28, 2022 Tinder TOU, February 28, 2022 Hinge TOU, January 31, 2024

24   Tinder TOU, and June 22, 2023 The League TOU) expressly applies to disputes with the Platform's

25   affiliates. Section 15a notes, "[f]or purposes of this Dispute Resolution Process and Arbitration

---

[9] The League's 2022 and 2023 blocking modals contained the full text of the updated TOU in the blocking modal itself rather than a hyperlink. Krosnjar Decl. ¶¶ 8–9. Additionally, as noted above, The League users had to check a box acknowledging that "[b]y signing up for The League you agree to our **Terms of Service**," in order to create an account. *Id.* and Ex. 5.

DEFENDANT MATCH GROUP, INC.'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:24-CV-00888-LB

1    Procedures set forth in Section 15, '[the Platform]' shall include our affiliates, employees, licensors,

2    and service providers." Ex. 1 § 15a; Ex. 16 § 15a; Ex. 2 § 15a; Ex. 25 § 15a, respectively. Thus,

3    Plaintiffs agreed to arbitrate "any dispute, claim, or controversy between" themselves and any of the

4    Platforms' affiliates "that arises from or related in any way to this Agreement, the Service, or our

5    relationship with you." Ex. 1 § 15a; Ex. 16 § 15a; Ex. 2 § 15a; Ex. 25 § 15a. MGI, as the indirect

6    parent company of the Platforms' operating companies, Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4;

7    Krosnjar Decl. ¶ 4, is plainly an affiliate, and is thus plainly within the scope of counterparties with

8    which Plaintiffs agreed to arbitrate. *See Hajibekyan v. BMW of N. Am., LLC*, 839 Fed. App'x 187,

9    188 (9th Cir. 2021) (holding that a parent company is an "affiliate" and can enforce an arbitration

10   agreement between a plaintiff and a subsidiary); *Kaselitz v. hiSoft Tech. Int'l, Ltd.*, No. C-12-5760

11   MMC, 2013 WL 622382, at *6–7 (N.D. Cal. Feb. 15, 2013) (holding that a non-signatory "parent"

12   of a signatory to the arbitration agreement had standing to invoke the arbitration agreement because

13   the agreement "on its face . . . encompasses entities other than [the signatory], including affiliates

14   thereof").

15          Even if the TOU did not explicitly mention affiliates, however, equitable estoppel allows

16   MGI to enforce the arbitration agreement against Plaintiffs. "Under California law, a nonsignatory

17   to a contract may enforce an arbitration provision under the doctrine of equitable estoppel when 'the

18   claims [against the nonsignatory] are "intimately founded in and intertwined with" the underlying

19   contract.'" *Herrera v. Cathay Pac. Airways Ltd.*, 94 F.4th 1083, 1087–88 (9th Cir. 2024) (quoting

20   *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013)).[10]

21          Plaintiffs' claims against MGI are premised on Plaintiffs' subscription purchases on the

22   Platforms. *See* Compl. ¶¶ 22-27 (describing alleged purchases). Plaintiffs allege, for example, that

23   they "would not have purchased the Platform subscriptions, would not have paid as much for them,

24   or would have engaged with the Platforms responsibility [sic]," had they known the Platforms are

25   addictive. Compl. ¶ 29. Plaintiffs even point to their alleged "purchase of the Platform

26

27   _____

     [10] The Fifth Circuit has held that Texas law, which governs the TOU, also recognizes a form of
28   "intertwined claims estoppel" that allows a nonsignatory to enforce an arbitration agreement against a
     signatory. *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 630-31 (5th Cir. 2016).

subscriptions"—purchases that were governed by the TOU—as the "transactions" necessary to support their CLRA claim. Compl. ¶ 110. And they allege a claim for "breach of express warranty," Compl. ¶¶ 199-203, even though the TOU expressly disclaim any representations or warranties. *See* Ex. 1 § 12; Ex. 16 § 11; Ex. 2 § 11; Ex. 25 § 11. Thus, Plaintiffs' claims are premised on Plaintiffs' use of and their relationship with the Platforms, all of which are governed by the TOU and the arbitration agreement contained within them, and implicate the parties' rights and responsibilities under the TOU. In that way, this case is similar to *Herrera*, where the plaintiffs' claim implicated rights and responsibilities under Terms & Conditions between plaintiffs and a third party. 94 F.4th at 1087–88. So too here. Plaintiffs' claims are "intimately founded in and intertwined with" the underlying TOU, so MGI is entitled to enforce the Plaintiffs' agreement to arbitrate their claims.

**C.  The Scope of the Arbitration Agreement Is for the Arbitrator to Decide.**

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein*, 139 S. Ct. at 528; *see Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). Under the relevant TOU, arbitrability disputes are delegated to the arbitrator. *See* Ex. 1 § 15c; Ex. 16 § 15c; Ex. 2 § 15c; Ex. 25 § 15c (designating issues including the "scope and enforceability" of the arbitration agreement to the arbitrator).

A provision delegating the question of arbitrability to the arbitrator is enforceable. *See Henry Schein*, 139 S. Ct. at 531; *Rent-A-Center, West, Inc.*, 561 U.S. at 68–70. Accordingly, the Court need not determine whether this case is within the scope of the arbitration agreements, as that determination has been delegated to the arbitrator.

**D.  In Any Event, the Agreements to Arbitrate Clearly Encompass These Claims.**

Even if the Court were to address the question of arbitrability, it is clear that the arbitration agreements cover Plaintiffs' claims. The relevant TOU provide that "[a]ny dispute, claim or controversy between you and [the Platform] … that arises from or relates in any way to this Agreement …, the Services, or our relationship with you (collectively, 'Dispute'), shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION." Ex. 1 § 15c; Ex. 16 § 15c

23

1   (emphasis in original); Ex. 2 §§ 15a, 15c (same); Ex. 25 § 15a, 15c (same). The TOU continue that

2   "'Dispute' as used in this Agreement shall have the broadest possible meaning." Ex. 1 § 15c; Ex. 16

3   § 15c; Ex. 2 § 15a; Ex. 25 § 15a. "This type of language has been interpreted broadly by . . . the

4   Ninth Circuit[.]" *Edwards v. Verizon*, No. CV 14-09394 BRO, 2015 WL 13654015, at *4 (C.D. Cal.

5   Jan. 26, 2015) (compelling claims to arbitration based on provision stating "*any dispute* that in any

6   way relates to or arises out of this agreement" will be resolved through arbitration (emphasis in

7   original)); *Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*, 497 Fed. App'x 740, 742 (9th Cir. 2012)

8   (broadly construing a provision that stated "[a]ny dispute, controversy or claim arising from or

9   relating to this Agreement shall be submitted to and determined by binding arbitration" to compel

10  claims to arbitration).

11      MGI contends that Plaintiffs' allegations are baseless. But regardless of their merits, each

12  of the pleaded causes of action relates to "the Services" provided by the Platforms through

13  subscriptions and the "relationship" the Platforms have with Plaintiffs as users. This is so because

14  Plaintiffs' claims involve allegations regarding the way the services are marketed to users like

15  Plaintiffs and purchases Plaintiffs made purportedly in reliance on the Platforms' representations.

16  *See* Compl. ¶¶ 105–243. The TOU require all such disputes to be resolved exclusively through

17  binding individual arbitration. Ex. 1 § 15c; Ex. 16 § 15c; Ex. 2 § 15c; Ex. 25 § 15c. Therefore, each

18  of these claims fall within the scope of the arbitration agreements contained within the relevant TOU.

19  *See, e.g.*, *Estrella v. Freedom Fin.*, No. C 09-03156 SI, 2011 WL 2633643, at *5 (N.D. Cal. July 5,

20  2011) (ordering plaintiffs to arbitrate their UCL and CLRA claims where the arbitration clause

21  covered "any controversy, claim or dispute . . . arising out of or relating to" the contract).

22      **E.  This Case Must Be Dismissed or Stayed Pending Completion of Arbitration.**

23      "In the Ninth Circuit, notwithstanding the language of § 3, a district court may . . . dismiss

24  [an action] outright when, as here, the court determines that all of the claims raised in the action are

25  subject to arbitration." *Sweeney v. Tractor Supply Co.*, 390 F. Supp. 3d 1152, 1162 (N.D. Cal. 2019).

26  Courts routinely hold that "a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction

27  is a procedurally sufficient mechanism to enforce an arbitration provision." *Laver v. Credit Suisse*

28  *Securities (USA), LLC*, No. 18-CV-00828-WHO, 2018 WL 3068109, at *4 (N.D. Cal. June 21, 2018)

24

aff'd, 976 F.3d 841 (9th Cir. 2020); *see also Harris v. Pacific Gas & Electric Co.*, No. 21-CV-04096-JCS, 2022 WL 16637987, at *6 (N.D. Cal. Nov. 2, 2022) (granting 12(b)(1) motion to dismiss based on arbitration agreement that delegated arbitrability to the arbitrator and explaining that "Rule 12(b)(1) is appropriate for dismissing claims subject to arbitration because it 'is a flexible rule' that often serves as a vehicle for raising residual defenses and the Federal Arbitration Act requires only that a party 'petition' the court for an order directing arbitration to proceed").

Even if the Court does not dismiss Plaintiffs' claims, it must, at a minimum, stay them. Under the FAA, upon application of a party, a court "shall" stay further proceedings in a legal action if it finds that "any issue" in the case should be referred to arbitration under an agreement in writing for such arbitration. 9 U.S.C. § 3. Given that Plaintiffs and MGI are mutually bound to arbitration, the Court must dismiss or at least stay this litigation pending conclusion of the arbitration of Plaintiffs' claims.

## V.   CONCLUSION

For the foregoing reasons, MGI respectfully requests that the Court grant its Motion to Compel Arbitration and Dismiss or Stay Proceedings.

1   Dated: April 15, 2024                    Respectfully submitted,

2

3                                            SIDLEY AUSTIN LLP

4                                            By:   */s/ Amy P. Lally*
                                                   Amy P. Lally, SBN 198555
5                                                  alally@sidley.com
                                                   SIDLEY AUSTIN LLP
6                                                  1999 Avenue of the Stars, 17th Floor
                                                   Los Angeles, CA 90067
7                                                  Tel: (310) 595-9662
                                                   Fax: (310) 595-9501
8

9                                                  Angela C. Zambrano (*pro hac vice*)
                                                   angela.zambrano@sidley.com
10                                                 Chelsea A. Priest (*pro hac vice*)
                                                   cpriest@sidley.com
11                                                 Kathrine Maldonado (*pro hac vice*)
                                                   kmaldonado@sidley.com
12                                                 SIDLEY AUSTIN LLP
                                                   2021 McKinney Avenue, Suite 2000
13                                                 Dallas, TX 75201
                                                   Tel: (214) 981-3476
14                                                 Fax: (214) 981-3400
15

16                                                 *Attorneys for Defendant Match Group, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MATCH GROUP, INC.'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:24-CV-00888-LB