**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Kelsey J. Elling (SBN 337915)
*kelling@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Counsel for Plaintiffs and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BURAK OKSAYAN, JACK KESSLER, ANDREW ST. GEORGE, BRADFORD SCHLOSSER, ANDREW KARZ, JAMI KANDEL, CHASE TAYLOR, HUSSEIN SAAB, and OLUMUYIWA OLANIYAN individually, and/or on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MATCHGROUP, INC.<br><br>Defendant. | Case No.: 3:24-cv-00888-LB<br>Filed: 2/14/2024<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1. VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT, ("CLRA") CAL. CIV. CODE § 1750<br>2. VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW ("FAL"), BUSINESS AND PROFESSIONS CODE § 17500<br>3. VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), BUSINESS AND PROFESSIONS CODE § 17200<br>4. VIOLATION OF NY GBL § 349<br>5. VIOLATION OF NY GBL § 350<br>6. VIOLATION OF GEORGIA DECEPTIVE TRADE PRACTICE LAW OCGA § 10-1-372<br>7. VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FL. STAT. § 501.201, *et seq.*<br>8. VIOLATION OF MISSOURI PRACTICES ACT ("MPA"), Mo. Rev. Stat § 407.025<br>9. VIOLATION OF MARYLAND CONSUMPER PROTECTION ACT, MD Code CL 13-301<br>10. VIOLATION OF MICH. COMP. LAWS ANN. § 445.903<br>11. VIOLATION OF VA. CODE § 59.1-200<br>12. FRADULENT ENDUCEMENT<br>13. DURESS<br>14. BREACH OF EXPRESS WARRANTY<br>15. UNJUST ENRICHMENT<br>16. STRICT PRODUCTS LIABILITY – FAILURE TO WARN<br>17. NEGLIGENCE – DESIGN<br>18. NEGLIGENCE – FAILURE TO WARN<br><br>**DEMAND FOR JURY TRIAL** |

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Plaintiffs Burak Oksayan, Jack Kessler, Andrew St. George, Bradford Schlosser, Andrew Karz, Jami Kandel, Chase Taylor, Hussein Saab, and Olumuyiwa Olaniyan ("Plaintiffs"), individually, on behalf of all other similarly situated consumers (the "Class"), and the public, as more fully described herein, bring this class action complaint against MatchGroup, Inc. ("Defendant" or "Match"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys.

I.   **SYNOPSIS**

1.     Over the past decade, MatchGroup's application-based dating platforms (Tinder, Hinge, and The League, collectively "Dating Platforms" or "Platforms") have altered social reality. A millennium of traditional courtship has been replaced by technology. Striking up an in-person conversation with a stranger cannot compete with the convenience of swiping left or right on a profile, and no person could engage with a hundred potential partners in person in a matter of minutes.

2.     Convenience, however, comes at a price. Harnessing powerful technologies and hidden algorithms, Match intentionally designs the Platforms with addictive, game-like design features, which lock users into a perpetual pay-to-play loop that prioritizes corporate profits over its marketing promises and customers' relationship goals.

3.     In violation of consumer protection and other laws, the purposely addictive design of the Platforms is not disclosed to users. Instead, Match affirmatively represents the Platforms as effective tools for establishing off-app relationships while secretly doing everything in its power to capture and sustain paying subscribers and keep them on-app.

4.     The undisclosed defective design is intended to erode users' ability to disengage from the Platforms and turn users into addicts who will purchase ever-more expensive subscriptions to unlock unlimited and other 'special' features which are not designed to deliver on Match's marketing promises, but instead to further addict and forever entrench users in the app.

/ / /

/ / /

**FIRST AMENDED CLASS ACTION COMPLAINT**

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

5.      Despite the Platform's purposely addictive qualities, Match continues to otherwise falsely market them. For example, Hinge's marketing promise brazenly claims the app was "Designed to be Deleted."

6.      The truth is the apps are *designed to be addictive*—and Match's motive and unlawful scheme is summarized as follows:  (1) Match's business model depends on generating returns through the monopolization of users' attention, and Match has guaranteed its market success by fomenting dating app addiction that drives expensive subscriptions and perpetual use, (2) Match employs recognized dopamine-manipulating product features to gamify the Platforms to transform users into gamblers locked in a search for psychological rewards that Match makes elusive on purpose, (3) to ensure users will purchase subscriptions, Match purposely manipulates them by inserting an artificial bottleneck and using a secret algorithm it designed to encourage and reward compulsive use, (4) simultaneously, Match misrepresents the design and makes false promises to prospective downloaders and consumers, to keep their guard against compulsive use down, while pressuring them into investing additional time and money into the Platforms based on the false promises (Match's **"Challenged Representation(s)"**) and (5) Match continues to distribute the Platforms without disclosing the harmful addictive use and attendant health risks for which Match in fact designed the Platforms to realize, and on which its business model depends (Match's **"Material Omission"**).

7.      ***First,*** **Match's business model ensures that addiction increases earnings.** Match's financial success is directly tied to their ability to convert non-paying users into paying customers. Match receives 98% of their revenue directly from end users, and according to their most recent SEC filing, that revenue is comprised of "subscriptions and in-app purchases."[1] In a letter to investors dated October 31, 2023, Match made it clear what their goals were for Tinder, "reach double-digit Direct Revenue growth," and they flaunted their success, with Tinder Direct Revenue growing 11% Y/Y, and Hinge Direct Revenue growing 44%.[2] In fact, in each of four letters to

---

[1] United States Securities and Exchange Commission, Match Group, Inc. Form 10-Q (Nov. 2, 2023), available at  https://www.bamsec.com/filing/89110323000114?cik=891103.

[2] United States Securities and Exchange Commission, Match Group Letter to Shareholders (Oct. 31, 2023), available at https://www.bamsec.com/filing/89110323000109?cik=891103.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

investors during FY '23, Match's "Quarter in Review" relays direct revenue information to the exclusion of total downloads. To Match and its shareholders, turning non-payers into payers is *the* metric used to gauge success.

8.     Match sells subscription plans which remove all "like limits" from their Platforms, 100 likes per day on Tinder and 8 likes per day on Hinge.[3,4] If users were content with these limits, they would not purchase subscriptions, and Match would generate no revenue. Instead, Match benefits from users who are unable to self-regulate and disengage from the Platforms once the daily "like limit" has been reached. Match is in the business of coercing its users into paying for continued, compulsive use.

9.     ***Second,*** **consistent with this business model, Match has designed, developed, and advertised psychologically manipulative product features to drive user addiction.** Match has designed at least three targeted features to achieve these ends: (1) The Platforms' **Content Presentation Format** has "gamified" romance to manipulate dopamine response by introducing intermittent variable rewards; (2) **Push Notifications** prey on users' fear of missing out on any potential matches with a strategic notification system designed to capture and retain attention at all times of the day; (3) **Incentive Rewards** which punish users from disengaging and rewards compulsive users.

10.     Match's manipulation has succeeded. Dating app addiction is now prevalent and awareness of the pervasive problem is growing. A survey conducted by eHarmony found that a shocking "nine in ten singles (90%) believe they are 'addicted' to dating apps," that "half (48%) [of users] admit to checking their apps last thing before going to bed and two-fifths (39%) check their apps against first thing when they wake up," and, "nearly a third (28%) confess to checking [dating apps] at work… and 12% have even checked dating apps while on a date."[5] Due to the purposely

---

[3] *Subscription Tiers*, TINDER, https://tinder.com/feature/subscription-tiers (last visited February 14, 2024).
[4] William Antonelli, *Hinge Is Free, but You Can Pay for Extra Features*, BUSINESS INSIDER (Nov 26. 2021), https://www.businessinsider.com/guides/tech/is-hinge-free (last visited June 5, 2024).
[5] eHarmony Editorial Team, *Why Singles are 'Addicted' to Dating Apps*, EHARMONY (Feb. 6, 2023), https://www.eharmony.co.uk/labs/app-dicted-to-love/ (last visited June 5, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

manipulative and addictive Platform design, no waking hour is safe from the allure of the Platforms, as underscored by users' incessant need to keep swiping.

11. Another dating platform, Badoo, a competitor of Match's Platforms primarily operating in Europe and South America, also released user data. The initial publication has since been removed from Badoo's website, which looked at 5,000 18–30-year-olds living in the UK. Media coverage referencing the study remains; the sampling found male users spend 85 minutes every day on dating apps, while averaging 9.7 minutes per session, while women spend 79 and 7.9 respectively.[6] Users spend over 10 hours a week on dating apps. Match also has access to internal user data that demonstrates the compulsive use for which the Platforms were secretly designed.

12. ***Third,*** **users are harmed by Match's predatory business model when they are coerced into purchasing a subscription to further enable compulsive use, thereby exacerbating a vicious cycle of addiction reinforcement.** Addiction itself is a physical manifestation of Plaintiffs' injury, but it is not the only end goal for Match. Match, consistent with their business model, seeks to monetize Plaintiffs' and the putative class's inability to disengage from the platforms by inserting artificial usage bottlenecks. Once addiction has been achieved, Plaintiffs are motivated to break through manipulatively designed bottlenecks, and they have to pay to keep playing the "game." Users are incentivized to take advantage of the "benefits" included in their subscriptions; for example, they are spurred to "like" more than 100 profiles a day on Tinder.

13. Additional second-order consequences of Match's scheme manifest as a result of compulsive use: upward social comparisons, decreased self-esteem, dissatisfaction with current relationships, and feelings of loneliness and depression. These results are all at odds with Match's marketing promises.

14. The epidemic of loneliness, which Match's business model exploits and exacerbates, has been recognized at the highest levels of public health authority. As elaborated *infra*, former US Surgeon General Dr. Vivek Murthy has declared loneliness an epidemic, with technology platforms

---

[6] Jack Peat, *Millennials 'Spend 10 Hours a Week on Dating Apps,'* THE INDEPENDENT (Jan. 23, 2018), https://www.independent.co.uk/life-style/dating-apps-millenials-10-hours-per-week-tinder-bumble-romance-love-a8174006.html (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

like those operated by Match playing a significant role.[7] Dr. Murthy's advisory underscores the necessity for significant reforms in digital environments to prevent compulsive use. However, Match's false advertising and engagement strategies are designed to perpetuate dependency and compulsive use, thereby increasing isolation, contradicting public health recommendations, and undermining social well-being for the public at large.

15.     ***Fourth,* Match misrepresents the Platforms as effective tools for establishing and sustaining off-app relationships, when they are designed to coerce subscriptions and retain users forever with dangerously addictive yet undisclosed product features.** Platform users are in search of off-app relationships, while Match is in the business of retaining subscribers. Fundamentally at odds, Match markets the Platforms and their attendant subscription offerings misleadingly, concealing the known, intended, and dangerous design features which leave users addicted to the Platform. Users are initially lured to the Platform to create accounts in reliance on Match's concerted and consistent messaging: engagement with the Platforms is temporary. Then, users seeking to escape the Platforms by finding partnership are assured that their chances will improve with a subscription. But all they receive is more of the same addictive features that serve only to further entrench users in the app while lining Match's pockets with profits unjustly earned based on materially false promises and omissions.

16.     Users invest their time and money into the Platform, in reliance on Match's promises that the light at the end of the tunnel will be a sustainable relationship and, crucially, freedom from the Platform. Users further rely on Match's expertise as matchmakers to buy into Match's representations that subscriptions, alongside compulsive use, will improve their chances of freeing themselves from the Platforms. Hence the Platform's false marketing promise: "Designed to be Deleted." Users' continually growing financial investment plays further into Match's scheme: users will be disinclined to disengage to justify their prior financial investment, especially together with

---

[7] *Our Epidemic of Loneliness and Isolation*, The U.S. Surgeon General's Advisory on the Healing Effects of Social Connection and Community (2023), available at https://www.hhs.gov/sites/default/files/surgeon-general-social-connection-advisory.pdf (last visited June 10, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

the emotional investment, which Match secured through deliberate psychological manipulation and addictive Platform design.

17.     **Fifth, Match continues to knowingly market an unreasonably dangerous product while failing to warn the public of the risks of addiction and compulsive use, and despite these known risks, continues to claim that the Platforms are effective tools for establishing off-app relationships while implementing features to keep users on the app.** Despite the stark disconnect between Match's intent, business model, and design features and consumers' reliance on Match's representations and Material Omission, Match continues to market and advertise the Platforms as effective tools for establishing off-app relationships, endorsing the view that one day users will be free from the Platforms, and Match does so without adequate warning or qualification.

18.     Accordingly, Plaintiffs seek to hold Match accountable for their violations of consumer protection and products liability statutes, breaches of warranties, and deception. Match chose to market and advertise the Platforms to users seeking off-app relationships while simultaneously inuring their users to compulsive use, eroding their ability to self-regulate and disengage, and ultimately fomenting addiction to unlawfully extract continued monetary investment from users.

19.     **Primary Dual Objectives**. Plaintiffs bring this action individually, on behalf of the public, and on behalf of those similarly situated who purchased the Platform subscriptions during the relevant Class Period (Class defined *infra*), for dual primary objectives: ***One***, Plaintiffs seek public injunctive relief to stop Match's unlawful development, marketing, and sale of the Platform subscriptions as described herein to prevent Match's ongoing deception which lures the public into downloading the Platforms under false pretenses, believing the Platforms are suited for their stated purpose. Plaintiffs further seek injunctive relief to mitigate the risk and harm from psychologically manipulative marketing and advertisement of the Platforms which mislead the public into believing the Platforms are the definitive solution for building relationships and ingraining unhealthy dependence on Match's manipulative Platforms. Plaintiffs seek injunctive relief requiring that Match change its business practices, which may include one or more of the following: provide adequate warning that the Platforms are prone to compulsive use and are designed to be addictive,

discontinuation of falsely marketed unlimited use subscription plans designed only to foment addiction, or providing additional resources to encourage informed choice and healthy use. Such relief benefits "diffuse whole" of individuals who in the future will fall victim to Match's ongoing deceptions and seek the Platforms without knowledge of their consequences. *See Hodges v. Comcast Cable Comms., LLC*, 21 F. 4th 535, 542 (9th Cir. 2012). **Two**, Plaintiffs seek on their behalf and on behalf of the Class, monetary recovery of the premium consumers paid for the Platforms due to the false and deceptive marketing and advertising, consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted). Additionally, Plaintiffs seek on their behalf and on behalf of the Class, injunctive relief to avoid or mitigate the risk of deceiving consumers into believing the Platforms are designed and fit for their particular purpose and do not carry substantial risk of addiction.

## II.   JURISDICTION AND VENUE

20.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. Section 1332, because: (i) the Class consists of 100 or more members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) minimal diversity exists because at least one Plaintiff and Defendant are citizens of different states. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

21.   Venue is proper in this District under 28 U.S.C. Section 1391 because a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims occur in this District. Defendant markets and sells the Platforms in this District, Defendant gains substantial revenue and profits from doing business in this District, and consumers pay Defendant in this District.

22.   Defendant is subject to personal jurisdiction in California based upon sufficient minimum contacts that exist between Defendant and California. Defendant is authorized to do and is doing business in California, and Defendant advertises and solicits business in California. Defendant has purposefully availed itself of the protections of California law and should reasonably

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

expect to defend itself in court in California for harm arising out of its pervasive contacts with California.

### III.   **PARTIES**

23.   **Plaintiff Burak Oksayan.** The following is alleged based upon Plaintiff Oksayan's personal knowledge:

a.   **Residence**. Plaintiff is, and at all relevant times was, a resident of California residing in the county of San Francisco.

b.   **Purchase Details and Background Information.** Plaintiff purchased a Tinder Gold monthly membership on September 17, 2023 for $19.99 and a Tinder Platinum weekly membership on November 16, 2023 for $24.99. All of Plaintiff's purchases were made in California within the last two years.

c.   **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Tinder account or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

d.   **Inducement.** Plaintiff's decision to create a Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships, he would not have agreed to create an account.

e.   **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

24.   **Plaintiff Jack Kessler.** The following is alleged based upon Plaintiff Kessler's personal knowledge:

    a.   **Residence**. Plaintiff is, and at all relevant times was, a resident of California residing in the county of Los Angeles.

    b.   **Purchase Details and Background Information**. Plaintiff purchased a Hinge Quarterly Subscription on February 23, 2023, which he renewed on August 23, 2023 and November 23, 2023 for $59.99 per quarter. Plaintiff further purchased a one month subscription to Tinder Platinum on March 4, 2023 for $19.99, renewed at the lower Tinder Gold tier on May 7, 2023 for $14.99 and downgraded his subscription to Tinder Plus on July 12, 2023 for $9.99. All of Plaintiff's purchases were made in California within the last two years.

    c.   **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Hinge and Tinder accounts or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

    d.   **Inducement.**  Plaintiff's decision to create a Hinge and Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted" and/or under the premise "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

    e.   **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

25.     **Plaintiff Andrew St. George.** The following is alleged based upon Plaintiff St. George's personal knowledge:

    a.  **Residence**. Plaintiff at all relevant times was a resident of California residing in the county of Los Angeles.

    b.  **Purchase Details and Background Information**. Plaintiff purchased several "roses" through Defendant's Hinge Platform for $3.99 per unit from September 2022 to May 2023. All of Plaintiff's purchases were made in California within the last two years.

    c.  **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Hinge account or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

    d.  **Inducement.** Plaintiff's decision to create a Hinge account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted." Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

    e.  **Duress.** Plaintiff felt compelled to purchase in-app purchases after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

26.     **Plaintiff Jami Kandel.** The following is alleged based upon Plaintiff Kandel's personal knowledge:

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of New York residing in the county of New York.

b. **Purchase Details and Background Information**. Plaintiff purchased Tinder, Hinge, and The League monthly and/or quarterly subscriptions several times within the last two years. All of Plaintiff's purchases were made in New York within the last two years.

c. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of her legal rights when she created her Tinder, Hinge, and The League accounts or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

d. **Inducement.** Plaintiff's decisions to create her Tinder, Hinge, and The League accounts were based on Defendant's assurances that the Platforms were specifically designed to facilitate real-life interactions and off-app relationships, under the premise that it was "Designed to Be Deleted" and/or the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platforms was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," she would not have agreed to create an account.

e. **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue her engagement under duress.

27. **Plaintiff Bradford Schlosser.** The following is alleged based upon Plaintiff Schlosser's personal knowledge:

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of Georgia residing in the county of Fulton.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

b. **Purchase Details and Background Information**. Plaintiff purchased a Hinge Preferred Membership for $35 per month on December 18, 2022, and upgraded his subscription to a $50 per month version on October 14, 2023. Plaintiff Schlosser also purchased a one-month premium subscription to Tinder for $12.49 on October 26, 2022. All of Plaintiff's purchases were made in Georgia within the last two years.

c. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Tinder and Hinge accounts or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

d. **Inducement.** Plaintiff's decision to create a Hinge account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted." Additionally, Plaintiff's decision to create a Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platforms was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

e. **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

28. **Plaintiff Andrew Karz.** The following is alleged based upon Plaintiff Karz's personal knowledge:

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

a. **Residence**. Plaintiff is, and at all relevant times was, a resident of Florida residing in the county of Pinellas.

b. **Purchase Details and Background Information**. Plaintiff purchased a Tinder premium subscription for $14.99 per month on January 17, 2023 which he upgraded to a higher tier, paying $24.99 per month on February 24, 2023. Plaintiff held the $24.99 per month subscriptions from February 2023 to June 30, 2023. Plaintiff again purchased a subscription on sale, for $18.98 on November 15, 2023, then held the subscriptions and was charged the same price on November 24, 2023 and December 1, 2023. All of Plaintiff's purchases were made in Florida within the last two years.

c. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Tinder account or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

d. **Inducement.** Plaintiff's decision to create a Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platforms was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

e. **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement under duress.

29.   **Plaintiff Chase Taylor.** The following is alleged based upon Plaintiff Taylor's personal knowledge:

FIRST AMENDED CLASS ACTION COMPLAINT

a. **Residence.** Plaintiff is, and at all relevant times was, a resident of Missouri, residing in the county of St. Louis.

b. **Purchase Details and Background Information.** Plaintiff Taylor bought a Hinge Subscription for $49.99 on April 14, 2023 and for $24.99 on September 29, 2023 and various in-application purchases on Hinge, including: a boost for $19.99 and a bundle of three roses for $9.99 on August 11, 2023; a bundle of three roses for $9.99 and a bundle of three superlikes for $9.99 on August 14, 2023; a bundle of three superlikes for $9.99 and a boost for $19.99 on August 18, 2023; a boost for $19.99 and a bundle of three superlikes for $9.99 on August 25, 2023; a bundle of three superlikes for $9.99 on September 1, 2023; a boost for $19.99 on September 19, 2023; a boost for $19.99 and two bundle of three superlikes for $9.99 each on September 26, 2023; and a boost on September 29, 2023 for $19.99. Plaintiff Taylor also bought a Tinder Platinum Subscription on March 18, 2023, May 6, 2023, June 9, 2023, August 4, 2023, August 18, 2023, and September 22, 2023 for $24.99 each time and various in-application purchases on Tinder, including: a super boost for $49.99 on March 18, 2023; a primetime boost for $13.99 on May 6, 2023, one boost for $7.99 on May 10, 2023; a super boost for $49.99 on June 9, 2023; a super boost for $49.99 on August 4, 2023; 3 super likes for $9.99 on September 2, 2023; and a Super Boost for $59.90 on September 22, 2023.

c. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Tinder and Hinge accounts or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

d. **Inducement.** Plaintiff's decision to create a Hinge account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted." Additionally, Plaintiff's decision to create a Tinder account was based on Defendant's assurances

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

e. **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

30. **Plaintiff Hussein Saab.** The following is alleged based upon Plaintiff Saab's personal knowledge:

a. **Residence.** Plaintiff is, and at all relevant times was, a resident of Michigan, residing in the county of Wayne.

b. **Purchase Details and Background Information.** Plaintiff Saab bought a Hinge Preferred Membership for $42.39 and 1 boost for $7.41 on July 14, 2020. Plaintiff also bought a Hinge One Month Subscription on February 28, 2022 for $31.79, he also bought 3 roses on March 1, 2022 for 10.59, 12 roses on March 3, 2022 for $31.79, another 12 roses on March 3, 2022 for $31.79, and a boost on March 4, 2022 for $10.59. Additionally, Plaintiff also bought a Tinder Plus Subscription on July 9, 2020 for $21.19.

c. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Hinge and Tinder account or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

d. **Inducement.** Plaintiff's decision to create a Hinge account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted." Additionally, Plaintiff's decision to create a Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

e. **Duress.** Plaintiff felt compelled to purchase in-app purchases after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

31. **Plaintiff Olumuyiwa Olaniyan.** The following is alleged based upon Plaintiff Olaniyan's personal knowledge:

a. **Residence.** Plaintiff Olaniyan was a resident of Virginia from February 14, 2020 to February 17, 2023. Plaintiff Olaniyan was a resident of Maryland, residing in the county of Howard from February 18, 2023 to present.

b. **Virigina Purchase Details and Background Information.** Plaintiff Olaniyan bought a Hinge Monthly Subscription for $34.99 on November 25, 2022. Additionally, Plaintiff bought a Tinder Gold Subscription for $24.99 on August 30, 2022 and a Tinder Plus Subscription for $14.99 on November 25, 2022.

c. **Maryland Purchase Details and Background Information.** Plaintiff bought a Hinge Quarterly Subscription on February 20, 2023 and October 18, 2023 for $99.99 each time and a Hinge X Subscription on April 17, 2024 for $149.99. Additionally, he bought a Tinder Platinum Yearly Subscription for $119.99 on February 21, 2023

and a bi-annual Subscription on May 1, 2024 for $63.99, and also bought add-ons for tinder, including: three super likes on October 18, 2023 for $9.99 and another three super likes on October 18, 2023 for $9.99 on October 18, 2023.

d. **No Agreement to Waive Legal Rights.** Plaintiff was unaware of and not informed of any agreement that constituted a waiver of his legal rights when he created his Tinder and Hinge accounts or at the time of each purchase. This lack of knowledge constitutes the absence of informed consent to waive legal protections traditionally afforded to consumers.

e. **Inducement.** Plaintiff's decision to create a Hinge account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise that it was "Designed to Be Deleted." Additionally, Plaintiff's decision to create a Tinder account was based on Defendant's assurances that the platform was specifically designed to facilitate real-life interactions, under the premise of "Match, Meet, and Date" off-app. Had Plaintiff been aware that the primary design of the Platform was to foster addiction and maximize subscription revenue, rather than to help establish meaningful off-app relationships and "Be Deleted," he would not have agreed to create an account.

f. **Duress.** Plaintiff felt compelled to purchase Platform subscriptions after being led by Match to believe that no viable alternatives existed for establishing a relationship outside the app. This perceived lack of alternatives was a direct result of Match's coercive tactics, which played on psychological pressures and a manipulated market environment, compelling Plaintiff to continue his engagement and make his purchases under duress.

32.    **Reliance**. In creating their accounts and making their purchases, Plaintiffs relied on Defendant's marketing and advertising claims, that the Platforms are effective tools for establishing off-app relationships and do not carry with them substantial risk of addiction. Further, Plaintiffs relied on Defendant's marketing and advertising claims as to their Platform subscriptions, namely

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

that the subscriptions would increase their chances of establishing off-app relationships and, as such, improve the probability that they would be freed from the Platforms.

33. **Causation/Damages**. Plaintiffs would not have purchased the Platform subscriptions, would not have paid as much for them, or would have engaged with the Platforms responsibility, had they known of the Platforms' inherent and intended risks of fomenting addiction and compulsive use.

34. **Causation, Failure to Warn.** Further, Plaintiffs' compulsive use would not have been formed had they been armed with requisite awareness and knowledge of how to engage with the Platforms responsibly and had they been told the Platforms were designed to be addictive. As such, Defendant's failure to warn is the but-for cause of Plaintiff and the putative class's harms.

35. **Desire to Repurchase**. Plaintiffs continue to see the Platform subscriptions available for purchase and would like to be able to purchase them again in the future, but only if they could be sure the Platforms were compliant with state and federal consumer protection and products liability laws—for example, if they were in fact designed to be deleted as advertised and not designed to be addictive as hidden from consumers.

36. **Lack of Personal Knowledge and Expertise**. Plaintiffs are not personally familiar with, and do not possess any specialized knowledge skill, experience, or education, in the development of dating apps. Therefore, plaintiffs have no way of determining whether the Platforms can safely provide the advertised benefit of establishing off-app relationships, without attendant consequences of falling into addictive use, and without Defendant's pernicious efforts to addict users to the Platforms.

37. **Inability to Rely**. Plaintiffs are, and continue to be, unable to rely on the Platforms' representations, statements, or function as they are advertised.

38. **Plaintiffs' Future Harm**. Defendant continues to market and sell the Platforms as safe and effective matchmaking tools. Plaintiffs want to purchase Platform subscriptions in the future if they can be sure the Platforms can safely provide the advertised benefits. However, Plaintiffs are average consumers who are not sophisticated in, for example, non-addictive and effective app features or algorithm development, and Plaintiffs cannot determine if the Platform

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

subscriptions can achieve their advertised benefits. Since Plaintiffs would like to purchase the Platform subscriptions again—even though the Platforms currently cannot safely achieve the advertised benefits—Plaintiffs would likely and reasonably, but incorrectly, assume that the Platforms have introduced adequate warning or resources, or have reformulated features once designed to addict. Accordingly, Plaintiffs are at risk of reasonably, but incorrectly, assuming Defendant has fixed the Platforms such that Plaintiffs may buy them again, believing they can be used safely, armed with full knowledge of the Platforms' addictive features, and used effectively, so that the Platforms are truly "designed to be deleted." In this regard, Plaintiffs are currently and, in the future, deprived of the ability to rely on the Platforms' advertising and marketing. However, an injunction prohibiting use of the misleading representations unless true would enable Plaintiffs to rely confidently on the Platforms' advertising and marketing in making their future purchase decisions.

39.     **Defendant MatchGroup, Inc.** is a public corporation incorporated in Delaware with US headquarters in Dallas, Texas. Defendant, directly and through its agents, has substantial contacts with and receives substantial benefits and income from and through the state of California. Defendant is the owner, manufacturer, and/or distributor of the Platforms, and is a company that created and/or authorized the false, misleading, and deceptive marketing and advertising for the Platforms. Defendant and its agents manufactured, advertised, marketed, and sold the Platforms at issue nationwide and in this judicial district. The unfair, unlawful, deceptive, and misleading false advertising claims regarding the Platforms were prepared, authorized, ratified, and/or approved by Defendant and its agents, and, accordingly, disseminated throughout the state of California and nationwide by Defendant and its agents to deceive and mislead consumers into purchasing the Platforms.

40.     Defendant and its agents designed, developed, and incorporated all dangerous product features present in the Platforms which are available for download and thereby disseminated throughout the state of California and nationwide. Defendant and its agents exercised complete control over whether warnings or instructions are provided to users.

/ / /

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT

41.    Defendant manufactures and markets the following Platforms, whose dangers and misrepresentations give rise to this action: Tinder, Hinge, the League.

## IV.    FACTUAL ALLEGATIONS

### A.    Background on Dating Platforms

42.    **History of Online Dating**.   New technologies have always been employed in matchmaking. Early computing power was harnessed to form partnerships at Stanford in 1959, and the dawn of the internet ushered in the first modern dating website in 1994.[8] Defendant was an early pioneer, launching its namesake Match.com in 1995,[9] when only 25 million people in the United States were internet users.[10]

43.    **Dating Apps.** Born from the inexorable tide of technological advancement, smartphones enabled internet access in a compact portable device. Dating algorithms were no longer confined to web browsers; now everyone could access matchmaking services from anywhere, at any time. In 2007, MeetMoi launched as the first location-based dating application.[11] Just five years later, Defendant, already a powerful player in the matchmaking arena, launched Tinder and Hinge.

44.    Dating apps differ from dating websites in several ways. Primarily, they enable perpetual use, since cellphones are always on users' person, they facilitate unbounded engagement relative to websites which require intentional visits through a web browser. They also differ in content presentation. While dating sites display several matches at once, leaning into the intentionality of browsing for a limited time by presenting many potential matches to choose from, dating apps show users one user at a time. Dating apps are unbounded, always displaying matches or potential matches, a never-ending game.

/ / /

[8] Alyssa Morgan, *et al.*, *Watch A Brief History of Online Dating*, BLOOMBERG, (March 13, 2019), https://www.bloomberg.com/news/videos/2019-03-13/a-brief-history-of-online-dating-video (last visited June 5, 2024).
[9] *Timeline: How Match.com Got Where it Is*, FOX BUSINESS (Feb. 12, 2010), https://www.foxbusiness.com/features/timeline-how-match-com-got-where-it-is (last visited June 5, 2024).
[10] *The rather petite Internet of 1995*, PINGDOM (Mar. 31, 2011), https://www.pingdom.com/blog/internet-1995/ (last visited June 5, 2024).
[11] Kevin Smith, *Check Out MeetMoi, The Dating App That Has Quietly Reached 3 Million Users*, BUSINESS INSIDER (Oct. 24, 2012), https://www.businessinsider.com/meetmoi-location-based-dating-2012-10 (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

45.     Today, dating apps are omnipresent. In 2016, 15% of Americans reported that they have used online matchmaking services, both mobile and browser-based.[12] In 2023, dating apps alone are used by 20% of American adults, according to Statista.[13] Defendant's Platforms account for the lion's share of downloads, with Tinder and Hinge being the 6th and 18th highest grossing applications on the Apple App Store.[14]

B.     **Match's Business Model Ensures that Addiction Increases Earnings**

46.     **Monetizing Romance.** The Platforms' business model is predicated on their ability to turn non-paying users into paying customers. Defendant has ensured that the success of their company is wholly reliant on *direct revenue*; end users purchase subscriptions to the Platforms, accounting for 98% of Defendant's total revenue.[15]

47.     As indicated in a letter to investors, revenue growth is driven by "tailwind[s] from U.S. pricing optimizations and weekly subscription packages."[16] In the same letter, Defendant CEO Bernard Kim explicitly stated that "Tinder's goal [in 2023] was to reach double-digit Direct Revenue growth by Q4." Defendant achieved this in Q3. Below is a true and accurate table provided in Defendant's Form 10-Q filing, dated November 2, 2023:

| Percentage of Total Revenue: | |
|---|---|
| Direct Revenue: | |
|    Americas | 52% |
|    Europe | 28% |
|    APAC and Other | 18% |
| Total Direct Revenue | 98% |
| Indirect Revenue | 2% |
| Total Revenue | 100% |

---

[12] Aaron Smith, *15% of American adults use online dating sites or mobile apps*, PEW RESEARCH CENTER (Feb. 11, 2016), https://www.pewresearch.org/internet/2016/02/11/15-percent-of-american-adults-have-used-online-dating-sites-or-mobile-dating-apps/ (last visited June 5, 2024).

[13] Sam J. Dixon, *U.S. smartphone dating app users 2023*, STATISTA (Apr. 28, 2022), https://www.statista.com/statistics/274144/smartphone-dating-app-users-usa/ (last visited June 5, 2024).

[14] *Top Charts*, SENSOR TOWER (Nov. 9, 2017), https://app.sensortower.com/top-charts?category=0&country=US&date=2024-02-10&device=iphone&os=ios (last visited June 5, 2024).

[15] Match Group Inc. Form 10-Q, *supra* note 1.

[16] Match Group Letter to Shareholders, *supra* note 2.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

48.     Convincing users to purchase ongoing subscriptions for an app supposedly "designed to be deleted" is an onerous task, but one which Defendant must overcome to generate revenue. New downloaders are not guaranteed, and users who in theory might "succeed" on the Platforms could be expected, but for Defendant's manipulation, to delete the Platforms in favor of nascent off-app relationships. As such, Defendant must consistently deliver addictive product features to retain subscribers and stay in business, in lieu of building an app "designed to be deleted." In fact, Defendant has *increased their total revenue despite a decrease in downloads* over FY 2023.[17] Attracting new users with an effective product has proven to be less profitable than turning existing users into addicts.

49.     "The brain is ready to get addicted, particularly when it comes to love," which is the exact aim of Match because it is "selling life's greatest prize" to consumers.[18] Match wants to make money and the best way to keep making money is by having users stay on their applications regardless of whether they find love or not.[19]

**C.     Match has Developed Psychologically Manipulative Product Features to Foment Addiction**

50.     **Psychological Manipulation.**  The Platforms utilize three distinct product features to ensure users become addicted and purchase subscriptions: the Platforms' (1) **Content Presentation Format** has "gamified" romance to manipulate dopamine response by introducing intermittent variable rewards, (2) **Push Notifications** prey on users' fear of missing out on any potential matches with a strategic notification system designed to capture and retain attention at any time of the day, and (3) **Incentive Rewards** which punish users from disengaging and reward compulsive users.

51.     **Content Presentation Format**. Intermittent variable rewards ("IVR") are a reinforcement schedule where unpredictability governs. Psychologist B.F. Skinner first put a name to the phenomenon that uncertain rewards trigger stronger psychological responses than expected,

---

[17] Match Group Inc. Form 10-Q, *supra* note 1.

[18] Leah Worthington, *This is your brain on dating apps*, NATIONAL GEOGRAPHIC (Mar. 20, 2024), https://www.nationalgeographic.com/science/article/dating-apps-psychology-addiction-lawsuit (last visited June 4, 2024).

[19] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

consistent ones. Skinner found that variable reinforcement produced the "slowest rate of extinction" compared to all other forms of psychological conditioning.[20]

52. Jonathan Badeen, a Tinder co-founder, Defendant's Chief Science Officer, and inventor of the "swipe mechanic," admitted to journalist Nancy Jo Sales that he was "inspired" by Skinner's 1948 experiment where he "turned pigeons into gamblers" by introducing IVR to the birds' feeding schedule.[21] In this rare moment of candor, one of Defendant's chief officers laid the truth, as Match sees it, bare: just as pigeons can be conditioned to peck at determinable intervals, so can users be conditioned to endlessly swipe. Match thus centered the addictive design of all the Platforms around this psychologically manipulative experiment.

53. The Platforms present potential matches one at a time. Users do not know what the next profile will bring, whether it will be better than the one they are currently viewing. There is also no telling which profiles will match back, doubling the incentive to view and engage with as many profiles as possible.

54. By ensuring that users do not "swipe right" (the method of selection on the Platforms) on each profile, and because not every positive swipe leads to a match, Platform users receive a jackpot, matches with a sought-after profile, at irregular intervals. As one gambling blogger put it, explaining dating app addiction, "the promise that the next person will the 'the one,' or even just

---

[20] Saul McLeod, *Operant Conditioning In Psychology: B.F. Skinner Theory*, SIMPLY PSYCHOLOGY (Feb. 2, 2024), https://www.simplypsychology.org/operant-conditioning.html (last visited June 5, 2024).Mcleod, S.

[21] Eric Johnson, *Swiping on Tinder is addictive. That's partly because it was inspired by an experiment that 'turned pigeons into gamblers,'* VOX (Sept. 19, 2018), https://www.vox.com/2018/9/19/17877004/nancy-jo-sales-swiped-hbo-documentary-tinder-dating-app-addictive-pigeon-kara-swisher-decode-podcast (last visited June 4, 2024); Rachel Hall, *Are dating apps fueling addiction? Lawsuit against Tinder, Hinge, and Match claims so*, The Guardian (February 17, 2024), https://www.theguardian.com/lifeandstyle/2024/feb/17/are-dating-apps-fuelling-addiction-lawsuit-against-tinder-hinge-and-match-claims-so (last visited June 5, 2024); Lois Shearing, *Everything you need to know about the Tinder and Hinge lawsuit*, Cosmopolitan (Feb. 23, 2024), https://uk.style.yahoo.com/everything-know-tinder-hinge-lawsuit-164100582.html?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAADrgqq_VJeXnz3DA6MavJcbTL-V3KMHd3oScB9cZ6qzIpDEw3K7RqNtbBCl_GFfuSvZ67KkF-bijTU7D7l1UXYitN8lNmVYHZBNoRn0d-bP3QuA5J21caQLe76ytQq1XjOxhIZGB7lOW3NZSQzYCHAfSTTsDKSqrNkrdUzaUT2X7&_guc_consent_skip=1717524201 (last visited June 4, 2024).

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

the promise of something even better, is similar to the next reel on the slots bringing you the big (or even bigger) jackpot."[22]

55.    This purposely designed irregularity of rewards makes the Platforms addicting, eroding users' ability to self-regulate and disengage, as they chase the high that each profile view and attendant potential match may bring.[23] "By hijacking the brain's reward system, which privileges the short-term hit of dopamine over more long-term rewards, the design of dating apps encourages us to keep playing."[24] It is fundamentally at odds with Defendants' marketing promise "Designed to be Deleted."

56.    Furthermore, Defendants utilize a swiping method, rather than tapping through potential matches, which inherently gamifies the process.[25] Cheng Chen, a professor of communication design at Elon University, says of swiping, "it is more fun than tapping, making the whole process feel like more like a game," and that swiping is coupled with intermittent variable rewards, "which really get our brains excited because we can't predict when we get a match."[26]

57.    Defendants' gamification of dating is exemplified by Defendants' utilization of the Elo algorithm, which originally was designed to rank players in competitive games and now is being used in dating apps.[27] The Elso algorithm ranks "profiles" based on predictions and outcomes.[28] For example, when a user swipes right on someone, to indicate interest, and gets a right swipe back it is considered a match and each time this happens the algorithm adjusts the users Elo score based on the score with the person you matched with.[29] Accordingly, a user's score will adjust based on who

---

[22] Ben Keaton, *The Real Reasons You're Addicted To Your Dating Apps*, CASINO.ORG (Feb. 12, 2020), https://www.casino.org/blog/how-dating-apps-copied-slots/ (last visited June 5, 2024).
[23] Leah Worthington, *supra* note 18.
[24] *Lawsuit Accuses Dating Apps of Intentionally Addicting Users*, Skeptic Society Magazine (Feb. 22, 2024), https://www.skepticsociety.co.uk/lawsuit-accuses-dating-apps-of-intentionally-addicting-users/ (last visited June 4, 2024).
[25] *Id.*
[26] *Id.*
[27] Rachel Hall, *supra* note 21.
[28] *Understanding What ELO Score is and How It Affects Your Matches*, Swiperino (Mar. 12, 2024), https://swiperino.com/understanding-what-elo-score-is-in-dating-apps#:~:text=At%20its%20core%2C%20the%20ELO%20system%20is%20about,the%20score%20of%20the%20person%20you%20matched%20with. (last visited June 4, 2024).
[29] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

they match with (e.g., it will increase if a user matches with another user that has a high Elo score and will decrease if a user matches with another user with a lower Elo score).[30] Therefore, Match entices users to be more selective in their matches (using a gaming mindset) to increase their own Elo score to come off more desirable to other users. Other factors that can influence a user's Elo score include the following: (1) activity use — regular use, e.g. promoting consistent use that can lead to addiction, can positively increase the Elo score; (2) swipe right ration—swiping right too often or even too infrequently can lower an Elo score because it may signal to the algorithm desperation or picky behavior; (3) quality of interaction—engaging in conversations after the initial match can positively impact an Elo score, rather than just collecting matches; (4) profile completeness and quality—better quality photos and a well-filled out profile can improve your attractiveness and, therefore, a user's Elo score; and (5) activity on a user's profile—if a profile is getting a lot of right swipes then the user's Elo score will sky rocket because it shows that the user is attractive and desirable.[31]

58.    **Push Notifications.** All push notifications are powerful psychological triggers. These notifications are "pushed" when they are delivered as the recipient is not actively using the platform. Airship, a consulting and software-as-a-service firm which works with mobile apps, counts push notifications as the primary force generating 3.5x revenue from mobile app users compared to loyal customers on other platforms.[32]

59.    Push notifications allow Defendant to draw users back onto the Platforms at any time of the day, recalling them back to the platform in the event they can successfully extract themselves. Defendant invests in push notification copy, framing their notifications to maximize the chance that users open the app. One marketing blogger was particularly fond of this notification:[33]

---

[30] *Id.*

[31] *Id.*

[32] *How to Master Mobile App Experiences,* AIRSHIP (Jul. 14, 2022), https://grow.urbanairship.com/rs/313-QPJ-195/images/app-experience-platform-pov-booklet-en.pdf (last visited June 5, 2024).

[33] Will Lam, *Tinder sends push notifications with prompts to update your profile with clever copy*, TAPLYTICS (May 22, 2020), https://taplytics.com/blog/tinder-sends-push-notifications-with-prompts-to-update-your-profile-with-clever-copy/ (last visited June 5, 2024)

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com



>  Tinder · 2m ⌄
>
> **Tinder**
> It's a crime to deprive the world of that beautiful face.....

60.     The above pictured notification prompted users to add more photos to their profile, generating more engagement and feeding into Defendant's overall strategy of eliciting investment into the Platforms. By flattering its userbase, Defendant imparts confidence; users believe that partnership will be forthcoming, if only they spend more time on the Platforms. Thus, this is yet another purposeful design feature at direct odds with the marketing promise: "Designed to be Deleted."

61.     In fact, Hinge has their own notification system which purportedly eliminates "ghosting" (failure to respond to a message from another user) but contributes to the incessant pulling of users back to the Platform. Hinge has dubbed this "Your Turn," which guilt-trips users into opening the app when they are disengaged because someone is waiting for them to respond.[34]

62.     Defendant knows that push notifications are powerful, and actively discourages users from disabling push notifications on Hinge, much less ever delete altogether the so-called designed-to-be-deleted app. Below is a true and correct screenshot of Hinge's "Account Setup" process when users elect to not receive push notifications:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[34] Anna Middleton *et al.*, *What Does the "Your Turn" Notification in Hinge Mean?*, TECH JUNKIE (May 21, 2020), https://social.techjunkie.com/hinge-your-turn-notification/ (last visited June 5, 2024)

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com



63.     Defendant does not publicly itemize total expenses to note the amount spent on push notification copy.[35] However, upon information and belief, Defendant allocates substantial resources towards crafting push notifications with the intent to lure users back onto the Platforms. Even when users are disengaged, Defendant actively hunts its users down, including those who might otherwise find satisfaction in their off-app relationships and delete the app, as Match supposedly intends.

64.     **Incentive Rewards**. Further underscoring Match's false marketing promises, it punishes users for disengaging and, on the other hand, it rewards compulsive use with zero regard for the health risks it knows and intends to materialize as a result. On Tinder, users will be tagged as "Top Picks," receiving a boost in the algorithm presenting them to other users. The designation is granted in part to "people who've been on Tinder recently," and this boost, "refresh[es] every 24

---

[35] Match Group Inc. Form 10-Q, *supra* note 1 (*see* Defendant's FY 2022 10-K filing, which does not list notification copy or any development costs in itemized form).

FIRST AMENDED CLASS ACTION COMPLAINT

hours,"[36] Users who seek a boosted designation must be active every 24 hours, or they risk being left out of the premier match pool.

65.     Conversely, disengaging is punished. Working in tandem with coercive push notifications, Tinder makes sure its users are aware that their profiles will be removed from the potential match pool if they do not remain committed to the Platform:[37]



66.     The same blogger who touted the "beautiful face" notification also praised the above. In his words, "baked into the copy of this push notification is the fear of missing out. What if 'the one' is on there waiting for you, just a swipe away?"[38] This is the exact sentiment the Platforms are trying to invoke: users must re-engage for fear of missing out on the jackpot.

67.     **Addiction to the Platforms**. "[B]ig tech is the new big tobacco, as smartphones are just as addictive as cigarettes."[39] Defendant's product features elicit their desired effect: users are unable to turn away from the Platforms. One of only two publicly released studies by a matchmaking platform was published by Badoo, a competitor of Defendant's Platforms primarily operating in Europe and South America. The initial publication has since been removed from Badoo's website, which looked at 5,000 18–30-year-olds living in the UK. Media coverage referencing the study remains; the sampling found male users spend 85 minutes *every day* on dating apps, while averaging 9.7 minutes per session, while women spend 79 and 7.9 respectively.[40]

---

[36] Tinder FAQ, *Top Picks – Tinder*, TINDER, https://www.help.tinder.com/hc/en-us/articles/360005039092-Top-Picks (last visited June 5, 2024).
[37] Will Lam, *supra* note 33.
[38] *Id.*
[39] Rachel Hall, *supra* note 21.
[40] Jack Peat, *Millennials 'Spend 10 Hours a Week on Dating Apps,'* THE INDEPENDENT (Jan. 23, 2018), https://www.independent.co.uk/life-style/dating-apps-millenials-10-hours-per-week-tinder-bumble-romance-love-a8174006.html (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

68.     In response to Badoo's study, Dr. Jess Carbino, a former in-house sociologist employed by Defendant, cautioned users to spend "15 minutes in the morning and 15 minutes at night" on dating platforms.[41] But despite Defendant's own sociologist's warnings, Match designed the Platforms with psychologically manipulative features that all but guarantee engagement with the Platforms for over an hour a day and in most cases much more. Defendant's internal studies will further demonstrate the addiction epidemic Match is knowingly and intentionally perpetuating while falsely promising otherwise.

69.     A survey conducted by eHarmony found that a shocking "nine in ten singles (90%) believe they are 'addicted' to dating apps," that "half (48%) [of users] admit to checking their apps last thing before going to bed and two-fifths (39%) check their apps against first thing when they wake up," and, "nearly a third (28%) confess to checking [dating apps] at work… and 12% have even checked dating apps while on a date."[42] Due to Match's intentionally manipulative and addictive design features, no waking hour is safe from the allure of the Platforms, as underscored by users' incessant need to keep swiping. Platforms "Designed to be Deleted" are instead designed to be addictive.

**D.**     **Users are Coerced into Purchasing Subscriptions to Further Drive Compulsive Use**

70.     **Subscription Models.** Defendant profits off users' addiction by injecting artificial barriers to use. Tinder has an undefined like limit,[43] while Hinge allows a paltry 8 likes per day.[44] Tinder uses an algorithm to determine the number of likes given to a user, which is dependent on a variety of factors including gender expression and likes received, with more free likes granted to

---

[41] Shana Lebowitz *et al.*, *A Scientist Who's Worked at Tinder and Bumble Shares How much Time to Spend on Dating Apps to find a Match and Avoid Wasting Your Energy*, BUSINESS INSIDER (May 15, 2020), https://www.businessinsider.com/tinder-bumble-scientist-time-spent-on-dating-apps-2018-5 (last visited June 5, 2024).
[42] eHarmony Editorial Team, *supra* note 5.
[43] *How many likes you can send on Tinder? (Latest 2024 Guide)*, DATEREVIEW.IO (Sep. 23, 2023), https://blog.datereview.io/how-many-likes-you-can-send-on-tinder-latest-2023-guide/ (last visitied June 5, 2024).
[44] *How many likes can I send per day and when do they reset?*, HINGE, https://hingeapp.zendesk.com/hc/en-us/articles/360036144774-How-many-likes-can-I-send-per-day-and-when-do-they-reset (last visited June 5, 2024).

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

women then to men. The Tinder like limit is part of the Platforms' backend algorithm, and crucially, there *is always a limit which can be overcome by purchasing a subscription*.

71.     Defendant's Platforms (Tinder, Hinge, and The League) offer premium subscriptions to boost a user's profile so it will be favored by the algorithm and to unlock unlimited likes. Users purchase these subscriptions relying on Defendant's representations that the Platforms are designed to foster off-app relationships (not knowing the Platforms are designed to be addictive) and to seek unlimited usage to feed the addiction Defendant intentionally inflicted on them. This in turn further feeds the addiction, enabling Defendant to sell ever-increasingly expensive subscriptions.

72.     Below are true and correct screenshots taken from Defendant's Platforms, Tinder, Hinge, and The League, evidencing Defendant's offered tiers:

 

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18




19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

FIRST AMENDED CLASS ACTION COMPLAINT



**E.**     **Match Misrepresents the Platforms as Safe and Effective Tools to Facilitate Off-App Relationships While Implementing Features Designed to Hold Users on the Platforms**

73.     **Challenged Representations.** Defendant trades on users' desire to establish and sustain off-app relationships while employing psychologically manipulative features to ensure they remain on the app perpetually as paying subscribers. To increase profits and gain an unfair advantage over its lawfully acting competitors, Defendant falsely and misleadingly markets, advertises, labels, and packages the Platforms with the Challenged Representations:

**Design/Purpose.** The Platforms are matchmaking services, which, by their very nature, convey to users that they were designed to facilitate off-app relationships.

**Tinder Challenged Representation**. Tinder's slogan, taken from their virtual app store homepage, states Tinder's purpose as "Match, Chat, and Date," conveying to users that the app is designed to effectively service users' desire to eventually "Date" off-app.

**Hinge Challenged Representation**. Hinge's marketing promise, taken from their virtual app store homepage, states that Hinge was, "Designed to be Deleted," conveying to users that the app is designed to effectively service users' desire to eventually "Delete" the platform, replacing it with an off-app relationship.

**The League Challenged Representation**. The League's slogan, taken from their virtual app store homepage, states The League's purpose as, "Meet & Date Ambitious People," conveying to users that the app is designed to effectively service users' desire to eventually "Date" off-app.

74.     **Tinder.** Pictured below is a true and correct example of the Tinder Challenged Representation seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[45]



75.     **Deception of the Tinder Challenged Representation.** Defendant represents that Tinder will enable users to "Meet & Date," fostering relationships off-app, while designing and implementing features, as outlined herein, with the express intent to drive compulsive use and keep users on the app.

---

[45] App Store Preview, *Tinder: Dating, Chat & Friends*, APPLE, https://apps.apple.com/us/app/tinder-dating-chat-friends/id547702041 (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

76.     **The League**. Pictured below is a true and correct example of The League Challenged Representation seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[46]



**The League: Intelligent Dating** [17+]
Meet & Date Ambitious People
The League App, Inc

#197 in Lifestyle
★★★★☆ 4.1 • 39.4K Ratings

Free · Offers In-App Purchases

77.     **Deception of The League Challenged Representation.** Defendant represents that The League will enable users to "Meet & Date," fostering relationships off-app, while designing and implementing features, as outlined herein, with the express intent to drive compulsive use and keep users on the app.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[46] App Store Preview, *The League: Intelligent Dating*, APPLE, https://apps.apple.com/us/app/the-league-intelligent-dating/id893653132 (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

78.   **Hinge.** Pictured below are true and correct examples of the Hinge Challenged Representations seen on Defendant's Apple App Store homepage, a screen which each user necessarily sees before downloading:[47]



HINGE, DESIGNED TO BE DELETED
Hinge is the dating app for people who want to get off of dating apps. With profiles that show your personality through text, photos, video, and voice, you have unique conversations that lead to great dates. And it's working. Currently, people on Hinge go on a date every three seconds. Additionally, in 2022, we were the fastest-growing dating app in the US, UK, and Canada.

HOW WE GET YOU OFF HINGE
When it comes to online dating, people are so busy matching that they're not actually connecting, in person, where it counts. Hinge is on a mission to change that. So we built an app that's designed to be deleted. Here's how:

79.   **Deception of the Hinge Challenged Representation.** Hinge was not "Designed to be Deleted," but rather designed to be addictive and optimize extraction of subscription costs from compulsive users by keeping them on the app.

---

[47] App Store Preview, *Hinge Dating App: Match & Date*, Apple, https://apps.apple.com/us/app/hinge-dating-app-match-date/id595287172 (last visited June 5, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

80.   **Material Omissions.** Defendant misleadingly and materially, on all relevant advertising including web pages and virtual application store materials, and in direct opposition to the Challenged Representations, omits that the Platforms were designed, developed and implemented with features intended to facilitate addiction and compulsive use, thereby keeping users on the Platforms.

81.   **Match had Exclusive Knowledge of Material Facts Not Known to Plaintiffs.** Defendant has actual knowledge that the Platforms' features foster a substantial risk of addiction and compulsive use, as Defendant intended that the Platforms hold users captive to procure subscriptions. Plaintiffs and the putative class, lacking expertise in dating app development, are unaware of Defendant's inexorable psychological manipulations which turn those seeking an off-app relationship into compulsive, paying users. Defendant has superior and exclusive knowledge regarding both the attendant risks of the Platform to facilitate addiction and compulsive use, and the machinations of Defendant's psychological manipulations.

82.   **The Challenged Representations and Material Omissions are Central to Platforms' Function.** Dating app users rely on Defendant's Challenged Representations, bolstered by the Material Omissions, that the Platforms are effective tools at establishing and sustaining off-app relationships. Defendant's Challenged Representations, including Tinder's "Match, Chat & Date," Hinge's "Designed to be Deleted," and The League's "Meet & Date Ambitious People," all feed into Plaintiffs' and Class members' goal to "Meet," and "Date" and ultimately "Delete." Plaintiffs and Class members download the Platform applications, create accounts, and purchase subscriptions with the misguided belief that Defendant has designed algorithms and systems to effectuate this goal. Had Plaintiffs and Class members shared Defendant's knowledge that the Platforms were traps, not designed to foster off app relationships, but designed to hold them as captive subscribers, they would not have purchased, or would have paid substantially less for, the Platform subscriptions.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**F.**     **Match Fails to Warn or Instruct Consumers that the Platforms Pose a Foreseeable Risk of Addiction**

83.   **Failure to Warn.** Defendant has failed to warn consumers that the Platforms pose a foreseeable risk of compulsive use and harmful addiction despite Defendant's intentional design development and marketing which foment addiction and obfuscate risk of harm. Further, Defendant fails to provide adequate instruction for responsible use of the Platforms, choosing instead to conceal this information because its business model depends on and benefits from the compulsive use for which it in fact designed the Platforms. At all relevant times, Defendant had a duty to disclose the risks associated with Platform use, especially because it knowingly designed the Platforms to realize these risks.

84.   **Material Omission**. Furthermore, Defendant's failure to warn manifests doubly as a fact concealed to boost profits. Users are coerced into purchasing Platform subscriptions to unlock unlimited use, not realizing that the Platforms carry a substantial risk of fomenting addiction. At all relevant times, Defendant had a duty to disclose the risks associated with Platform use.

85.   **Injury.** Users suffer proximate harm from Defendant's false representations, material omissions, and failure to warn by becoming addicted to the Platforms, impacting their everyday wellbeing and mental health, and by being coerced and manipulated financially into purchasing subscriptions to chase the purposely elusive high of receiving a match and to unlock unlimited access which serves only to further the compulsive use.

86.   **Harms to Mental Health.** Addiction in any form is harmful, but there are second order impacts of excessive Platform use directly catalyzed by Defendant's failure to warn. A study in 2020 found that excessive use increases likelihood of "ghosting" or "breadcrumbing," phenomenon born from dating apps whereby users are ignored or sent meaningless, non-committal messages to keep matches engaged while failing to build relationships.[48] Users with unlimited swipes will chase the elusive high of matching, match more often, and fall victim to ghosting and breadcrumbing at higher rates. The study found that this would "significantly increase the likelihood

---

[48] Raul Navarro et al., *Psychological Correlates of Ghosting and Breadcrumbing Experiences: A Preliminary Study among Adults*. INT'L. J. ENV. RES. AND PUB. HEALTH, Feb. 2020, at 1116, available at https://doi.org/10.3390/ijerph17031116.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

of experiencing less satisfaction with life, and of having more feelings of loneliness and helplessness."[49]

87.    **Match Fuels the Loneliness Epidemic and Directly Harms the General Public.** Match has harmed the public at large by perpetuating and profiting off of an epidemic of loneliness. The former US Surgeon General Dr. Vivek Murthy released an advisory report in 2023 which asserted that loneliness had reached epidemic proportions, with *half* US adults reporting that they experience loneliness.[50]Online interactions, such as those on Match's Platforms, have played a critical role in fueling this epidemic, leading Dr. Murthy to call upon tech companies to "Reform Digital Environments." One such reform was supporting the public's "greater ability to avoid or limit their own uses," which stands in direct opposition to Match's business model.[51]

88.    Dating apps have contributed to and profited off the loneliness epidemic. As highlighted in a study published in 2019, the Platforms often exacerbate feelings of isolation and social dissatisfaction among users.[52] The study reveals that the endless cycle of swiping and superficial interactions ultimately leads to a decrease in real-life (or off-app) social connectivity.[53] As Defendant's business model is designed to keep users engaged in the Platforms to extract subscription and in-app purchases revenue, the Platforms have directly contributed to the loneliness epidemic while profiting from increased disconnection and isolation.

89.    Platform users have taken to social media to express their deepening sense of loneliness after engaging with the Platforms. Below are true and correct screenshots of a few consumer reviews:[54]

---

[49] *Id.*

[50] *Our Epidemic of Loneliness and Isolation*, *supra* note 7.

[51] *Id.* at 51.

[52] Kathryn D. Coduto, et al., *Swiping for trouble: Problematic dating application use among psychosocially distraught individuals and the paths to negative outcomes*, Journal of Social and Personal Relationships (2020), Vol. 37 (1) 212-232, 134-136, available at https://journals.sagepub.com/doi/pdf/10.1177/0265407519861153 (last visited June 10, 2024).

[53] *Id.* at 137.

[54] *Anyone else feel more lonely and defeated with online dating?*, REDDIT (2023), https://www.reddit.com/r/dating/comments/16a2nxk/anyone_else_feel_more_lonely_and_defeate d_with/ (last visited June 10, 2024); @Marshmellow3971, Comment on *The Evil Economics of Tinder*, YOUTUBE (2021), available at https://www.youtube.com/watch?v=OnLpylrZ028 (last

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

1

2

3

4

5

6

**r/dating** • 9 mo. ago
Jaxxs90

### Anyone else feel more lonely and defeated with online dating?

`Question ❓`

I recently thought I'd try Hinge and Bumble again and I find myself feeling more lonely then normal. I get the odd match but no real conversation really comes from these and I kinda feel like I end up playing a game of twenty questions. Just wondering if anyone feels this way.

7

8

9

10

**@Marshmellow3971** 2 years ago
Tinder actually sounds like something out of Black Mirror. A massive corporation has put dating behind a pay wall, and is actively profiting off of people's loneliness, destroying average looking people's self esteem and unjustly inflating the egos of attractive people.

👍 566  👎   Reply

11

12

13

14


**Comp_b7r** • 3y ago

I think tinder is designed to make you feel lonely. Ordinary things has a good youtube video on it that also encompasses dating apps in general.

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27

28

visited June 10, 2024); Comment on *Tinder makes me feel lonely*, REDDIT (2021), https://www.reddit.com/r/infj/comments/mlyrkc/tinder_makes_me_feel_lonely/ (last visited June 10, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

90.     Despite Defendant's catalytic effect on loneliness, it brazenly claims that Hinge's "Mission" is to "create a less lonely world." The following is a true and correct representation of Hinge's "Mission" page taken from Defendant's website:[55]

> Hinge Today
>
> # We want to create a less lonely world
>
> ## by inspiring intimate, in-person connections

91.     Another study, from March 2023, found several adverse correlates in excessive swiping, the very behavior Defendant invented and actively encourages with manipulative design features. The study found that first, all dating app use eventually blossomed into excessive swiping, which in turn, "linked to a) upward social comparison, b) fear of being single, and c) partner choice overload."[56] In each case, these phenomena are drastically exacerbated by addictive, compulsive use.

92.     Upward social comparison diminishes self-esteem by comparing oneself to perceived "superiors."[57] Mass availability of partner options also induces fear of being single, where users believe themselves deficient for their failure to form meaningful relationships despite the proverbial

---

[55] *At the Heart of Hinge*, HINGE, https://hinge.co/mission (last visited June 10, 2024).
[56] Margaret Thomas *et al.*, *99+ Matches But A Spark Ain't One: Adverse Psychological Effects of Excessive Swiping on Dating Apps*, 78 TELEMATICS AND INFORMATICS (2023), available at https://www.sciencedirect.com/science/article/pii/S0736585323000138 (last visited June 5, 2024).
[57] Leon Festinger, *A Theory of Social Comparison Processes*, 7 HUM. REL. 117-140 (1954), available at https://doi.org/10.1177/001872675400700202 (last visited June 5, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

bounty available to them.[58] Rather than recognize the Platforms are designed to keep users on the app, not forming off-app relationships, users incorrectly blame themselves, furthering diminishing self-esteem.[59] Finally, users are confronted with self-doubt regarding the off-app relationships the Platforms are supposedly designed to foster: they are manipulated into feeling dissatisfied with their relationships with other options waiting and being actively "pushed" on the Platforms, introducing constant counterfactual thinking. This leaves users exactly where Defendant wants and leads them, asking themselves, "what if."[60]

93.   **Economic Injury.** Users are further deprived of their hard-earned money when they are coerced into purchasing subscriptions to unlock unlimited access and feed the addictive behavior that Defendant intentionally perpetuates.

**G.   Plaintiffs and Reasonable Users Were Misled by the Challenged Representations**

94.   **Advertising and Marketing Misrepresentation of the Platforms**. Defendants manufacture, market, advertise, and sell Platform subscriptions as effective tools to improve users' chances at finding off-app relationships.

95.   Consumers reasonably understand these statements to mean the Platforms are intentionally designed to foster off-app relationships, when in reality they are designed to addict users, drive compulsive use, and procure subscriptions at ever-increasing levels (and prices).

96.   Like Plaintiffs, other consumers have been misled by the Platforms' Challenged Representations. Below are true and correct screenshots of some consumer reviews of the Platforms:[61]

---

[58] Margaret Thomas *et al.*, *The agony of partner choice: The effect of excessive partner availability on fear of being single, self-esteem, and partner choice overload*, COMPUTERS IN HUM. BEHAV. (2022), available at https://doi.org/10.1016/j.chb.2021.106977 (last visited June 5, 2024).
[59] Stephanie S. Spielmann *et al*., *Settling for less out of fear of being single*, 105 J. PERS. SOC. PSYCH. 1049–1073 (2013), available at https://doi.org/10.1037/a0034628 (June 5, 2024).
[60] Barry Schwartz, *Self-determination: The tyranny of freedom*, 55(1) AM. PSYCH. 79–88 (2000), available at https://doi.org/10.1037/0003-066X.55.1.79 (last visited June 5, 2024).
[61] *Tinder Reviews*, TRUST PILOT (Jan. 28, 2024),
https://www.trustpilot.com/review/tinder.com?stars=1 (last visited June 5, 2024); *Tinder Reviews*, BESTCOMPANY (2020), https://bestcompany.com/online-dating/company/tinder?review_filter=1#reviews (last visited June 5, 2024); *Getting Hinge Premium Unmasked the Fact That I Was Addicted to Dating Apps*, REDDIT (2023), https://www.reddit.com/r/dating/comments/xswsda/getting_hinge_premium_unmasked_the_fact_t hat_i/ (last visited June 5, 2024); *Hinge Dating App Reviews*, GOOGLE PLAY (Jan. 21, 2024, Jan.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

★☆☆☆☆

**J. S.**  Meridian, ID

Tinder was not a positive experience. I felt the app is addictive and unfair based on how much is paid

4 years ago

★☆☆☆☆  February 6, 2024

It's been about two years since I've used it but the experience has significantly gotten worse. There's more options but it's all so monetized and paywalled that it just feels like it there's no point using it. They're motto is that it's the dating app made to be deleted and right now it's pretty true but in the wrong ways. It's designed to keep you on as long as possible to get you to buy the subscription. I'd say don't bother or get off the app before you're sucked in.

[–] LycanZo  6 points 1 year ago

damn I feel guilty of the Hinge addiction syndrome you described here... I just cant let go of the fact that there might be someone behind the next swipe. Ive only ever paid for one month of tinder plus in my life(6bucks I think) and Ive been on the apps for 5+ years... Thanks for the wake up call. yea its "your fault" for getting addicted but dating apps work as a whole to ensure you get addicted. Pretty similar to casino imo, people who have low self control are very vulnerable

permalink   embed   save   report



Jan 28, 2024

### Just a total money rinse

Just a total money rinse. Full of fake profiles. Before you actually pay you'll get dozens of "likes" and messages that all instantly disappear when you subscribe. Pay for the Gold subscription but get absolutely nothing for the money. You have to upgrade to Platinum to interact...then there are "add-ons" and boosts, etc, that all cost extra. Never actually managed to interact directly with anyone despite my best efforts. Avoid at all costs

★★★☆☆  January 8, 2024

This app is the same as all the rest at the end of the day: keeping you on the hook for a membership to gain any exposure on the app whatsoever. The whole "made to be deleted" thing may have been the intention at first but it certainly doesn't function that way now. Perhaps the people who gravitate towards dating apps are the problem but the execution of this app could certainly be better. I imagine there are some great potential matches that are just lost in the fog of a non-premium membership.

---

28, 2024, Feb. 6, 2024),
https://play.google.com/store/apps/details?id=co.hinge.app&hl=en_US&gl=US&pli=1 (last visited June 5, 2024); *The League Reviews*, TRUST PILOT (Apr. 9, 2023),
https://www.trustpilot.com/review/theleague.com?stars=1 (last visited June 5, 2024).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com



★ ☆ ☆ ☆ ☆     January 21, 2024

Designed to take your money, not to be deleted.

★ ☆ ☆ ☆ ☆                                                    Apr 9, 2023

**Total scam**

Total scam. They try to suck money out of you at every turn. Disgusting abuse of peoples emotions.

97.    **Material**. The Challenged Representations and Omissions are material to reasonable consumers, including Plaintiffs, because they have the potential to influence consumers' decision to purchase the Platform subscriptions, as set forth herein. Plaintiffs would not have purchased the Platform subscriptions or would have paid significantly less for them if they had known that the Platform's advertising and marketing claims were false, misleading, and materially incomplete, that the Platforms were not designed to be effective or ever "deleted" but instead to foment addiction, and that the Platform subscriptions are intended only to increase time spent on the Platforms and further compulsive use, rather than decrease on-app time in favor of successfully building off-app relationships as advertised.

98.    **Reliance.** Reasonable consumers, including Plaintiffs, reasonably rely on the Platforms' Challenged Representations and Omissions in deciding to purchase the Platform subscriptions.

99.    **Falsity.** The Platforms' Challenged Representations are false and deceptive because the Platform subscriptions do not provide the advertised benefits.

100.    **Consumers Lack Knowledge of Deception/Fraudulence.** Consumers, including Plaintiffs, who purchased the Platform subscriptions, did not know, and had no reason to know, at the time of purchase, that the Platforms were incapable of providing the advertised benefits.

101.    **Defendant's Knowledge.** Defendants knew, or should have known, that their Platforms' Challenged Representations were false, misleading, deceptive, and unlawful at the time that Defendant manufactured, marketed, advertised, and sold the Platform subscriptions using the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Challenged Representations to Plaintiffs and the Class. Defendants intentionally and deliberately used the Challenged Representations to cause Plaintiff and similarly situated consumers to purchase the Platform subscriptions. Defendants, as manufacturers, have exclusive control over how the Platforms were marketed and advertised, and Defendants readily and easily could have remedied the deception by stopping the use of the Challenged Representations. Instead, Defendants deliberately chose to market the Platforms with the Challenged Representations, thereby misleading consumers into buying or overpaying for the Platform subscriptions. Thus, Defendants knew, or should have known, at all relevant times, that the Challenged Representations mislead reasonable consumers, such as Plaintiffs, into buying the Platform subscriptions to attain the product attributes that Defendant falsely advertised and warranted.

102.  **Detriment.** Plaintiffs and similarly situated consumers would not have purchased the Platform subscriptions if they had known the Platform subscriptions could not provide the advertised benefits or would not have overpaid a price premium for the Platform subscriptions, if they had known that the Challenged Representations were false claimed, promised, warranted, advertised, marketed, and represented. Accordingly, based on Defendants' material misrepresentations and omissions, reasonable consumers, including Plaintiffs, purchased the Platforms to their detriment.

## V.    <u>CLASS ALLEGATIONS</u>

103.  **Class Definition**. Plaintiffs bring this action on their own behalf and on behalf of all other persons similarly situated. The Classes Plaintiffs seeks to represent are defined as follows:

> All residents of the United States, within four years prior to the filing of this Complaint, purchased one or more of the Platform subscriptions (the "Nationwide Class").

> All residents of California who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "California Class")

All residents of New York who, within three years prior to the filing of this Complaint, purchased a Platform subscription (the "New York Class")

All residents of Georgia who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Georgia Class")

All residents of Florida who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Florida Class")

All residents of Missouri who, within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Missouri Class")

All residents of Michigan, who within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Michigan Class")

All residents of Maryland, who within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Maryland Class")

All residents of Virginia, who within four years prior to the filing of this Complaint, purchased a Platform subscription (the "Virginia Class")

104.    **Class Definition Exclusions**. Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

105.    **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserve the right to

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

amend or otherwise alter the class definition presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendants, or otherwise.

106. **Numerosity.** The Class is so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands or hundreds of thousands throughout California. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

107. **Common Questions Predominate.** Common questions of fact and law predominate over questions which may affect individual class members, including the following:

a.    Whether Defendant intentionally or knowingly designed addictive Platforms;

b.    Whether Defendant marketed the Platforms as safe and effective tools at facilitating off-app relationships;

c.    What measures Defendant took to conceal the true nature, i.e., addictive qualities, of the Platforms;

d.    Whether Defendant had a duty to disclose the risks associated with the Platforms, i.e., their risk of addiction;

e.    Whether Defendant misrepresented the Platform subscriptions as effective tools for facilitating off-app relationships while encouraging perpetual use and not decreasing time spent on the Platforms;

f.    Whether Defendant's conduct constitutes a breach of warranty;

g.    Whether Defendant was unjustly enriched by its deceptive conduct;

h.    Whether Plaintiff and the Class paid more money or a premium amount for the Platform subscriptions than they actually received; and

i.    How much more money or premium amount Plaintiff and the Class paid for the Platform subscriptions than they actually received.

108. **Typicality.** Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

competent and experienced counsel in class action and other complex litigation. Plaintiffs suffered damages as a direct and proximate result of the same wrongful practices in which Defendant engaged to harm the class.

109.    **Adequacy.** Plaintiffs are an adequate representative of the Class they seeks to represent because his interests do not conflict with the interests of the Class Members Plaintiffs seek to represent. Plaintiffs will fairly and adequately protect Class Members' interests and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

110.    **Superiority and Substantial Benefit.** A class action is superior to other available methods for fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for the Class to prosecute their claims individually.

111.    **Manageability.** The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

112.    **Injunctive/Equitable Relief.** Defendant has acted on grounds generally applicable to the entire Class and the public at large, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

113.    **Inconsistent Rulings.** Absent a class action, Defendant will likely retain the benefits of its wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Defendant will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

114. **Plaintiffs and the Class have suffered injury in fact and have lost money because of Defendant's false representations.** Plaintiffs and the Class purchased Platform subscriptions under the false belief that the Platform subscriptions could provide the advertised benefits. Plaintiffs and the Class relied upon Defendant's advertising and marketing claims and would not have purchased the Platform subscriptions or would have paid significantly less for them if they had known that the Platform subscriptions could not provide the advertised benefits.

115. **Plaintiffs and the Class have suffered injury in fact and have lost money because of Defendant's failure to provide adequate warning or instruction for responsible use of the Platforms.** Plaintiffs and the Class engaged with the Platforms to their detriment and in a harmful manner, which could and should have been avoided by Defendant's adequate warning and instruction.

116. **Because Defendant Intends to Continue Its Deceptive and Unfair Conduct, a Public Injunction is Needed to Protect the Public from Future Harm.** Defendant's unlawful, deceptive, and unfair marketing and feature development shows no sign of abating. Defendant knows that the Platforms catalyze compulsive use, addiction, perpetuation of mental health crises and countless user complaints, yet its business model and predatory practices remain the same. Plaintiffs, all purported Classes, and the public at large will continue to suffer injury so long as Defendant's practices are permitted.

117. **Unlawful, Deceptive, and Unfair Practices.** Among other things, Defendant intends to continue to (1) design psychologically manipulative product features which foment addiction and compulsive use; (2) extract revenue from its manipulated and captive user base; (3) hide the true nature of the Platforms, namely, that they are designed to be addictive; (4) use materially misleading, affirmative representations that the Platforms are designed to foster off-app relationships and are suited to this particular purpose; (5) unfairly compete with lawfully acting competitors and any new market entrants, undermining and ultimately supplanting alternative dating platforms.

118. **Defendant's Practice is Poised to Worsen.** As fully illustrated *supra*, Defendant's unlawful, deceptive, and unfair practices will continue because Defendant is committed to growing

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

via extracting revenue from existing users. Defendant has admitted in its SEC filings that its current growth runway is dependent on making more money per user, rather than growing its user base. Defendant exploits existing users' loyalty while distorting the social fabric of relationships writ large—the public is inundated with Defendant's false advertising and marketing techniques. Defendant's strategies deepen the loneliness epidemic, further harm the public by fostering superficial and gamified interactions, and systematically undermine the public's ability to seek and establish meaningful relationships, be they formed on- or offline. This false advertising and predatory behavior is likely to intensify so long as Defendant's profit incentive remains aligned with extracting as much revenue per user as possible.

119. **Plaintiffs, Members of the Class, and the Public Will Continue to Suffer Injury Due to Defendant's Unlawful Practices.** Defendant continues to profit from the public's reasonable trust, lack of knowledge, and intentionally misguided belief that the Platforms are designed to, and are effective at, establishing and maintaining off-app relationships. Additionally, Defendant continues to harm the public by: addicting new users and perpetuating and exploiting mental health crises, such as the epidemic of loneliness, harmful social comparisons, feelings of inadequacy and reduction of self-esteem, fears of being single and feelings of helplessness.

120. **Public Injunction is Necessary to Stop Defendant's False Advertising and Unlawful Practices**. To protect the general public from the threat of future injury, Plaintiffs seek a public injunction, under *McGill v. Citibank, N.A.,* 2 Cal. 5th 945 (2017), prohibiting Defendant from continuing its unlawful, deceptive and unfair practices. Absent a public injunction, Plaintiffs and the public are likely to be misled or confused by Defendant's misrepresentations and are likely to fall victim to Defendant's intentional, psychological manipulations. Stopping Defendant's false advertising and unlawful practices is crucial to prevent harm to the public and ensure that misleading information is corrected.

/ / /

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

**CAUSES OF ACTION**

**COUNT ONE**

**Violation of California Consumers Legal Remedies Act,**

**(California Civil Code 1750, *et seq*.)**

**(*On Behalf of the California Class*)**

121.   **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

122.   **California Class**. Plaintiffs bring this claim in their individual capacity, seeking the imposition of public injunctive relief to protect the general public, and representatives of the California Class.

123.   **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

124.   **Goods/Services.** The Platform subscriptions are "goods," as defined by the CLRA in California Civil Code §1761(a).

125.   **Defendant.** Defendant is a "person," as defined by the CLRA in California Civil Code §1761€.

126.   **Consumers.** Plaintiffs and members of the Class are "consumers," as defined by the CLRA in California Civil Code §1761(d).

127.   **Transactions.** The purchase of the Platform subscriptions by Plaintiffs and members of the Class are "transactions" as defined by the CLRA under California Civil Code section 1761€.

128.   **Violations of the CLRA.** Defendant violated the following sections of the CLRA by advertising and selling the Platform subscriptions to Plaintiffs and the Class through the false, misleading, deceptive, and fraudulent Challenged Representation and Material Omission:

   a.   Section 1770(a)(5) by representing that the Platforms have "characteristics, . . . uses [or] benefits . . . which they do not have."

   b.   Section 1770(a)(7) by representing that the Platforms "are of a particular

50

standard, quality, or grade . . . [when] they are of another."

c. Section 1770(a)(9) by advertising the Platforms "with [the] intent not to sell them as advertised."

129. **Knowledge.** Defendant's uniform material representations regarding the Platform subscriptions were likely to deceive, and Defendant knew or should have known that its representations were untrue and misleading.

130. **Malicious.** Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sales of the Platform subscriptions.

131. **Plaintiffs Could Not Have Avoided Injury.** Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Defendant suppressed and failed to disclose, and Plaintiffs and members of the Class would not have purchased the Platforms and/or would have purchased them on different terms had they known the truth.

132. **Causation/Reliance/Materiality.** Plaintiffs and the Class suffered harm as a result of Defendant's violations of the CLRA because they purchased the Platform subscriptions relying on the Challenged Representations and Material Omissions in deciding to purchase the Platform subscriptions. The Challenged Representations and Material Omissions were substantial factors. The Challenged Representations and Material Omissions were material because a reasonable consumer would consider them important in deciding whether to purchase the Platform subscriptions.

133. **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Platform subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seeks a monetary award for violation of the CLRA in damages, restitution, and/or disgorgement of ill-gotten gains to

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

134. **Injunction.** Given that Defendant's conduct violated California Civil Code section 1780, Plaintiff and members of the Class are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA. Plaintiffs have no adequate remedy at law. Without equitable relief, Defendants' unfair and deceptive practices will continue to harm Plaintiffs and the Class.

135. **Section 1782(d)—Prelitigation Demand/Notice.** More than thirty days prior to the filing of this complaint, on or about February 21, 2024, Plaintiffs' counsel, acting on behalf of all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Match Group, Inc. at its headquarters and principal place of business registered with the California Secretary of State (8750 N. Central Expy, Ste. 1400, Dallas, TX 75231) and its registered agent for service of process (CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201), which were delivered to those addresses on or about February 28, 2024. The form, content, and delivery of the notice satisfy subsections (1) and (2) of section 1782(a). The notice of violations and demand for remedial action, as of the filing of this complaint, did not result in adequate correction, repair, replacement, and/or other remedy by Defendant, including all remedial action set forth in the notice letter and as set forth under section 1782(c).

136. Plaintiff and the California Subclass seek public injunctive relief under the CLRA to protect the general public from Defendant's false advertising and misrepresentations.

137. Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

## COUNT TWO

### Violation of California False Advertising Law,

### (Business & Professions Code 17500, *et seq.*)

### (*On Behalf of the California Class*)

138. **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

139.   **California Class.** Plaintiffs bring this claim in their individual capacity, seeking the imposition of public injunctive relief to protect the general public, and representatives of the California Class.

140.   **FAL Standard.**   The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, et seq., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

141.   **False & Material Challenged Representation and Material Omission Disseminated to Public**. Defendant violated § 17500 when it advertised and sold the Platform subscriptions through unfair, deceptive, untrue, and misleading Challenged Representation and Material Omission disseminated to the public through the Platforms' marketing and advertising. These representations were false because the Platforms did not conform to them. The representations were material because they are likely to mislead a reasonable consumer into purchasing a Platform subscription.

142.   **Knowledge.** In making and disseminating the Challenged Representations with the Material Omissions alleged herein, Defendant knew or should have known that the representations were untrue or misleading and acted in violation of § 17500.

143.   **Intent to sell.** Defendant's conduct was specifically designed to induce reasonable consumers, like Plaintiffs and the Class, to purchase the Platform subscriptions.

144.   **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in violation of the FAL, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Platform subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seeks a monetary award for violation of the FAL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

145.   Plaintiff and the California Subclass seek public injunctive relief under the FAL to protect the general public from Defendant's false advertising and misrepresentations.

146.   Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

### COUNT THREE

**Violation of California Unfair Competition Law,**

**(Business & Professions Code Section 17200, *et seq*.)**

**(*On Behalf of the California Class*)**

147.   **Incorporation by Reference.** Plaintiffs Burak Oksayan, Jack Kessler, and Andrew St. George re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

148.   **California Class.** This cause of action is brought pursuant to Business and Professions Code Section 17200, et seq. Plaintiffs bring this claim in their individual capacity, seeking the imposition of public injunctive relief to protect the general public, and representatives of the California Class

149.   **The UCL.** California Business & Professions Code, sections 17200, et seq. (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

150.   **False Advertising Claims.** Defendant, in its advertising and marketing of the Platform, made misleading statements and fraudulent omissions regarding the quality and characteristics of the Platform—specifically, Defendant advertised and marketed the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," thereby efficiently facilitating off-app relationships, when in fact the Platforms are designed to extract subscription costs from captive users, causing them to remain on the app.

151.   **Defendant's Deliberately Fraudulent Marketing Scheme.** Defendant does not have any reasonable basis for the claims about the Platforms made in Defendants' advertising and

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

marketing of the Platforms because the Platforms do not provide the advertised benefits. Defendant knew and continues to know that the Platforms cannot provide the advertised benefits (i.e., rapid formation of off-app relationships), though Defendant intentionally advertised and marketed the Platforms to deceive reasonable consumers into believing that they could achieve the advertised benefits.

152. **Misleading Advertising and Marketing Cause Purchase of Platforms.** Defendant's advertising and marketing of the Platforms using the Challenged Representations and Material Omissions continues to lead reasonable consumers, including Plaintiffs, to believe the Platforms are "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," thereby efficiently facilitating off-app relationships, when they cannot.

153. **Injury in Fact.** Plaintiffs and the Class have suffered injury in fact and have lost money or property as a result of and in reliance upon Defendant's Challenged Representation and Material Omission—namely, Plaintiffs and the Class lost the money they paid for the Platform subscriptions they purchased from Defendant.

154. **Conduct Violates the UCL.** Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising." Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to deceive the consuming public, in violation of Business and Professions Code Section 17200.

155. **No Reasonably Available Alternatives/Legitimate Business Interests**. Defendant failed to avail itself of reasonably available, lawful alternatives to further its legitimate business interests.

156. **Business Practice**. All the conduct alleged herein occurred and continues to occur in

Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or generalized course of conduct, which will continue daily until Defendant voluntarily alters its conduct or Defendant is otherwise ordered to do so.

157.   **Injunction**. Pursuant to Business and Professions Code Sections 17203 and 17535, Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as ""Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," when they are not. Plaintiffs and the members of the Class also seek an order requiring Defendant to disclose such information and/or precluding Defendant from selling the Platform subscriptions.

158.   **Causation/Restitution**. As a direct and proximate result of Defendant's misconduct in violation of the UCL, Plaintiffs and the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Plaintiffs and the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

159.   Plaintiff and the California Subclass seek public injunctive relief under the UCL to protect the general public from Defendant's false advertising and misrepresentations.

160.   Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

### *"Unfair" Prong*

161.   **Unfair Standard**. Under the UCL, a challenged activity is "unfair" when "any injury it causes outweighs any benefits provided to consumers and the injury is one that the consumers themselves could not reasonably avoid." Camacho v. Auto Club of Southern California, 142 Cal. App. 4th 1394, 1403 (2006).

162.   **Injury**. Defendant's false marketing and advertising of the Platforms with the

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Challenged Representations and Material Omissions does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive subscription benefits commensurate with their reasonable expectations, and receive subscription benefits of lesser standards than what they reasonably expected to receive. Consumers cannot avoid any of the injuries caused by Defendant's deceptive marketing and advertising of the Platforms. The injuries caused by Defendant's deceptive marketing and advertising outweigh any benefits.

163. **Balancing Test**. Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

164. **No Utility**. Under this test, Defendant's conduct of falsely marketing and advertising the Platform subscriptions "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," has no utility and rather, harms purchasers. Thus, the utility of Defendant's conduct is substantially outweighed by the gravity of harm.

165. **Legislative Declared Policy**. Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

166. **Unfair Conduct**. Defendant's marketing and advertising of the Platforms, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's representations constitute an unfair business practice within the meaning of California Business and Professions Code Section 17200.

167. **Reasonably Available Alternatives**. Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Platform subscriptions.

168. **Defendant's Wrongful Conduct**. All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

169. **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date."

170. **Causation/Restitution**. Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for subscriptions to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships when the apps were designed to ensnare users and keep them subscribing.

171. Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

172. Plaintiff and the California Subclass seek public injunctive relief under the UCL to protect the general public from Defendant's false advertising and misrepresentations.

173. Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

### *"Fraudulent" Prong*

174. **Fraud Standard**. The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

175. **Fraudulent & Material Challenged Representation & Material Omission**. Defendant marketed and advertised the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." These representations were deceptive, and Defendant knew or should have known of its deception. The representations are likely to mislead consumers into purchasing the subscriptions because they are material to the average, ordinary, and reasonable consumer. Defendant used the Material Omission to with the intent to sell the Platform subscription to users. The Material Omission is deceptive, and Defendant knew, or should have known, of its deception. The omission is likely to mislead consumers into purchasing Platform subscriptions

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

because they are material to the average reasonable Platform user.

176. **Fraudulent Business Practice**. As alleged herein, the representations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

177. **Reasonable and Detrimental Reliance**. Plaintiffs and the Class reasonably and detrimentally relied on the marketing and advertising on the Platforms to their detriment in that they purchased the Platform subscriptions without receiving the advertised benefits.

178. **Reasonably Available Alternatives**. Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Platform subscriptions.

179. **Business Practice**. All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

180. **Injunction**. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," and employ its practice of labeling the Platforms with the Material Omission.

181. **Causation/Restitution**. Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for a subscriptions to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships, when the apps were designed to ensnare users and keep them subscribing.

182. Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

183. Plaintiff and the California Subclass seek public injunctive relief under the UCL to protect the general public from Defendant's false advertising and misrepresentations.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

184.   Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

### *"Unlawful" Prong*

185.   **Unlawful Standard**. The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

186.   **Violations of CLRA and FAL**. Defendant's marketing and advertising of the Platforms, as alleged herein, violates California Civil Code sections 1750, *et seq*. and California Business and Professions Code sections 17500, *et seq*. as set forth below in the sections regarding those causes of action.

187.   **Fraud**. Additionally, Defendant's use the Material Omission to the sell Platform subscriptions violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

188.   **Additional Violations**. Defendant's conduct in making the deceptive representations and omission described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and burdensome to their competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendant's representations of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, and 1711, as well as the common law.

189.   **Unlawful Conduct**. Defendant's marketing and advertising of the Platforms, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unlawful conduct. Defendant knew or should have known of its unlawful conduct.

190.   **Reasonably Available Alternatives**. Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from selling the Platform subscriptions.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

191. **Defendant's Wrongful Conduct**. All the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

192. **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of marketing and advertising the Platforms as "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date."

193. **Causation/Restitution.** Plaintiffs and the Class have suffered injury in fact, have lost money, as a result of Defendant's unfair conduct. Plaintiffs and the Class paid for a subscription to Platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date," expecting that the subscriptions would further their goal of efficiently facilitating off-app relationships, when the apps were designed to ensnare users and keep them subscribing.

194. Plaintiffs and the Class would not have purchased the Platform subscriptions if they had known that the Platforms' advertising and marketing were deceptive. Accordingly, Plaintiffs seek restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

195. Plaintiff and the California Subclass seek public injunctive relief under the UCL to protect the general public from Defendant's false advertising and misrepresentations.

196. Plaintiff and the California Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

## COUNT FOUR

### Violation of New York General Business Law

### (GBL 349, *et seq*)

### (*On Behalf of the New York Class*)

197. **Incorporation by Reference**. Plaintiff Jami Kandel re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

198. **New York Class.** Plaintiff Kandel brings this claim on behalf of herself and the New York Class against Defendant.

199.   **Jurisdiction**. Defendant does business in New York, sells and distributes the Platform in New York, and engages in deceptive acts and practices in its development, selling, and marketing of the Platform in New York.

200.   **GBL § 349 Standard.** New York Gen. Bus. Law, section 349, *et seq.* prohibits the "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state."

201.   **Defendant's Deceptive Act or Practice**. Defendant's uniform material representations and omissions of the Platform were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were untrue or misleading.

202.   **Defendants' Deceptive Actions Cause Purchase of Products.** Defendant intended that Plaintiff and the New York Class rely on the misleading representations and omissions in their making their purchase decision. And Defendant's misleading representations and omissions did lead reasonable consumers, including Plaintiffs, to purchase the Platform subscriptions.

203.   As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each New York Class member as a subscription to platforms "Designed to be Deleted," and/or with promises to "Match, Chat and Date" and "Meet and Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

204.   **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading.

205.   **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

206.   Defendant therefore engaged in unfair methods of competition and unfair or deceptive acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platforms and Platform

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

subscriptions. Defendant therefore violated the New York General Business Law 349, *et seq*.

207.   **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to NY GBL 349(b).

208.   Plaintiff and the New York Subclass seek public injunctive relief under the GBL to protect the general public from Defendant's false advertising and misrepresentations.

209.   Plaintiff and the New York Subclass seek to recover their actual damages or fifty (50) dollars, whichever is greater, three times actual damages; all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees; and any other relief that is just and proper, in an amount to be proven at trial.

## COUNT FIVE

### Violation of New York General Business Law

### (GBL 350, *et seq*)

### (*On Behalf of the New York Class*)

210.   **Incorporation by Reference**. Plaintiff Jami Kandel re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

211.   **New York Class.** Plaintiff Kandel brings this claim on behalf of herself and the New York Class against Defendant.

212.   **Jurisdiction**. Defendant does business in New York, sells and distributes the Platform in New York, and engages in deceptive acts and practices in its development, selling, and marketing of the Platform in New York.

213.   **False Advertising Standard.** The New York False Advertising Law, codified at Gen. Bus. Law section 350, *et seq.*, prohibits advertising, including labeling, that "is misleading in a material respect."

214.   **False & Material Representations and Omissions Disseminated to Public**. Defendant violated section 350 when they advertised and marketed the Products through the unfair,

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

deceptive, untrue, and misleading uniform material representations and omissions of the Platform. These representations were false because the Products do not conform to them.  The representations were material because they are likely to mislead a reasonable consumer into purchasing the Products

215.   **Knowledge.** In making and disseminating the representations and omissions alleged herein, Defendant knew or should have known that the representations were untrue or misleading.

216.   **Defendants' Deceptive Actions Cause Purchase of Products.** Defendant intended that Plaintiff and the New York Class rely on the misleading representations and omissions in their making their purchase decision. And Defendant's misleading representations and omissions did lead reasonable consumers, including Plaintiffs, to purchase the Platform subscriptions.

217.   As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each New York Class member as a subscription to platforms "Designed to be Deleted," and/or with promises to "Match, Chat and Date" and "Meet and Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

218.   **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to NY GBL 350(d).

219.   Plaintiff and the New York Subclass seek public injunctive relief under the GBL to protect the general public from Defendant's false advertising and misrepresentations.

220.   Plaintiff and the New York Subclass seek to recover their actual damages or five hundred (500) dollars per violation, whichever is greater, three times actual damages; all monetary and non-monetary relief allowed by law; injunctive relief; reasonable attorneys' fees; and any other relief that is just and proper, in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

## COUNT SIX

### Violation of Georgia Deceptive Trade Practices Act

### (O.C.G.A. Section 10-1-372, *et seq*)

### (*On Behalf of the Georgia Class*)

221.  **Incorporation by Reference**. Plaintiff Bradford Schlosser re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

222.  **Georgia Class.** Plaintiff Schlosser brings this claim on behalf of themselves and the Georgia Class against all Defendants.

223.  **Jurisdiction**. Defendant does business in Georgia, sells and distribute the Platform in Georgia, and engaged in deceptive acts and practices in its development, selling, and marketing of the Platform in Georgia.

224.  **O.C.G.A. § 10-1-372 Standard.** O.C.G.A. § 10-1-372, *et seq* prohibits "deceptive trade practice… in the course of business, vocation or occupation."

225.  **Violations of O.G.C.A § 10-1-372.** Defendant violated the following sections of the O.G.C.A. by advertising and selling the Platform subscriptions to Plaintiffs and the Class through the false, misleading, deceptive, and fraudulent Challenged Representations:

a.    Section 10-1-372(a)(5) by representing that the Platforms have "characteristics, . . . uses [or] benefits . . . which they do not have."

b.    Section 10-1-372(a)(7) by representing that the Platforms "are of a particular standard, quality, or grade . . . [when] they are of another."

c.    Section 10-1-372(a)(9) by advertising the Platforms "with [the] intent not to sell them as advertised."

226.  **Deceptive Act or Practice**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were untrue or misleading. Defendant intended that Plaintiff and the Georgia Class rely on the misleading representations in their making their purchase decision.

227.  As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each

Georgia Class member as a subscription to platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

228.   **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading.

229.   **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

230.   Defendant therefore engaged in unfair methods of competition and unfair or deceptive acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platforms and Platform subscriptions. Defendant therefore O.C.G.A § 10-1-372, *et seq*.

231.   **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to O.G.C.A. § 10-1-373.

232.   Plaintiff and the Georgia Subclass seek public injunctive relief under the OCGA to protect the general public from Defendant's false advertising and misrepresentations.

233.   Plaintiff and the Georgia Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

/ / /

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

## COUNT SEVEN

### Violation of Florida Deceptive and Unfair Trade Practices Act

### (Florida Stat. Section 501.201 *et seq*)

### (*On Behalf of the Florida Class*)

234.   **Incorporation by Reference**. Plaintiff Andrew Karz re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

235.   **Florida Class.** Plaintiff Karz brings this claim on behalf of themselves and the Florida Class against all Defendants.

236.   **Jurisdiction**. Defendant does business in Florida, sells and distributes the Platforms in Florida, and engaged in deceptive acts and practices in its development, selling, and marketing of the Platform in Florida.

237.   **FS § 501 Standard.** Florida Stat. § 501, *et seq* prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.204(1). Defendant participated in unfair, unconscionable and deceptive trade practices that violated Florida's Deceptive and Unfair Trade Practices Act.

238.   **Deceptive Act or Practice**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships and Defendant knew that its representations were untrue or misleading. Defendant intended that Plaintiff and the Florida Class rely on the misleading representations in their making their purchase decision.

239.   As alleged herein, Defendant sold the Platform subscription to Plaintiff and each Florida Class member as a subscription to a platform "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the apps to extract more revenue from subscriptions.

240.   **Unconscionable Act or Practice.** Furthermore, Defendant actively and knowingly misrepresented or omitted disclosure of material information to Plaintiff Karz and the Florida Subclass at the time they purchased Platform subscriptions, including the fact that Defendant's

FIRST AMENDED CLASS ACTION COMPLAINT

Platforms carry a substantial risk of, and was intentionally designed to be effective at, fomenting dangerous addiction and compulsive use.

241. **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading. Defendant's omission of a material fact, that the Platforms carry a substantial risk of fomenting dangerous addiction, was likely to induce users to purchase the Platform subscriptions, as otherwise users would refrain from doing so.

242. **Course of Commerce.** Defendant's deceptions occurred, at all relevant times, in a course of conduct involving trade and commerce, as they occurred during the development, selling, and marketing of the Platforms and Platform subscriptions.

243. Defendant therefore engaged in unfair methods of competition and unfair, deceptive, or unconscionable acts or practices with intent that others rely upon the concealment, suppression, or omission of such material fact in their development, selling, and marketing of the Platform and Platform subscriptions. Defendant therefore violated Florida Stat. § 501, *et seq.*

244. **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased, in amounts to be determined at trial, pursuant to Florida Stat. § 501.2105.

245. Plaintiff and the Florida Subclass seek public injunctive relief under the Florida Deceptive and Unfair Trade Practices Act to protect the general public from Defendant's false advertising and misrepresentations.

246. Plaintiff and the Florida Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050   F: (213) 788-4070  |  clarksonlawfirm.com

## COUNT EIGHT

### Violation of Missouri Practices Act ("MPA")

### (Mo. Rev. Stat. Section 407.025, *et seq*)

### (*On Behalf of the Missouri Class*)

247. **Incorporation by Reference**. Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

248. **Missouri Class.** Plaintiff Taylor brings this claim on behalf of themselves and the Missouri Class against Defendant.

249. **Jurisdiction**. Defendant does business in Missouri, sells and distributes the Platforms in Missouri, and engaged in deceptive acts and practices in its development, selling, and marketing of the Platform in Missouri.

250. **Standard.** Mo. Rev. § 407.025 is intended to protect consumers against unfair and deceptive practices.

251. **Merchandise.** The Platform subscriptions are "merchandise," as defined by the MMPA § 407.010(4).

252. **Unlawful Practice.** MPA declares an "unlawful practice" the "use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the  sale  or advertisement of any merchandise in trade or commerce... in or from the state of Missouri" (Mo. Rev. Stat. § 407.020).

253. **Violations.** Defendant engaged in conduct that is unlawful under MPA § 407.010, which includes the following:

    a.  Fraudulently advertising and omitting material facts pertaining to the Platform Subscriptions;

    b.  Misrepresenting and omitting material facts pertaining to the Platform Subscriptions; and

    c.  Omitting, suppressing, and concealing the material facts regarding the Platform Subscriptions.

69

254.   Plaintiff Taylor, acting reasonably, used the Platform subscription, expecting a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations and omissions were untrue or misleading.

255.   **Reliance.** Plaintiff Taylor relied on the material omissions and misrepresentations in purchasing premium version of the Platform subscription to his detriment.

256.   **Injury.** As a direct and proximate result of Defendant's unlawful and deceptive practices, Plaintiff Taylor and the Missouri Class suffered injuries, including but not limited to, the monies they paid to the Defendant to use the Platform subscription.

257.   Plaintiff and the Missouri Subclass seek public injunctive relief under the MPA to protect the general public from Defendant's false advertising and misrepresentations.

258.   Plaintiff and the Missouri Subclass seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

## COUNT NINE

### Violation of the Maryland Consumer Protection Act

### (MD Code CL 13-301, *et seq*)

### (*On Behalf of the Maryland Class*)

259.   **Incorporation by Reference.** Plaintiff Olaniyan re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

260.   **Maryland Class.** Plaintiff Olaniyan brings this claim on behalf of the Maryland Class against Defendant.

261.   **Jurisdiction.** Defendant does business in Maryland, sells and distributes the Products in Maryland, and are engaged in deceptive acts and practices in their manufacturing, selling, and marketing of the Products in Maryland.

262.   **Maryland Standard.** MD Code CL 13-301 prohibits unfair, abusive, or deceptive trade practices. MD Code CL 13-301 defines such trade practice as "false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." MD Code CL 13-

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

301(2)(i) further provides that a representation that "consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have," is unfair, abusive, or deceptive.

263.   **Deceptive Trade Practices.** Defendant's uniform material representations and omissions regarding the Platform subscriptions were likely to deceive reasonable consumers and Defendant knew that their representations were untrue or misleading. Defendant intended that Plaintiff and the Maryland Class rely on the misrepresentations and omissions in their purchase decision.

264.   As alleged herein, Defendant sold the Products to Plaintiff and each other Maryland Class member as a safe, efficient, and effective tool to facilitate off-app relationships products. Yet Defendants knew that these representations and omissions were untrue, and thus, misleading.

265.   Therefore, Defendants advertised the Products as having characteristics, uses, and benefits which they did not have.

266.   **Knowledge.** Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading. Defendant's omission of a material fact, that the Platforms carry a substantial risk of fomenting dangerous addiction, was likely to induce users to purchase the Platform subscriptions, as otherwise users would refrain from doing so.

267.   **Capacity to Mislead.** Plaintiff and the Maryland Class members are not personally familiar with, and do not possess any specialized knowledge skill, experience, or education, in the making of dating apps.   Plaintiff and the Maryland Class members have no way to determine whether Defendants' Products are truly effective apps that can help facilitate-off app relationships.

268.   Plaintiff and the Maryland Subclass seek public injunctive relief under the Maryland Consumer Protection Act to protect the general public from Defendant's false advertising and misrepresentations.

269.   Plaintiff and the Maryland Subclass members seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just

and proper, in an amount to be proven at trial.

## COUNT TEN

### Violation of the Michigan Consumer Protection Act

### (Mich Comp Laws Ann. Section 445.903, *et seq.*)

### (*On Behalf of the Michigan Class*)

270. **Incorporation by Reference.** Plaintiff Saab re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

271. **Michigan Class**. Plaintiff Saab brings this claim on behalf of themselves and the Michigan Class against all Defendants.

272. **Person.** Plaintiff Saab, Michigan Class members, and Defendant are "persons" as defined by Mich. Comp Laws Ann. § 445.903(d).

273. **Course of Commerce.** Defendant advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp Laws Ann. § 445.903(g).

274. **M.C.P.A. § 445.903 Standard.** Defendant engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp Laws Ann. § 445.903(1), including:

    a.  Representing that its goods and services have characteristics, uses, and benefits that they do not have;

    b.  Representing that its goods and services are of a particular standard or quality if they are of another;

    c.  Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

    d.  Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050 F: (213) 788-4070 | clarksonlawfirm.com

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

e.  Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

275.  **Deceptive Act or Practice.** As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each Michigan Class member as a subscription to platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

276.  **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading.

277.  **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's unfair, unconscionable, and deceptive practices, Plaintiff Saab and Michigan Subclass members have suffered and will continue to suffer damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased.

278.  Plaintiff Saab and the Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250 per Michigan Subclass member, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

279.  Plaintiff and the Michigan Subclass seek public injunctive relief under the Michigan Consumer Protection Act to protect the general public from Defendant's false advertising and misrepresentations.

/ / /

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT

**COUNT ELEVEN**

**Violation of the Virginia Consumer Protection Act**

**(Va. Code Section 59.1-200, *et seq.*)**

**(*On Behalf of the Virginia Class*)**

280. **Incorporation by Reference.** Plaintiff Olaniyan re-alleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

281. **Virginia Class**. Plaintiff brings this claim on behalf of themselves and the Virginia Class against all Defendants.

282. **Violations of Va. Code § 59.1-200.** Defendant engaged in fraudulent and deceptive practices in the conduct of commerce, in violation of Va. Code § 59.1-200(A), including:

(1) Misrepresenting goods or services as those of another;

(5) Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

283. **Deceptive Act or Practice.** As alleged herein, Defendant sold the Platform subscriptions to Plaintiff and each Virginia Class member as a subscription to platforms "Designed to be Deleted," or as services to "Match, Chat and Date" or "Meet & Date." Yet Defendant knew that the Platforms were designed to ensnare users, keeping them on the app to extract more revenue from subscriptions.

284. **Knowledge**. Defendant's uniform material representations of the Platforms were likely to deceive reasonable consumers seeking a safe, efficient, and effective tool to facilitate off-app relationships, and Defendant knew or should have known that its representations were untrue or misleading.

285. **Causation/Reliance/Materiality.** As a direct and proximate result of Defendant's unfair, unconscionable, and deceptive practices, Plaintiff and the Virginia Subclass members have suffered and will continue to suffer damages and ascertainable losses of moneys, by paying more for the Platform subscriptions than they would have, and/or by purchasing subscriptions that they would not have purchased.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

286.   Plaintiff and the Virginia Subclass members seek all monetary and non-monetary relief allowed by law, injunctive relief, reasonable attorneys' fees, and any other relief that is just and proper, in an amount to be proven at trial.

287.   Plaintiff and the Virginia Subclass seek public injunctive relief under the Virginia Consumer Protection Act to protect the general public from Defendant's false advertising and misrepresentations.

## COUNT TWELVE

### Fraudulent Inducement

### (*On Behalf of the Nationwide Class*)

288.   **Incorporation by Reference**. Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

289.   **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class who purchased the Platform subscriptions within the applicable statute of limitations.

290.   **False Representation.** Every user must visit Defendant's virtual App Store homepage, where prospective downloaders are exposed to the Challenged Representations explained more fully herein.

291.   **Knowledge.** Defendant knew, or should have known, that the Platforms' Challenged Representations were false, misleading, deceptive, and unlawful at the time that Defendant manufactured, marketed, advertised, and sold the Platform subscriptions using the Challenged Representations to Plaintiffs and the Class. Defendant's Platforms are not "Designed to be Deleted," and are not effective tools to facilitate their stated promise, for users to "Match, Chat, and Date."

292.   **Intent to Deceive**. Defendant's conduct was specifically designed to induce prospective downloaders, like Plaintiffs and the Class, to download the Platforms' applications and create accounts, believing in the efficacy and temporary nature of the services offered.

293.   **Reliance**. Prospective downloaders, including Plaintiffs, justifiably relied on the Challenged Representations when deciding to create an account.

294.   **Damages.** As a result of Plaintiffs' and putative class members' reliance on the

Challenged Representation, they downloaded the Platforms' applications, created accounts, and began to engage with the Platforms. They were immediately subjected to the Platforms' manipulative features, designed to foster addiction and compulsive usage. Plaintiffs and the Class have incurred financial losses through continued subscriptions and in-app purchases as well as the impairment of their autonomy, erosion of their self-esteem, and a decrease in real-life connectivity.

## COUNT THIRTEEN

### Duress

### (*On Behalf of the Nationwide Class*)

295.   **Incorporation by Reference**. Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

296.   **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class who purchased the Platform subscriptions within the applicable statute of limitations.

297.   **Threat.** Defendant's Platforms are purposefully engineered to foster user addiction, posing a significant threat to Plaintiffs and the Class by compelling them into prolonged and compulsive engagement.

298.   **Lack of Free Will.** The inherently, intentional addictive nature of the Platforms stripped Plaintiffs and the Class of their autonomy in purchasing subscriptions and engaging with the Platforms. Defendant strategically designed and marketed the Platforms to make disengagement or refusal of future purchases appear unreasonable to users—they are led to believe that the Platforms and Platform subscriptions are the only means to establish relationships.

299.   **Causation**. The Platforms' addictive features led Plaintiffs and the Class to purchase subscriptions or in-app purchases based on the impression that such purchases were necessary to experience the advertised benefits. The addictive nature of the Platforms manipulated Plaintiffs' and Class Members' decisions. Undue influence was the primary factor leading to Plaintiffs' and Class members' decision to use and purchase the Platform.

300.   **Immediate Harm**. The addiction created by the Platforms constitutes an immediate and ongoing harm, compelling Plaintiffs and the Class to continue engaging with the Platforms, and

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

1    to make further subscriptions and in-app purchases, even as these actions are taken under duress.

2        301.   **Damages**. As a result of the duress imposed by Defendant's intentionally addictive

3    design, Plaintiffs and putative class members suffered damages in the financial costs associated

4    with ongoing subscriptions and in-app purchases.

5                                    **COUNT FOURTEEN**

6                               **Breach of Express Warranty**

7                          (***On Behalf of the Nationwide Class***)

8        302.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all

9    allegations contained in this complaint, as though fully set forth herein.

10       303.   **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of the

11   Nationwide Class who purchased the Platform subscriptions within the applicable statute of

12   limitations.

13       304.   **Implied Warranty of Merchantability.** By advertising and selling the Platform

14   subscriptions at issue, Defendant, merchants of goods, made promises and affirmations of fact that

15   the Platform subscriptions are merchantable and conform to the promises or affirmations of fact

16   made through its marketing and advertising, as described herein. This marketing and advertising,

17   combined with the implied warranty of merchantability, constitute warranties that became part of

18   the basis of the bargain between Plaintiffs and members of the Class and Defendant—to wit, that

19   the Platforms, among other things, could provide the advertised benefits.

20       305.   **Breach of Warranty.** Contrary to Defendant's warranties, the Platform does not

21   conform to the Platform's representation that it was "Designed to be Deleted," and attendant

22   expectation arising thereof, as described herein. Therefore, Defendant breached its warranties about

23   the Platform and its qualities.

24       306.   **Causation/Remedies.** As a direct and proximate result of Defendant's breach of

25   warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they

26   paid for the Platform subscription. Further, Plaintiffs and members of the Class have suffered and

27   continue to suffer economic losses and other damages including, but not limited to, the amounts

28   paid for the Platform subscriptions, and any interest that would have accrued on those monies, in an

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendants' misconduct to prevent ongoing and future harm that will result.

## COUNT FIFTEEN

### Unjust Enrichment/Restitution

#### (*On Behalf of the Nationwide Class*)

307. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

308. **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of members of the Class who purchased the Platform subscriptions within the applicable statute of limitations.

309. **Plaintiff/Class Conferred a Benefit.** By purchasing the Platform subscriptions, Plaintiffs and members of the Class conferred a benefit on Defendant in the form of the purchase price of the subscriptions.

310. **Defendant's Knowledge of Conferred Benefit.** Defendant had knowledge of such benefit and Defendant appreciated the benefit because, were consumers not to purchase the subscriptions, Defendant would not generate revenue, as more fully described herein.

311. **Defendant's Unjust Receipt Through Deception.** Defendant's knowing acceptance and retention of the benefit is inequitable and unjust because the benefit was obtained by Defendant's fraudulent, misleading, and deceptive representations and material omissions.

312. **Causation/Restitution.** As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Platform subscriptions. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the subscriptions, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for unjust enrichment in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing

FIRST AMENDED CLASS ACTION COMPLAINT

1   and future harm that will result.

2   **COUNT SIXTEEN**

3   **Strict Products Liability – Failure to Warn**

4   (***On Behalf of the Nationwide Class***)

5       313.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all

6   allegations contained in this complaint, as though fully set forth herein.

7       314.   **Nationwide Class.** Plaintiffs bring this claim individually and on behalf of members

8   of the Class who purchased the Platform subscriptions within the applicable statute of limitations.

9       315.   **Duty.** At all relevant times, Defendant owed Plaintiffs and the Nationwide Class a

10   duty to warn users about risks and dangers associated with the use of the Platforms, namely, that

11   the Platforms carry a substantial risk of fomenting addiction.

12       316.   **Failure to Provide Adequate Warning.** Defendant fails to provide any warning

13   whatsoever concerning the Platforms' addictive qualities and further does not provide any

14   instruction or guidance which would help users engage with the Platform responsibly.

15       317.   **Unreasonably Dangerous.** The lack of sufficient warning or instruction render the

16   Platforms unreasonably dangerous when used in a foreseeable manner. The Platforms carry

17   substantial risk of fomenting addiction, and compulsive use of the Platforms is linked to a number

18   of deleterious consequences to users' mental health.

19       318.   **Plaintiffs and Members of the Nationwide Class Suffered Foreseeable Harms.**

20   Purchasing a subscription to unlock unlimited access foreseeably results in availing oneself of

21   unlimited access. Without warning, users are left with no opportunity to regulate Platform use before

22   Defendant's intentionally enticing features ensnare them. As such, Plaintiffs and the Nationwide

23   Class engaged with the Platforms in a manner foreseeable to, and as fully described herein, a manner

24   encouraged by, Defendant.

25       319.   **Causation.** If not for Defendant's failure to warn, users would have the opportunity

26   to self-regulate platform use, instead, their ability is intentionally eroded by Defendant's carefully

27   developed product features.

28       320.   **Injury.** Plaintiffs and Nationwide Class members are harmed by Defendant's failure

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

to warn as they become addicted to using the Platforms. Furthermore, they suffer from the attendant consequences of compulsive Platform use such as reduction in self-esteem and other deleterious effects on users' mental health.

321.   **Knowledge.** Defendant's failure to warn users of the Platform's substantial risks and dangers was and continues to be likely to induce addiction. Such risks are evident to Defendant, or alternatively, reasonable investigation into Defendant's own Platforms would reveal such risks and dangers.

322.   **Defective Product,** The Platforms, as currently constructed without adequate warning or instruction on responsible use, are therefore defective, as they are rendered unreasonably dangerous.

<u>**COUNT SEVENTEEN**</u>

**Negligence – Design**

(***On Behalf of the Nationwide Class***)

323.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

324.   **Control.** At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its Platforms used by Plaintiffs and Class members.

325.   **Uniform Defect.** Each of Defendant's Platforms included in this cause of action were designed and intended to be a dating platform. The software and architecture of each Platform is the same for every user that logs in or creates an account. The Platforms are uniformly defective and pose the same danger to each user.

326.   **Knowledge**. Defendant knew, or by the exercise of reasonable care, should have known, that the Platforms were dangerous, harmful, and injurious when used in a reasonably foreseeable manner by Plaintiffs and Class members.

327.   Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Platforms. Those risks of harm include, but are not necessarily limited to, addiction, compulsive

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries. These risks were, and remain to be, known or knowable considering Defendant's own internal data and knowledge regarding the Platforms and their usage.

328.   Plaintiffs and Class members were the foreseeable and intended users of the Platforms.

329.   **Duty.** Defendant owed Plaintiffs and Class members a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of the Platforms not to create an unreasonable risk of harm from and in the use of the Platforms (including, but not necessarily limited to, unreasonable risks of addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries).

330.   **Defendant Failed to Exercise Reasonable Care in Designing the Platforms.** Defendant breached its duty by failing to use reasonable care in the design of the Platforms by negligently designing them with features that are intentionally, or would be reasonably foreseeable to be, specifically injurious. The Platforms are less safe to use than an ordinary user would expect when used in an intended and foreseeable manner, as ordinary users would not expect the features described herein to create or increase the risk of abuse and addiction and resulting cascade of negative consequences.

331.   **Defendant Could Have Avoided Plaintiffs' Injuries.** Defendant could have utilized cost-effective, reasonably feasible alternative designs, including cessation, or redesigning, of the specific features outlined herein, or by employing safety measures to ensure or encourage responsible use of the Platforms. Reasonable alternatives were available to Defendant which would have reduced the gravity and severity of the Platforms' dangers.

332.   **Plaintiffs Were Directly Injured by Defendant's Conduct in Providing Plaintiffs with the Use of Defendant's Platforms.** As a direct and proximate result of Defendant's breached duties, Plaintiffs and Class members were harmed. Plaintiffs and Class members would not have been harmed but for the development and institution of dangerous features.

333.   **Ongoing Harm.** The safety concerns arising from Defendant's negligent and

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway, Malibu, CA 90265  |  P: (213) 788-4050  F: (213) 788-4070  |  clarksonlawfirm.com

unlawful acts are not immediately apparent to Platform users. Many putative Class members are continuing to use Defendant's Platforms every day, and Plaintiffs lack the requisite knowledge to independently verify whether the Platforms continue to pose unreasonable risks. Plaintiffs and Class members are therefore unable to rely of Defendant's future representation as to the safety of the Platforms.

334. **Relief.** Plaintiffs and Class members seek judgement against Defendant for injunctive relief alongside compensatory damages and all other damages prescribed by law, including treble and punitive damages, together with interest, costs of suit, attorneys' fees, and all other relief as the Court deems proper.

## COUNT EIGHTEEN

### Negligence – Failure to Warn

### (*On Behalf of the Nationwide Class*)

335. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

336. **Control.** At all relevant times, Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its Platforms used by Plaintiffs and Class members.

337. **Uniform Defect.** Each of Defendant's Platforms included in this cause of action were designed and intended to be a dating platform. The software and architecture of each Platform is the same for every user that logs in or creates an account on a respective Platform. The Platforms are uniformly defective and pose the same danger to each user.

338. **Knowledge**. Defendant knew, or by the exercise of reasonable care, should have known, that the Platforms were dangerous, harmful, and injurious when used in a reasonably foreseeable manner by Plaintiffs and Class members.

339. Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Platforms. Those risks of harm include, but are not necessarily limited to, addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

physical or psychological injuries. These risks were, and remain to be, known or knowable considering Defendant's own internal data and knowledge regarding the Platforms and their usage.

340.   Plaintiffs and Class members were the foreseeable and intended users of the Platforms.

341.   **Duty.** Defendant owed Plaintiffs and Class members a duty to provide adequate warnings or instructions about the known and foreseeable risks associated with using the Platforms, or those risks which Defendant should have known through the exercise of reasonable care (including, but not necessarily limited to, unreasonable risks of addiction, compulsive use, diminished self-esteem, perpetuation of insecurity, anxiety, and/or depression, and any other physical or psychological injuries).

342.   **Defendant Failed to Exercise Reasonable Care by Not Providing Warning or Instruction to Combat Known Risks of Harm.** Defendant breached its duty by failing to use reasonable care in providing adequate warning regarding, or instruction for the responsible use of, the Platforms by negligently omitting any warning which would mitigate the gravity and severity of foreseeable harms associated with Platform engagement.

343.   **Defendant Could Have Avoided Plaintiffs' Injuries.** Defendant could have utilized cost-effective, reasonably feasible alternative designs, including adoption of warning or instruction, or by employing safety measures to ensure or encourage responsible use of the Platforms. Reasonable alternatives were available to Defendant which would have reduced the gravity and severity of the Platforms' dangers.

344.   **Plaintiffs Were Directly Injured by Defendant's Conduct in Providing Plaintiffs with the Use of Defendant's Platforms.** As a direct and proximate result of Defendant's breached duties, Plaintiffs and Class members were harmed. Plaintiffs and Class members would not have been harmed had Defendant provided reasonable and adequate warning.

345.   **Ongoing Harm.** The safety concerns arising from Defendant's negligent and unlawful acts are not immediately apparent to Platform users. Many putative Class members are continuing to use Defendant's Platforms every day, and Plaintiffs lack the requisite knowledge to independently verify whether the Platforms continue to pose unreasonable risks. Plaintiffs and Class

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

members are therefore unable to rely of Defendant's future representation as to the safety of the Platforms.

346.   **Relief.** Plaintiffs and Class members seek judgement against Defendant for injunctive relief alongside compensatory damages and all other damages prescribed by law, including treble and punitive damages, together with interest, costs of suit, attorneys' fees, and all other relief as the Court deems proper.

**<u>PRAYER FOR RELIEF</u>**

**<u>Public Injunctive Relief:</u>**

WHEREFORE, Plaintiffs request that the Court enter a public injunction against MatchGroup, Inc. as follows:

      a.     To enjoin Match from making the materially false representations and omissions detailed herein;

      b.     To remedy the material omission of risks in Match's false advertising by way of example requiring them to conspicuously, on application storefronts or within Platform applications themselves, to indicate that the Platforms carry substantial risk of addiction and attendant harms and instruct prospective users on responsible use of the Platforms;

      c.     To require Match to implement policies and/or applicable procedures to monitor compulsive use and evidence of addictive behaviors and implement policies and/or applicable procedures to mitigate attendant harms therein;

**<u>Individual and Class Relief:</u>**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment and relief on all causes of action as follows:

      a.     **Certification**: For an order certifying this action as a class action, appointing Plaintiffs as the Class Representatives of their respective state's Classes, and appointing Plaintiffs' Counsel as Class Counsel;

      b.     **Declaratory Relief**: For an order declaring that Defendant's conduct violates the statutes and laws referenced herein;

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway, Malibu, CA 90265   |   P: (213) 788-4050   F: (213) 788-4070   |   clarksonlawfirm.com

84

**FIRST AMENDED CLASS ACTION COMPLAINT**

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway, Malibu, CA 90265 | P: (213) 788-4050  F: (213) 788-4070 | clarksonlawfirm.com

c.      **Injunction**: For an order requiring Defendant to immediately cease and desist from selling the unlawful subscriptions in violation of law; enjoining Defendant from continuing to market, advertise, distribute, and sell the subscriptions in the unlawful manner described herein; requiring Defendant to engage in an affirmative advertising campaign to dispel the public misperception of the Platforms resulting from Defendant's unlawful conduct; and requiring all further and just corrective action, consistent with permissible law and pursuant to only those causes of action so permitted;

d.      **Damages/Restitution/Disgorgement**: For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with permissible law and pursuant to only those causes of action so permitted;

e.      **Attorneys' Fees & Costs**: For an order awarding attorneys' fees and costs, consistent with permissible law and pursuant to only those causes of action so permitted;

f.      **Pre-/Post-Judgment Interest**: For an order awarding pre-judgment and post-judgment interest, consistent with permissible law and pursuant to only those causes of action so permitted; and,

g.      **All Just & Proper Relief**: For such other and further relief as the Court deems just and proper.

///

///

///

///

///

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues and causes of action so triable.

DATED: June 10, 2024                    **CLARKSON LAW FIRM, P.C.**

/s/ *Ryan J. Clarkson*
Ryan J. Clarkson
Bahar Sodaify
Kelsey J. Elling

*Counsel for Plaintiffs and the Proposed Classes*

FIRST AMENDED CLASS ACTION COMPLAINT