1  Amy P. Lally, SBN 198555
   alally@sidley.com
2  SIDLEY AUSTIN LLP
   1999 Avenue of the Stars, 17th Floor
3  Los Angeles, CA 90067
   Tel: (310) 595-9662
4  Fax: (310) 595-9501

5

6  *Attorney for Defendant Match Group, Inc.*

7  [Additional Counsel listed on signature page]

8                **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10                **SAN FRANCISCO DIVISION**

11  BURAK OKSAYAN, JACK KESSLER,          Case No. 3:24-cv-00888-LB
    ANDREW ST. GEORGE, BRADFORD
12  SCHLOSSER, ANDREW KARZ, JAMI          Magistrate Judge Beeler
    KANDEL, CHASE TAYLOR, HUSSEIN
13  SAAB, and OLUMUYIWA OLANIYAN,         **DEFENDANT MATCH GROUP, INC.'S**
    individually and/or on behalf of all others  **NOTICE OF MOTION AND MOTION TO**
14  similarly situated,                   **COMPEL ARBITRATION AND STAY**
                                          **PROCEEDINGS AND MEMORANDUM**
15                                        **OF POINTS AND AUTHORITIES**
                    Plaintiffs,
16                                        Filed concurrently herewith:
17        v.                              - Declaration of Jennifer Flashman
                                          - Declaration of Ethan Greenspan
18  MATCH GROUP, INC.,                    - Declaration of Marko Krosnjar

19                  Defendant.            Hearing date: August 29, 2024 at 9:30 AM

20

21

22

23

24

25

26

27

28

PLEASE TAKE NOTICE that on August 29, 2024 at 9:30 AM, or as soon thereafter as it may be heard before the Honorable Laurel Beeler of the United States District Court for the Northern District of California in Courtroom B – 15th Floor, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Match Group, Inc.[1] ("MGI") will and hereby does move for an order staying this action and compelling Plaintiffs Burak Oksayan, Jack Kessler, Andrew St. George, Bradford Schlosser, Andrew Karz, Jami Kandel, Chase Taylor, Hussein Saab, and Olumuyiwa Olaniyan (collectively, "Plaintiffs") to pursue their claims, if at all, in arbitration and on an individual basis only, on the grounds that each Plaintiffs' claims are subject to an arbitration agreement and class waiver in the Terms of Use that govern their respective use of the online dating platforms at issue in this case.

Specifically, MGI moves this Court for an order compelling individual arbitration of all of the claims in the Amended Complaint (ECF No. 29, "Compl."). This motion is brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., and well-settled law on the grounds that each Plaintiff agreed to arbitrate on an individual basis all disputes related to their respective use of Tinder, Hinge, and/or The League when each Plaintiff agreed to the Terms of Use and continued to access and use those platforms respectively.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, and the Declarations of Jennifer Flashman, Ethan Greenspan, and Marko Krosnjar filed concurrently herewith, the record in this action, and any oral argument permitted by the Court.

Dated: July 22, 2024

SIDLEY AUSTIN LLP

By: */s/ Amy P. Lally*
Amy P. Lally
Angela C. Zambrano
Chelsea A. Priest
Kathrine Maldonado

*Attorneys for Defendant Match Group, Inc.*

---

[1] MGI disputes that it is the proper defendant in this matter, as it does not own or operate any of the platforms that form the basis of Plaintiffs' claims. Nevertheless, as explained in more detail below, MGI is entitled to enforce the arbitration agreement in the platforms' Terms of Use.

# **TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................ 1

II. BACKGROUND ................................................................................................ 2

    A. Platform Users Must Accept the Terms of Use. .................................... 2

    B. The TOU Include Conspicuous Arbitration Agreements. ..................... 5

    C. Plaintiffs Agreed to Arbitrate When They Created Accounts, Purchased Subscriptions, Accepted the Updated TOU, and Signed In to Their Accounts. .............................................................................................. 7

        1. Burak Oksayan ............................................................................ 7

        2. Jack Kessler ................................................................................ 8

        3. Andrew St. George ..................................................................... 9

        4. Jami Kandel ............................................................................. 10

        5. Bradford Schlosser ................................................................... 12

        6. Andrew Karz ............................................................................ 14

        7. Chase Taylor ............................................................................ 14

        8. Hussein Saab ............................................................................ 16

        9. Olumuyiwa Olaniyan ............................................................... 17

III. LEGAL STANDARD ...................................................................................... 18

IV. ARGUMENT ................................................................................................... 19

    A. Under Settled Contract Principles, Plaintiffs Agreed to Arbitrate Their Claims. ................................................................................................. 19

    B. MGI Can Enforce the Arbitration Agreement. ................................... 22

    C. The Scope of the Arbitration Agreement Is for the Arbitrator to Decide. ................ 23

    D. In Any Event, the Agreements to Arbitrate Clearly Encompass These Claims. ................................................................................................. 24

    E. Plaintiffs' Inducement and Duress Allegations Do Not Change This Result. ........... 25

    F. This Case Must Be Stayed Pending Completion of Arbitration. ......... 25

V. CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                             **Page(s)**

*AT&T Mobility LLC v. Concepcion*,
 563 U.S. 333 (2011)..............................................................................................18

*Brennan v. Opus Bank*,
 796 F.3d 1125 (9th Cir. 2015) ............................................................................18

*Buckeye Check Cashing, Inc. v. Cardegna*,
 546 U.S. 440 (2006)..............................................................................................25

*Capps v. JPMorgan Chase Bank, N.A.*,
 No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990 (E.D. Cal. Apr. 21, 2023) ......22

*Caremark, LLC v. Chickasaw Nation*,
 43 F.4th 1021 (9th Cir. 2022) ..............................................................................23

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
 207 F.3d 1126 (9th Cir. 2000) ............................................................................18

*Cordas v. Uber Techs., Inc.*,
 228 F. Supp. 3d 985 (N.D. Cal. 2017) ...........................................................20, 21

*Edwards v. Verizon*,
 No. CV 14-09394 BRO, 2015 WL 13654015 (C.D. Cal. Jan. 26, 2015) ...............24

*Estrella v. Freedom Fin.*,
 No. C 09-03156 SI, 2011 WL 2633643 (N.D. Cal. July 5, 2011) .........................25

*Gonzalez-Torres v. Zumper, Inc.*,
 No. 19-cv-02183-PJH, 2019 WL 6465283 (N.D. Cal. Dec. 2, 2019)....................19

*Graf v. Match.com, LLC*,
 No. 15-CV-3911-PA, 2015 WL 4263957 (C.D. Cal. July 10, 2015) .....................21

*Hajibekyan v. BMW of N. Am., LLC*,
 839 F. App'x 187 (9th Cir. 2021) ........................................................................22

*Hays v. HCA Holdings, Inc.*,
 838 F.3d 605 (5th Cir. 2016) ...............................................................................23

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
 139 S. Ct. 524 (2019)...................................................................18, 19, 23, 24

*Herrera v. Cathay Pac. Airways Ltd.*,
 104 F.4th 702 (9th Cir. 2024) ..............................................................................23

ii

*Kahl v. Plentyoffish Media, ULC*,
    No. 23-cv-00985-AGT (N.D. Cal. June 13, 2023), Dkt. No. 19 ...........................................21

*Kaselitz v. hiSoft Tech. Int'l, Ltd.*,
    No. C-12-5760 MMC, 2013 WL 622382 (N.D. Cal. Feb. 15, 2013) .....................................22

*Kim v. Tinder, Inc.*,
    No. 18-CV-03093-JFW (AS), 2018 WL 6694923 (C.D. Cal. July 12, 2018) ........................21

*Lee v. Ticketmaster L.L.C.*,
    817 F. App'x 393 (9th Cir. 2020) ...................................................................................20, 21

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.*,
    473 U.S. 614 (1985) .............................................................................................................19

*Oberstein v. Live Nation Entmt., Inc.*,
    60 F.4th 505 (9th Cir. 2023) ...................................................................................19, 20, 22

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) .............................................................................................................25

*Rainey v. A Place for Rover, Inc.*,
    No. 2:22-cv-00403-RGK-E, 2022 WL 16942849 (C.D. Cal. July 18, 2022) ......................22

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ...............................................................................................................24

*Shearson/Am. Express, Inc. v. McMahon*,
    482 U.S. 220 (1987) .............................................................................................................19

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) ...............................................................................................18

*Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*,
    497 F. App'x 740 (9th Cir. 2012) ........................................................................................24

**Statutes**

9 U.S.C. § 2 ..................................................................................................................................18

9 U.S.C. § 3 ..................................................................................................................................25

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*...............................................................1, 18, 19, 25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs' Amended Complaint does nothing to change the fact that their claims must be arbitrated. Plaintiffs sued Match Group, Inc. ("MGI") claiming that the Tinder, Hinge, and The League online dating platforms (collectively, the "Platforms") are "addictive" and engender "compulsive use."[2] These allegations remain groundless. Countless people have used the Platforms to find relationships and then deleted their accounts, and the features Plaintiffs complain about— like "present[ing] potential matches one at a time," Compl. ¶ 53, "flattering" their users by "impart[ing] confidence," *id.* ¶ 60, and warning inactive users that their profiles will be hidden, *id.* ¶ 65—are actions of a responsible Platform taking into consideration its users' needs, not evidence of a nefarious plan to cause addiction.

But just as with the original Complaint, the baseless nature of these claims remains an issue for another day and another forum. This case must be stayed because each Plaintiff agreed multiple times to resolve any disputes related to the Platforms exclusively through individual arbitration. To create an account (which Plaintiffs admittedly did), Plaintiffs were required to agree to the Platforms' respective Terms of Use ("TOU"), which contain an arbitration agreement and class action waiver. Each Plaintiff thereby entered into a binding arbitration agreement and class action waiver and later reconfirmed their consent when purchasing subscriptions, consenting to updated TOU via pop-up screens that require consent for continued Platform use, and, in some cases, when signing back in to the Platforms.

What is more, the TOU's arbitration agreement contains a delegation provision, meaning that any disagreement about whether the underlying disputes are arbitrable must be decided by an arbitrator. So, the only question this Court needs to decide is whether an arbitration agreement exists;

---

[2] Plaintiffs bring their claims against MGI, but MGI does not own or operate any of the Platforms. Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4; Krosnjar Decl. ¶ 4. Rather, MGI is the non-operating, parent holding company of the entities that operate the Platforms. Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4; Krosnjar Decl. ¶ 4. As explained more fully below, while MGI at no time operated any of the Platforms at issue in this case, it is still entitled to benefit from the arbitration provisions contained in the Terms of Use governing Plaintiffs' use of the Platforms.

it clearly does. But even if the Court were to reach the question of whether the arbitration agreement applies to the disputes in this case (it should not), the answer is yes. The broad language of the arbitration agreements plainly encompasses Plaintiffs' claims.

Plaintiffs' Amended Complaint attempts to avoid their (repeated) agreement to arbitrate by claiming that Plaintiffs were "unaware of" the agreement to arbitrate, that the Platforms somehow improperly induced Plaintiffs to create an account, and even that Plaintiffs made their purchases "under duress." These allegations are absurd (not least because nearly all of the Plaintiffs *re-confirmed* their agreement to the TOU *after* filing this case, and even *after* MGI initially moved to compel arbitration). Regardless, these issues are also for the arbitrator to decide.

Under controlling Supreme Court and Ninth Circuit precedent, Plaintiffs must submit their claims to arbitration on an individual basis, and this action must be stayed in the interim.

## II.    BACKGROUND

### A.  Platform Users Must Accept the Terms of Use.

Tinder, Hinge, and The League are online dating platforms. Flashman Decl. ¶ 3; Greenspan Decl. ¶ 3; Krosnjar Decl. ¶ 3. All users of these Platforms must create an account and agree to the Platforms' TOU before accessing any of the Platforms' services. Flashman Decl. ¶ 5; Greenspan Decl. ¶ 5; Krosnjar Decl. ¶ 5. For example, before creating a Tinder account, a user must tap a button adjacent to a notice informing them that by tapping that button and creating an account, the user agrees to the Tinder TOU. Flashman Decl. ¶ 6. The Tinder TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting font in the notice. *Id.* Once a Tinder user creates an account, the user may use the platform for free without purchasing a subscription. *Id.* ¶ 8. If the user chooses to purchase a subscription, the user reconfirms their consent to the TOU (including the arbitration agreement and class action waiver). The purchase confirmation page alerts the user that the purchase is subject to agreement to the TOU, which are hyperlinked, and users complete the purchase only if they tap a button after being presented with the notice. *Id.* Examples of the Tinder purchase confirmation pages that Plaintiffs encountered are attached as Exs. A-6–A-7, A-10–A-11, A-13–A-15, A-17 and A-19–A-20. Tinder users again reconfirm their consent to the TOU *every time* they sign in, via a screen informing them that "[b]y tapping Sign In, you agree

to our <u>Terms</u>." Flashman Decl. ¶¶ 7, 24, 31, 48. Examples of the Tinder sign-in pages that Plaintiffs encountered are attached as Exs. A-8, A-12, and A-21.

As with Tinder, all Hinge users must create an account before accessing any Hinge services. Greenspan Decl. ¶ 5. And before creating a Hinge account, a user must tap a button adjacent to a notice informing users that by creating an account, the user agrees to the Hinge TOU. *Id.* ¶ 6. As with Tinder, the Hinge TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting font in the notice. *Id.* For those Hinge users who choose to purchase a subscription, they reconfirm their consent to the TOU (including the arbitration agreement and class action waiver). Specifically, the purchase confirmation page alerts the user that the purchase is subject to agreement to the TOU, which are hyperlinked, and users complete the purchase only if they tap a button after being presented with the notice. *Id.* ¶ 8. Examples of the Hinge purchase confirmation pages that Plaintiffs encountered are attached as Exs. B-5, B-8–B-10, B-13–B-14, and B-17. Hinge users again reconfirm their consent to the TOU *every time* they sign in, via a screen informing them that by tapping "Sign in," they agree to the TOU. *Id.* ¶ 7. Examples of the Hinge sign-in pages that Plaintiffs encountered are attached as Exs. B-6–B-7, B-11, B-15, B-16, and B-18.

Accessing The League's services also requires creating an account. Krosnjar Decl. ¶ 5. Before creating an account with The League, a user must check a box acknowledging that by signing up for The League, the user agrees to The League TOU. *Id.* The League TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting font. *Id.* An example of the account creation page is attached as Exhibit C-1. If a user on The League does not check the box acknowledging agreement to The League TOU, a pop-up blocker screen appears with a message in bold, capitalized letters: "**TO[U] ACCEPTANCE REQUIRED**," followed by a notice that the user must agree to The League TOU to continue with the account creation process. Krosnjar Decl. ¶ 6. An example is attached as Exhibit C-2.

In addition to the TOU agreement processes described above, users accessing the Platforms between 2022 and the present (who had existing accounts) would have encountered ***at least one*** "blocking modal" requiring them to accept an updated version of the TOU to continue using the Platforms. A blocking modal is a pop-up that appears on a user's screen when they attempt

to access the Platform. Flashman Decl. ¶¶ 12–13; Greenspan Decl. ¶¶ 11–12; Krosnjar Decl. ¶¶ 10–12. When a blocking modal appears, the user cannot continue to use the app without agreeing to the TOU by tapping a button (here, "Agree" or "I accept," as explained in more detail below). Flashman Decl. ¶¶ 12–13; Greenspan Decl. ¶¶ 11–12; Krosnjar Decl. ¶¶ 10–12. If the user leaves the app without tapping the required button, the blocking modal will appear again when the user attempts to access the app again. Flashman Decl. ¶¶ 12–13; Greenspan Decl. ¶¶ 11–12; Krosnjar Decl. ¶¶ 13. In other words, users cannot bypass the modal; if they want to use the services, they must accept the updated TOU. *See* Flashman Decl. ¶¶ 12–13; Greenspan Decl. ¶¶ 11–12; Krosnjar Decl. ¶¶ 10–13.

Tinder users encountered a blocking modal screen when they first attempted to access Tinder after the 2022 and January 2024 TOU updates. Flashman Decl. ¶¶ 12–13. Hinge users encountered a blocking modal screen when they first attempted to access Hinge after the 2022 and 2024 TOU updates. Greenspan Decl. ¶¶ 11–12. The blocking modal screens required the user to tap "Agree" before they were able to navigate away from the blocking modal. Flashman Decl. ¶¶ 12–13; Greenspan Decl. ¶¶ 11–12. The blocking modals stated that "By tapping Agree, you agree to our updated **Terms**." *See* Exs. A-4–A-5, B-3–B-4. The word "Terms" was a hyperlink to the updated TOU and was bolded, underlined, or both. *See id.*

The League similarly used blocking modals to inform existing users of TOU updates over the last two years. Each time The League updated its TOU, existing users encountered a blocking modal with the full version of the updated TOU when they tried to access the Platform after the TOU updates. Krosnjar Decl. ¶¶ 10–12; Exs. C-6–C-8. Users could not navigate within the app until they tapped "I accept." Krosnjar Decl. ¶¶ 10–13. The 2023 and 2024 modals explicitly stated that "By tapping "I accept"," the user agreed to the updated TOU. Exs. C-7–C-8.

Since at least February 2022, each version of the TOU has allowed users the opportunity to opt out of retroactive application of changes to the updated TOU's arbitration provision, though not the arbitration agreement itself. Flashman Decl. ¶ 14; Greenspan Decl. ¶ 13; Krosnjar Decl. ¶ 14; Section 15e of Exs. A-1–A-3, B-1–B-2, C-4–C-5. None of the Plaintiffs in this action exercised their right to opt out. Flashman Decl. ¶ 14; Greenspan Decl. ¶ 13; Krosnjar Decl. ¶ 14. Also, and as explained more fully below, each Plaintiff claims to have made purchases on at least one of the

1    Platforms "within the last two years," Compl. ¶¶ 23–31, which, if true, necessarily means they would

2    have had to reconfirm their acceptance of the TOU when purchasing subscriptions *and* upon

3    encountering the blocking modal(s) during that time, which (like the earlier TOU) contained an

4    arbitration agreement and class action waiver. Thus, even if Plaintiffs had opted out of retroactive

5    application of changes to the updated TOU's arbitration provision (they did not), that would make

6    no difference to the arbitrability of their claims because they previously agreed to arbitrate claims

7    arising out of their purchases on and usage of the Platforms when they created accounts.

8        **B.    The TOU Include Conspicuous Arbitration Agreements.**

9        All named Plaintiffs agreed to one or more of at least the 2022 Tinder TOU, the January

10   2024 Tinder TOU, the April 2024 Tinder TOU, the 2022 Hinge TOU, and the 2024 Hinge TOU.[3] If

11   Plaintiff Jami Kandel used The League within the last two years, as she alleges, Compl. ¶ 26, she

12   would have encountered at least one blocking modal requiring her to accept the 2022, 2023, and/or

13   2024 The League TOU. Krosnjar Decl. ¶ 18. Each of these TOU—all of which are attached hereto

14   as Exs. A-1–A-3, B-1–B-2, C-3–C-5—includes dispute resolution provisions that require individual

15   arbitration of Plaintiffs' claims. The arbitration provisions in each of these TOU are substantially

16   similar. Each clearly requires Plaintiffs to resolve their claims through individual arbitration—not a

17   class action in federal court. The first section of the TOU contains a bolded, upper-case paragraph

18   advising users to carefully review the dispute resolution provisions and specifically warning that the

19   TOU include an arbitration agreement, class action waiver, and jury trial waiver. *See* Section 1 of

20   Exs. A-1–A-3, B-1–B-2, C-4–C-5.

21       Section 15 of the 2022 Tinder and Hinge TOU provides that "[a]ny dispute, claim, or

22   controversy, between you and [the Platform] . . . that arises from or relates in any way to this

23   _____

24   [3] Although Plaintiffs agreed to the TOU on multiple occasions, this brief focuses on the most recent
     versions they agreed to for each Platform because the TOU, by their terms, supersede previous
25   agreements. Ex. A-1 §§ 1, 15e, 19; Exs. A-2–A-3, B-1–B-2, C-4–C-5 §§ 15e, 20; Ex. C-3 § 16. The
     most recent TOU version to which each Plaintiff agreed on each Platform is as follows. **Tinder:** Mr.
26   Taylor and Mr. Olaniyan most recently agreed to the April 2024 Tinder TOU. Flashman Decl. ¶¶ 37,
     47. Mr. Oksayan, Mr. Kessler, Mr. Schlosser, and Mr. Saab most recently agreed to the 2022 Tinder
27   TOU. *Id.* ¶¶ 18–19, 21, 23–24, 29, 31, 40. Mr. Karz most recently agreed to the January 2024 Tinder
     TOU. *Id.* ¶ 33. **Hinge:** Mr. Kessler and Mr. Olaniyan most recently agreed to the 2022 Hinge TOU.
28   Greenspan Decl. ¶¶ 18, 44–45. Mr. St. George, Ms. Kandel, Mr. Schlosser, Mr. Taylor, and Mr. Saab
     most recently agreed to the 2024 Hinge TOU. *Id.* ¶¶ 22, 25, 27, 32–33, 35, 38, 41.

Agreement (including any alleged breach of this Agreement), the Service[s], or our relationship with you (collectively, 'Dispute'), shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION." Ex. A-1 § 15c; Ex. B-1 § 15c. The same section further provides that "'Dispute' as used in this Agreement shall have the broadest possible meaning and include claims that arose before the existence of this or any prior Agreement and claims that arise during the term of this Agreement or after the termination of this Agreement." Ex. A-1 § 15c; Ex. B-1 § 15c. Other than a carve-out for disputes in small claims court, the arbitration agreement further contains a delegation provision, which provides that all issues "are exclusively for the Arbitrator to decide, including but not limited to scope and enforceability of this Dispute Resolution Section." Ex. A-1 § 15c; Ex. B-1 § 15c. Finally, the TOU warn, in all caps, that the parties "WAIVE THE RIGHT TO A JURY TRIAL AND THE RIGHT TO LITIGATE DISPUTES IN COURT IN FAVOR OF INDIVIDUAL ARBITRATION," and further warn that the parties "EACH WAIVE THE RIGHT TO FILE OR PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER OR OTHERWISE TO SEEK RELIEF ON A CLASS BASIS." Ex. A-1 § 15b; Ex. B-1 § 15b.

The January 2024 Tinder TOU, April 2024 Tinder TOU, 2024 Hinge TOU, 2023 The League TOU, and 2024 The League TOU are virtually identical to the 2022 Tinder and Hinge TOU in all relevant respects.[4] Section 15 provides that "[a]ny Dispute . . . shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION," where "Dispute" is defined as "any dispute, claim, or controversy between [the user] and Tinder that arises from or related in any way to this Agreement (including any alleged breach of this Agreement), the Service, or our relationship with you." Sections 15a and 15c of Exs. A-2–A-3, B-2, C-4–C-5. Again, the section provides that "'Dispute' as used in this Agreement shall have the broadest possible meaning and include claims

---

[4] The 2022 The League TOU is slightly different from the others, but not in any substantive way. A paragraph near the beginning advises users of the dispute resolution provision located in section 14. Section 14 states that the parties "agree that every dispute arising in connection with these Terms will be resolved by binding arbitration," and continues that "[t]his agreement to arbitrate disputes includes all claims arising out of or relating to any aspects of these Terms." Ex. C-3 § 14.1. A delegation clause provides that "[t]he arbitrator has exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this binding arbitration agreement." *Id.* § 14.3. Section 14.1 warns in all caps that the parties "ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION." *Id.* § 14.1.

that arose before the existence of this or any prior Agreement and claims that arise during the term of this Agreement or after the termination of this Agreement." *Id.* § 15a. And like the 2022 version, the 2024 versions provide that, other than small claims court disputes, all issues "are exclusively for the Arbitrator to decide, including but not limited to scope and enforceability of this Dispute Resolution Section and including questions of arbitrability." *Id.* § 15c. The 2024 version also warns in bold and all caps that the parties "**EACH WAIVE THE RIGHT TO A JURY TRIAL AND THE RIGHT TO LITIGATE DISPUTES IN COURT**," as well as "**EACH WAIVE THE RIGHT TO FILE OR PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER OR OTHERWISE TO SEEK RELIEF ON A CLASS BASIS.**" *Id.* § 15b.

The arbitration agreement expressly applies to disputes with the Platforms' affiliates. In each TOU, Section 15a notes, "[f]or purposes of this Dispute Resolution Process and Arbitration Procedures set forth in Section 15, '[the Platform]' shall include our affiliates, employees, licensors, and service providers." Section 15a of Exs. A-1–A-3, B-1–B-2, C-4–C-5. MGI, as the indirect parent company of the Platforms' operating companies, is plainly an affiliate.

### C. Plaintiffs Agreed to Arbitrate When They Created Accounts, Purchased Subscriptions, Accepted the Updated TOU, and Signed In to Their Accounts.

Each Plaintiff's allegations and account data confirm that Plaintiffs agreed to the Platforms' TOU, including the arbitration agreement and class action waiver.

#### 1. Burak Oksayan

Mr. Oksayan alleges that he purchased two Tinder subscriptions in 2023, which form the gravamen of Mr. Oksayan's claims. Compl. ¶ 23. Taking these allegations as true, he would have agreed to the 2022 Tinder TOU upon each of these purchases. Specifically, when Mr. Oksayan initiated those purchases, he would have encountered a screen stating "[b]y tapping Continue, . . . you agree to our **Terms**." Flashman Decl. ¶ 17; Ex. A-6. This notice underscored and bolded a hyperlink to the 2022 Tinder TOU and was displayed directly above the button Mr. Oksayan tapped to continue with his purchase. Flashman Decl. ¶ 17. Tinder's database confirms that Mr. Oksayan purchased Tinder subscriptions in 2023 and would have seen this purchase screen. *Id.*

¶ 18; Ex. A-6. Mr. Oksayan could not have completed these purchases without tapping the "Continue" button. Flashman Decl. *Id.* ¶ 18.

Mr. Oksayan's account history demonstrates that he accepted the Tinder TOU on other occasions as well. Tinder's database shows that Mr. Oksayan created a Tinder account in 2014.[5] *Id.* ¶ 16. Mr. Oksayan continued using that account throughout 2023. When Mr. Oksayan accessed his account on April 20, 2022, he encountered a blocking modal requiring him to agree to the 2022 Tinder TOU if he wanted to continue using Tinder. *Id.* ¶ 19. The blocking modal informed users of the updated version of the TOU and explained that assent to the updated TOU was necessary to continue using Tinder's service. *Id.*; Ex. A-4. The modal further informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. A-4. This notice was directly above the "Agree" button, and the word "**Terms**" was displayed in contrasting bold blue font and underscored, which hyperlinked to the updated 2022 Tinder TOU. Ex. A-4. Mr. Oksayan could not have continued using the Tinder service without tapping "Agree." Flashman Decl. ¶ 19.

### 2. Jack Kessler

Mr. Kessler alleges that he purchased Tinder subscriptions in 2023, which forms the gravamen of his claim as to Tinder. Compl. ¶ 24. Taking that allegation as true, when Mr. Kessler initiated a purchase, he agreed to the 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 22; Ex. A-7. Tinder's database confirms that Mr. Kessler purchased Tinder subscriptions in 2023 and would have seen this purchase screen. Flashman Decl. ¶ 23; Ex. A-7. Mr. Kessler could not have completed his purchase without tapping the "Continue" button. Flashman Decl. ¶ 23.

As with Mr. Oksayan, Tinder's database confirms that Mr. Kessler agreed to the Tinder TOU on other occasions. Mr. Kessler first created a Tinder account in 2016 and agreed to the then-effective TOU. Flashman Decl. ¶ 20. Mr. Kessler continued to use his original Tinder account through 2023. When Mr. Kessler accessed his account on March 30, 2022, he encountered the same

---

[5] Mr. Oksayan created another Tinder account in 2023, which required him to agree to the 2022 Tinder TOU as a condition of account creation. Flashman Decl. ¶ 16.

blocking modal that Mr. Oksayan did (described above), requiring him to tap "Agree" to consent to the 2022 Tinder TOU if he wanted to continue using Tinder. *Id.* ¶ 21; Ex. A-4. Further, when Mr. Kessler last signed in to Tinder on October 31, 2023, he once again agreed to the 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' you agree to our <u>Terms</u>," with an underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 24; Ex. A-8. Mr. Kessler could not have signed in without tapping the "Sign in" button. Flashman Decl. ¶ 24.

Mr. Kessler also alleges that he purchased a Hinge subscription in 2023, which forms the basis for his claim related to Hinge. Compl. ¶ 24. Assuming that allegation is true, when Mr. Kessler initiated his purchase, he agreed to the 2022 Hinge TOU when he was presented with a screen stating, "[b]y tapping Continue, you agree to our <u>Terms</u>," with an underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 16; Ex. B-5. Hinge's database confirms Mr. Kessler purchased Hinge subscriptions in 2023 and would have seen this purchase screen. Greenspan Decl. ¶ 17; Ex. B-5. Mr. Kessler could not have completed this purchase without tapping "Continue." Greenspan Decl. ¶ 17.

Hinge's database confirms that Mr. Kessler agreed to the Hinge TOU on a number of other occasions as well. Mr. Kessler created a Hinge account in 2022, which required him to agree to the 2022 Hinge TOU. *Id.* ¶ 15. Further, when Mr. Kessler last signed in to Hinge on August 9, 2023, he again agreed to the 2022 Hinge TOU when he was presented with a screen stating "[b]y tapping 'Sign in' / 'Create account', you agree to our **<u>Terms of Service</u>**" with an underscored and bolded hyperlink to the 2022 Hinge TOU. *Id.* ¶ 18; Ex. B-6. Mr. Kessler could not have signed in without tapping the "Sign in" button. *See* Greenspan Decl. ¶ 18.

### 3. Andrew St. George

Mr. St. George claims that he purchased "roses" from Hinge between September 2022 and May 2023, which form the basis for his claims. Compl. ¶ 25. Assuming those allegations are true, Mr. St. George necessarily agreed to the 2022 Hinge TOU via a blocking modal, as he would not have been able to navigate within the app to purchase roses without having encountered the blocking modal. Greenspan Decl. ¶ 20. Indeed, Hinge's database reflects that on March 3, 2022, Mr. St. George accepted the 2022 Hinge TOU when he encountered a blocking modal informing him

that the TOU had been updated and explaining that assent to the updated TOU was necessary to continue using Hinge. *Id.*; Ex. B-3. The blocking modal stated that "[b]y tapping Agree, you agree to our updated **Terms**." Ex. B-3. This notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold purple font, which hyperlinked to the 2022 Hinge TOU. *Id.* Mr. St. George could not have continued using the Hinge service, and purchased his "roses," without tapping "Agree," thereby consenting to the 2022 Hinge TOU. Greenspan Decl. ¶ 20.

Additionally, when Mr. St. George last signed in to his Hinge account on February 28, 2024, he again agreed to the 2022 Hinge TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' / 'Create account', you agree to our **Terms of Service**," with a bolded and underscored hyperlink to the 2022 Hinge TOU. *Id.* ¶ 21; Ex. B-7. Mr. St. George could not have signed in without tapping the "Sign in" button. Greenspan Decl. ¶ 21.

Finally (and perhaps most tellingly in light of Mr. St. George's claim that he was unaware of the arbitration agreement) on May 17, 2024—after MGI filed its original motion to compel arbitration—Mr. St. George agreed to the 2024 Hinge TOU when he encountered a blocking modal informing him that Hinge had updated its TOU, and that "[b]y tapping Agree, you agree to our updated **Terms**," with a contrasting, bolded hyperlink to the 2024 Hinge TOU. Ex. B-4. Mr. St. George could not have continued using Hinge without tapping "Agree." *See* Greenspan Decl. ¶ 22.

### 4. Jami Kandel

Jami Kandel alleges that she "purchased Tinder, Hinge, and The League . . . subscriptions within the last two years." Compl. ¶ 26. Assuming those allegations are true, Ms. Kandel would have agreed to one or more versions of the TOU on each Platform.[6]

As to Tinder, if Ms. Kandel created a Tinder account in 2022, she would have agreed to the 2022 Tinder TOU during account creation when she was presented with a screen stating "[b]y tapping Create Account or Sign In, you agree to our Terms" with an underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 26; Ex. A-9. Ms. Kandel could not have created a Tinder account in 2022 without tapping the "Create Account" button. *See* Flashman Decl. ¶¶ 6, 26. If Ms.

---

[6] With current information, Tinder and The League did not identify any accounts believed to belong to Ms. Kandel with purchases within the last two years. Flashman Decl. ¶ 25; Krosnjar Decl. ¶ 16.

Kandel made subscription purchases on Tinder within the last two years, as she alleges, when she initiated those purchases, she again agreed to the 2022, January 2024, and/or April 2024 Tinder TOU (depending on purchase date) when she was presented with a screen stating, "[b]y tapping Continue, you agree to our **Terms**." *Id.* ¶ 27; Ex. A-10; *see also* Ex. A-11. This notice underscored and bolded a hyperlink to the 2022, January 2024, or April 2024 Tinder TOU (as applicable) and was displayed directly below the button Ms. Kandel pressed to continue with her purchase. Exs. A-10–A-11. Ms. Kandel could not have completed these purchases without tapping the "Continue" button. Flashman Decl. ¶ 27. Further, if Ms. Kandel was active on Tinder since 2022, she could not have continued using her account, and making her alleged purchases, without agreeing to the 2022 and/or January 2024 Tinder TOU after encountering a blocking modal as described above, informing her of the updated TOU and explaining that assent to the updated TOU (by tapping "Agree") was necessary to continue using Tinder's service. *Id.* ¶ 28; Exs. A-4–A-5. Ms. Kandel could not have used the Tinder services from 2022 until the present without tapping "Agree." Flashman Decl. ¶ 12–13, 28.

As to Hinge, if Ms. Kandel purchased Hinge subscriptions within the last two years, she would have agreed to the 2022 and/or 2024 Hinge TOU when she was presented with a screen stating, "[b]y tapping Continue, you agree to our Terms," with an underscored hyperlink to the applicable Hinge TOU. Greenspan Decl. ¶ 26; Ex. B-5. Hinge's records indicate that Ms. Kandel purchased a Hinge subscription on June 22, 2024—*after* Ms. Kandel filed this lawsuit and *after* MGI moved to compel arbitration based on Ms. Kandel's past agreements to the TOU—and that she would have seen the purchase page informing her that "[b]y tapping Subscribe . . . you agree to our Terms." Greenspan Decl. ¶ 27; Ex. B-8. Ms. Kandel therefore agreed to the 2024 Hinge TOU.

Hinge's database confirms that Ms. Kandel agreed to the Hinge TOU on other occasions. Ms. Kandel created a Hinge account in 2021 and agreed to the then-effective TOU. Greenspan Decl. ¶ 23. Ms. Kandel also consented to the 2022 and 2024 Hinge TOU via blocking modals informing her that "[b]y tapping Agree, you agree to our updated **Terms**." *Id.* ¶¶ 24–25; Exs. B-3–B-4. This notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold purple font, which hyperlinked to the updated TOU. Exs. B-3–B-4. Ms. Kandel could not have continued using the Hinge service without tapping "Agree." *See* Greenspan Decl. ¶¶ 24–25.

As to The League, if Ms. Kandel created an account on The League since 2022, she would have been required to check a box agreeing to The League TOU before creating an account. Krosnjar Decl. ¶ 17; Ex. C-1. The TOU are easily accessible and available for review through a conspicuous hyperlink in contrasting blue font. Krosnjar Decl. ¶ 5. If Ms. Kandel did not check the box acknowledging her agreement to The League TOU, a pop-up blocker screen would appear with a message in bold, capitalized letters: "TO[U] ACCEPTANCE REQUIRED," followed by a notice that she must agree to The League's TOU and Privacy Policy to continue in the account creation process. *Id.* ¶ 17; Ex. C-2.

Additionally, if Ms. Kandel was active on The League since 2022, she could not have continued using her account, and making her alleged purchases, without encountering at least one blocking modal screen requiring acceptance of the updated The League TOU. Krosnjar Decl. ¶ 18. She would have encountered a blocking modal screen with the full version of the 2022, 2023, and/or 2024 The League TOU, requiring her to accept the updated TOU. *Id.* Ms. Kandel could not have continued using The League service without tapping "I accept" on the  modals, and the 2023 and 2024 blocking modals even explicitly informed users that "[b]y tapping "I accept", you agree to our updated Terms." Exs. C-6–C-8; Krosnjar Decl. ¶ 18.

### 5. Bradford Schlosser

Mr. Schlosser alleges that he purchased a Tinder subscription in 2022, upon which he bases his claims as to Tinder. Compl. ¶ 27. Assuming that allegation is true, when Mr. Schlosser made that purchase, he agreed to the 2022 Tinder TOU, as he was presented with a screen stating, "[b]y tapping Continue, you agree to our **Terms**," with a bolded and underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 30; Ex. A-10. Tinder's database confirms that Mr. Schlosser purchased a subscription in late 2022 and would have seen the purchase page. Flashman Decl. ¶ 30; Ex. A-10. Mr. Schlosser could not have completed this purchase without tapping the "Continue" button. Flashman Decl. ¶ 30.

Tinder's database also confirms that Mr. Schlosser agreed to the Tinder TOU on other occasions as well. Mr. Schlosser created multiple Tinder accounts and agreed to the then-effective TOU each time. *Id.* ¶ 29. When Mr. Schlosser created his most recent account in October 2022, he

agreed to the 2022 Tinder TOU during account creation when he was presented with a screen stating "[b]y tapping Create Account or Sign In, you agree to our <u>Terms</u>" with an underscored hyperlink to the 2022 Tinder TOU. *Id.*; Ex. A-9. Mr. Schlosser could not have created his Tinder account without tapping the "Create Account" button. Flashman Decl. ¶¶ 6, 29. Additionally, when Mr. Schlosser last signed in to his Tinder account in December 2023, he again agreed to the 2022 Tinder TOU when he was presented with a screen stating, "[b]y tapping 'Sign in' you agree to our <u>Terms</u>," with an underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 31; Ex. A-12. Mr. Schlosser could not have signed in without tapping a "Sign in" button. Flashman Decl. ¶ 31.

Mr. Schlosser also alleges that he purchased Hinge subscriptions in December 2022 and October 2023, which form the basis for his claims as to Hinge. Compl. ¶ 27. Assuming the truth of those allegations, when Mr. Schlosser made each of those purchases, he agreed to the 2022 Hinge TOU, as he was presented with a screen stating, "[b]y tapping Continue, you agree to our <u>Terms</u>," with an underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 29; Exs. B-9–B-10. Hinge's database confirms that Mr. Schlosser purchased subscriptions in late 2022 and in 2023 and would have seen the purchase screen. Greenspan Decl. ¶ 30; Exs. B-9–B-10. Mr. Schlosser could not have completed these purchases without tapping the "Continue" button. Greenspan Decl. ¶ 29.

Hinge's database confirms that Mr. Schlosser agreed to the 2022 and 2024 Hinge TOU on other occasions. Mr. Schlosser created a Hinge account in September 2022 and agreed to the 2022 Hinge TOU upon account creation. *Id.* ¶ 28. He reiterated his acceptance of the TOU when he signed into his Hinge account in July 2023, when he encountered a screen informing him that "[b]y tapping 'Sign in' / Create account', you agree to our **<u>Terms of Service</u>**", with a bolded and underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 31; Ex. B-11. Mr. Schlosser could not have signed in without tapping "Sign in." *See* Greenspan Decl. ¶ 31.

Additionally, Mr. Schlosser agreed to the 2024 Hinge TOU when he was presented with a blocking modal on May 16, 2024 (after he filed this lawsuit and after MGI moved to compel arbitration). Greenspan Decl. ¶ 32. The blocking modal notified Mr. Schlosser that Hinge had updated its TOU, and that "[b]y tapping Agree, you agree to our updated **Terms**," with a bolded

1   hyperlink to the 2024 Hinge TOU. Ex. B-4. Mr. Schlosser could not have continued using Hinge

2   without tapping "Agree," thereby consenting to the 2024 Hinge TOU. *See* Greenspan Decl. ¶ 32.

### 6. Andrew Karz

4   Mr. Karz alleges that he purchased Tinder subscriptions throughout 2023, which form

5   the basis for his claims. Compl. ¶ 28. Assuming those allegations are true, when Mr. Karz made

6   those purchases, he agreed to the 2022 Tinder TOU, as he was presented with a screen stating, "[b]y

7   tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the

8   2022 Tinder TOU. Flashman Decl. ¶ 34; Exs. A-13–A-15. Tinder's database confirms that Mr. Karz

9   purchased Tinder subscriptions in 2023 and would have seen the purchase screen. Flashman Decl.

10  ¶ 35; Exs. A-13–A-15. Mr. Karz could not have completed these purchases without tapping the

11  "Continue" button. Flashman Decl. ¶ 35.[7]

12  Additionally, Tinder's database shows that Mr. Karz purchased another Tinder

13  subscription on January 31, 2024. Flashman Decl. ¶ 36. When doing so, Mr. Karz encountered a

14  screen that informed him, "[b]y tapping Continue, . . . you agree to our **Terms**." The word "**Terms**"

15  was an underscored and bolded hyperlink to the January 2024 Tinder TOU. *Id.*; Ex. A-11. By tapping

16  "Continue," Mr. Karz agreed to the January 2024 Tinder TOU. Flashman Decl. ¶ 36. Mr. Karz also

17  confirmed his agreement to the January 2024 Tinder TOU when he encountered a blocking modal

18  on May 3, 2024. Flashman Decl. ¶ 33. The modal informed Mr. Karz that "[b]y tapping Agree, you

19  agree to our updated **Terms**," with an underscored and bolded hyperlink to the January 2024 Tinder

20  TOU. Ex. A-5. Mr. Karz could not have continued using Tinder without tapping "Agree," thereby

21  (again) consenting to the January 2024 Tinder TOU. Flashman Decl. ¶ 33.

### 7. Chase Taylor

23  Mr. Taylor alleges that he purchased Hinge subscriptions in 2023, which form the basis

24  for his claims as to Hinge. Compl. ¶ 29. Assuming those allegations are true, when Mr. Taylor made

25  those purchases, he agreed to the 2022 Hinge TOU, as he was presented with a screen stating, "[b]y

26  tapping Continue, you agree to our Terms," with an underscored hyperlink to the 2022 Hinge TOU.

---

27
28  [7] Mr. Karz also agreed to the TOU each time he created an account. Flashman Decl. ¶ 32. He most
    recently created an account in November 2023, at which time he agreed to the 2022 Tinder TOU. *Id.*

Greenspan Decl. ¶ 34; Exs. B-13–B-14. Hinge's records confirm that Mr. Taylor purchased Hinge subscriptions in 2023 and would have seen the purchase page. Greenspan Decl. ¶ 34; Exs. B-13–B-14. Mr. Taylor could not have completed these purchases without tapping the "Continue" button. Greenspan Decl. ¶ 34.

Hinge's database confirms that Mr. Taylor agreed to the Hinge TOU on other occasions. Mr. Taylor created multiple Hinge accounts. *Id.* ¶ 33. Upon creation of these accounts, Mr. Taylor encountered an account creation screen that stated that by creating an account, he accepted the then-effective TOU. *Id.* He most recently created an account on May 25, 2024, and at that time he agreed to the 2024 Hinge TOU when he was presented with a screen stating "[b]y tapping 'Sign in' / 'Create account', you agree to our **Terms of Service**", with an underscored and bolded hyperlink to the 2024 Hinge TOU. *Id.*; Ex. B-12. Mr. Taylor could not have created his Hinge account without tapping the "Create account" button. Greenspan Decl. ¶¶ 33.

Mr. Taylor also alleges that he purchased Tinder subscriptions in 2023, which form the basis for his claims as to Tinder. Compl. ¶ 29. Assuming those allegations are true, when Mr. Taylor made those purchases, he agreed to the 2022 Tinder TOU, as he was presented with a screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored hyperlink to the 2022 Tinder TOU. Flashman Decl. ¶ 38; Ex. A-17. Tinder's records confirm that Mr. Taylor purchased subscriptions in 2023 and would have seen the purchase screen. Flashman Decl. ¶ 39; Ex. A-17. Mr. Taylor could not have completed these purchases without tapping the "Continue" button. Flashman Decl. ¶ 39.

Tinder's database confirms that Mr. Taylor agreed to the Tinder TOU on several occasions. Mr. Taylor created multiple Tinder accounts. *Id.* ¶ 37. Upon creation of these accounts, Mr. Taylor encountered an account creation screen that stated that by creating an account, he accepted the then-effective TOU. *Id.* He most recently created an account in May 2024, and at that time he agreed to the April 2024 Tinder TOU when he was presented with a screen stating "[b]y tapping 'Create account' or 'Sign in' you agree to our Terms", with an underscored hyperlink to the April 2024 Tinder TOU. *Id.*; Ex. A-16. Mr. Taylor could not have created his Tinder account without tapping the "Create account" button. Flashman Decl. ¶¶ 6, 37.

15

8.  **Hussein Saab**

Mr. Saab alleges that he purchased Hinge subscriptions in 2020 and 2022, which form the basis for his claims as to Hinge. Compl. ¶ 30. Assuming those allegations are true, when Mr. Saab made those purchases, he agreed to the Hinge TOU. In 2022, for example, he was presented with a screen stating, "[b]y tapping Subscribe you agree to our Terms," with an underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 39. Hinge's records confirm that Mr. Saab purchased Hinge subscriptions, most recently in 2022, and therefore would have seen the purchase screen. *Id.* ¶ 40. Mr. Saab could not have completed his purchases without tapping "Subscribe." *Id.*

Mr. Saab again indicated his agreement to the 2022 and 2024 Hinge TOU by completing the blocking modals in 2022 and 2024. Specifically, on March 1, 2022, he was presented with a screen notifying him that Hinge had changed its TOU and that "[b]y tapping Agree, you agree to our updated **Terms**." Greenspan Decl. ¶ 37; Ex. B-3. This notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold purple font, which hyperlinked to the updated 2022 Hinge TOU. Ex. B-3. And on June 9, 2024, he was presented with a screen notifying him that Hinge had changed its TOU and that "[b]y tapping Agree, you agree to our updated **Terms.**" Greenspan Decl. ¶ 38; Ex. B-4. Again, this notice was directly above the "Agree" button and the word "**Terms**" was displayed in contrasting bold purple font, which hyperlinked to the updated 2024 Hinge TOU. Ex. B-4. Mr. Saab could not have continued using the Hinge service without tapping "Agree." *See* Greenspan Decl. ¶¶ 37–38. When Mr. Saab signed in to his Hinge account that same month, he was presented with a screen informing him that "[b]y tapping 'Sign in' / Create account', you agree to our **Terms of Service**", with a bolded and underscored hyperlink to the 2024 Hinge TOU. *Id.* ¶ 41; Ex. B-16. Mr. Saab could not have signed in without tapping "Sign in," thereby expressing his agreement to the 2024 Hinge TOU. Greenspan Decl. ¶ 41.

Mr. Saab also alleges that he purchased a Tinder subscription in 2020, which forms the basis for his claims as to Tinder. Compl. ¶ 30. Assuming that allegation is true, when Mr. Saab made that purchase, he was required to click a button, thereby agreeing to the TOU; he could not have completed his purchase without tapping that button. Flashman Decl. ¶ 41. Tinder's records confirm that Mr. Saab purchased a subscription in 2020 and would have seen the purchase screen. *Id.* ¶ 42.

16

Tinder's database confirms that Mr. Saab agreed to the Tinder TOU on multiple occasions. Mr. Saab created multiple Tinder accounts in 2020 and 2022, which required him to consent to the then-effective TOU. *Id.* ¶ 40. For example, when Mr. Saab created two different accounts in May 2022, he encountered an account creation screen that stated "[b]y clicking Log In, you agree with our **Terms**", with an underscored and bolded hyperlink to the 2022 Tinder TOU. *Id.*; Ex. A-18.

### 9. Olumuyiwa Olaniyan

Mr. Olaniyan alleges that he purchased Hinge subscriptions in 2022, 2023, and 2024, which form the basis for his claims as to Hinge. Compl. ¶ 31. Assuming those allegations are true, when Mr. Olaniyan made those purchases, he agreed to the 2022 Hinge TOU, as he was presented with a screen stating, "[b]y tapping Subscribe, . . . you agree to our <u>Terms</u>," with an underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 43; Ex. B-17. Hinge's records show that Mr. Olaniyan purchased multiple subscriptions (most recently in April 2024), and that he would have seen the purchase screen. Greenspan Decl. ¶ 44; Ex. B-17. Mr. Olaniyan could not have completed his purchases without tapping the "Subscribe" button. Greenspan Decl. ¶ 44. Additionally, when Mr. Olaniyan last signed in to his account in September 2022, he was presented with a screen informing him that "[b]y tapping 'Sign in' / 'Create account', you agree to our **Terms of Service**", with a bolded and underscored hyperlink to the 2022 Hinge TOU. Greenspan Decl. ¶ 45; Ex. B-18. Mr. Olaniyan could not have signed in without tapping "Sign in," thereby expressing his agreement to the 2022 Hinge TOU. *See* Greenspan Decl. ¶ 45.

Mr. Olaniyan also alleges that he purchased Tinder subscriptions in 2022, 2023, and 2024, which form the basis for his claims as to Tinder. Compl. ¶ 31. Assuming those allegations are true, when Mr. Olaniyan made those purchases, he agreed to the then-applicable Tinder TOU, as he was presented with a purchase screen requiring him to agree to then-applicable Tinder TOU to complete his purchase. Flashman Decl. ¶ 46; *see, e.g.*, Ex. A-19. Tinder's records confirm that Mr. Olaniyan purchased multiple subscriptions, and that he would have seen the purchase screen. During his most recent purchase on May 1, 2024, for example, Mr. Olaniyan encountered a purchase screen stating, "[b]y tapping Continue, . . . you agree to our **Terms**," with a bolded and underscored

hyperlink to the applicable Tinder TOU. Flashman Decl. ¶ 47; Ex. A-20. Mr. Olaniyan could not have completed his purchases without tapping the "Continue" button. Flashman Decl. ¶ 47.

Mr. Olaniyan also encountered blocking modals in 2022 and 2024 that required him to agree to Tinder's then-effective TOU. *Id.* ¶¶ 44–45; Exs. A-4–A-5. The modals informed users that "[b]y tapping Agree, you agree to our updated **Terms**." Exs. A-4–A-5. This notice was directly above the "Agree" button, and the word "**Terms**" was displayed in contrasting blue font and underscored, hyperlinking to the updated TOU. *Id.* Mr. Olaniyan most recently encountered a blocking modal on February 15, 2024, at which time he agreed to the January 2024 Tinder TOU. Flashman Decl. ¶ 45. Mr. Olaniyan could not have continued using the Tinder service without tapping "Agree." *Id.*[8]

## III.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the parties' agreements to arbitrate. *See* 9 U.S.C. § 2. Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Pursuant to the FAA's strong policy favoring arbitration, a court's role is strictly circumscribed when ruling on a motion to compel arbitration. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The two issues for the court are: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). The "[FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (citations omitted) (emphasis in original). "The standard for demonstrating arbitrability is not high," and agreements to arbitrate "are to be rigorously enforced." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). Where (as here) an arbitration agreement "delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019). "[P]arties may

---

[8] Mr. Olaniyan also agreed to the TOU each time he created a Tinder or Hinge account. Greenspan Decl. ¶ 42; Flashman Decl. ¶ 43.

1   agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway'

2   questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their

3   agreement covers a particular controversy." *Id.* at 529 (citation omitted). Accordingly, such

4   provisions must be enforced according to their terms. *Id.*

5   **IV.    ARGUMENT**

6            The FAA requires enforcement of the arbitration agreements at issue here because the

7   Plaintiffs entered into valid agreements to arbitrate on an individual basis, and the TOU plainly

8   encompass Plaintiffs' claims and prayers for relief. The parties' dispute must be compelled to

9   arbitration and this case stayed.

10           **A.  Under Settled Contract Principles, Plaintiffs Agreed to Arbitrate Their Claims.**

11           Plaintiffs entered into binding arbitration agreements when they consented to the TOU

12  (containing a section requiring individual arbitration of disputes) when creating accounts, any time

13  they accepted updated TOU on the blocking modal screen, when they purchased a subscription, and,

14  in some instances, when they signed in to the Platforms. Arbitration agreements governed by the

15  FAA, such as the agreements here, are presumed to be valid and enforceable. *Shearson/Am. Express,*

16  *Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*

17  *Inc.*, 473 U.S. 614, 626–27 (1985). Plaintiffs bear the burden of proving otherwise. *Gonzalez-Torres*

18  *v. Zumper, Inc.*, No. 19-cv-02183-PJH, 2019 WL 6465283, at *3 (N.D. Cal. Dec. 2, 2019).

19           As explained above, on multiple occasions, Plaintiffs were notified that by tapping a

20  button to use the Platforms—whether by creating an account, purchasing a subscription, agreeing to

21  updated TOU, or signing in—they agreed to the TOU. *See supra*. The full text of the TOU was

22  hyperlinked through the word "Terms" (or similar) or for The League blocking modal, was displayed

23  in the modal itself. Flashman Decl. ¶¶ 6–8, 12–13; Greenspan Decl. ¶¶ 6–8, 11–12; Krosnjar Decl.

24  ¶¶ 5, 10–12. And the TOU contained clear and conspicuous arbitration agreements, including class

25  action waivers. Additionally, these TOU were presented to users in a context (dating apps and

26  subscriptions) that "reflected the contemplation of some sort of continuing relationship that would

27  have put users on notice for a link to the terms of that continuing relationship." *Oberstein v. Live*

28  *Nation Entmt., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023).

19

Courts consistently enforce arbitration agreements when consumers create an account or complete a purchase with actual *or* constructive knowledge that the transaction is subject to terms and conditions. *See Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394–95 (9th Cir. 2020) (enforcing arbitration agreement where website provided "sufficient notice for constructive assent" by displaying the advisory, "[b]y continuing past this page, you agree to our Terms of Use"). Plaintiffs attempt to avoid that outcome by asserting that they were "unaware of and not informed of any agreement that constituted a waiver of [their] legal rights," so there was an "absence of informed consent."[9] *See* Compl. ¶¶ 23–31. But constructive notice, determined by an objective-reasonableness test—not Plaintiffs' subjective assertions—is sufficient to enforce the agreement. *See, e.g.*, *Oberstein*, 60 F.4th at 515 (discussing constructive notice and whether a "reasonable user would have seen the notice and been able to locate the Terms via hyperlink"). The party seeking to enforce the agreement need only show that (1) "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound, and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.*

In *Robbins v. Mscripts,* for example, this Court enforced an arbitration agreement where "the plaintiff inputted data and clicked a button to create the account directly below a statement that he agreed to the terms (and featuring a bright blue hyperlink to the terms)." No. 23-cv-013810-LB, 2023 WL 5723220, at *4–5 (N.D. Cal. Sept. 5, 2023). Similarly, the Ninth Circuit upheld an order compelling arbitration where, three lines below the "Sign In" button, a website displayed the phrase, "[b]y continuing past this page, you agree to our Terms of Use" and where a similar advisory appeared above the "Place Order" button at checkout. *See Ticketmaster*, 817 F. App'x at 394–95; *see also, e.g.*, *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (compelling arbitration where the mobile application displayed the notice, "[b]y creating an Uber account, you agree to the Terms & Conditions and Privacy Policy"). Similarly, in *Keebaugh v. Warner Brothers Entertainment,* the Ninth Circuit reversed denial of motion to compel arbitration where the sign-in

---

[9] Plaintiffs' "unawareness" argument rings particularly hollow given that most of the Plaintiffs (as described above) *re-confirmed* their agreement to the TOU *after* MGI filed its original motion to compel arbitration, Dkt. No. 20, highlighting the TOU's arbitration provision and the ways in which Plaintiffs had earlier consented to those TOU.

screen notified users that "By tapping 'Play' I agree to the Terms of Service." 100 F.4th 1005, 1020–21 (9th Cir. 2024). The Ninth Circuit reasoned that the sign-in screen "satisf[ied] the visual requirements to provide conspicuous notice," as the notice was directly below the "Play" button, used a "contrasting font," and "clearly denote[d] that continued use" would constitute agreement to the TOU, with a link to the TOU. *Id.* All the same is true in this case.

Indeed, courts in this Circuit have previously compelled arbitration based on Tinder's previous TOU and TOU of other affiliates. *See Kim v. Tinder, Inc.*, No. 18-CV-03093-JFW (AS), 2018 WL 6694923, *2–*3 (C.D. Cal. July 12, 2018) (compelling arbitration where "Plaintiff logged in to her Tinder account through a login screen on her phone which stated that tapping the Log In button would constitute consent to the [terms of use]"); *Graf v. Match.com, LLC*, No. 15-CV-3911-PA (MRWX), 2015 WL 4263957, at *4 (C.D. Cal. July 10, 2015) (compelling arbitration where user was "required to affirmatively agree to the Terms of Use when they clicked on a 'Continue' or other similar button" and where it was explained that "by clicking on that button, the user was affirming that they would be bound" by the terms); *Kahl v. Plentyoffish Media, ULC*, No. 23-cv-00985-AGT (N.D. Cal. June 13, 2023), Dkt. No. 19 (compelling arbitration).

The Platforms' account creation, checkout for subscription purchases, blocking modal pages, and/or sign-in screens during the relevant time period more than meet the standard for demonstrating Plaintiffs' constructive knowledge and assent. The Platforms repeatedly presented Plaintiffs with "explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." *Ticketmaster*, 817 F. App'x at 394; *see* Flashman Decl. ¶¶ 6–8, 12–13; Greenspan Decl. ¶¶ 6–8, 11–12; Krosnjar Decl. ¶¶ 5, 10–12. Plaintiffs manifested consent to the TOU each time they tapped "Continue," "Create account," "Sign in," "Agree," or "I accept" adjacent to a disclosure that clearly explained that tapping that button constituted agreement to the TOU—made accessible via a conspicuously displayed hyperlink.[10] "This method of consent is fully enforceable." *Kim*, 2018 WL 6694923 at *2 (citations omitted). Therefore, Plaintiffs accepted the

---

[10] The League's blocking modals contained the updated TOU's full text in the modal itself. Exs. C-6–C-8. Additionally, to create an account, The League users had to check a box acknowledging that "[b]y signing up for The League you agree to our **Terms of Service**." Krosnjar Decl. ¶ 5; Ex. C-1.

Platforms' TOU, including the provisions compelling individual arbitration of any dispute and waiving the right to a jury trial and to pursue a class action. *Oberstein*, 60 F.4th at 515–16 (affirming order compelling arbitration where user clicked a "Sign In" button above language stating "[b]y continuing past this page, you agree to the Terms of Use"); *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *4 (E.D. Cal. Apr. 21, 2023) (compelling arbitration where account creation page had a hyperlink to the terms of use); *Rainey v. A Place for Rover, Inc.*, No. 2:22-cv-00403-RGK-E, 2022 WL 16942849, at *2 (C.D. Cal. July 18, 2022) (same). Thus, Plaintiffs entered into a binding agreement to arbitrate their claims on an individual basis.

### B. MGI Can Enforce the Arbitration Agreement.

MGI, as an affiliate of the entities operating the Platforms, can enforce the arbitration agreement contained in the TOU against Plaintiffs. As noted above, the arbitration agreement in the operative versions of the TOU expressly applies to disputes with the Platforms' affiliates. Section 15a notes, "[f]or purposes of this Dispute Resolution Process and Arbitration Procedures set forth in Section 15, '[the Platform]' shall include our affiliates, employees, licensors, and service providers." Section 15a of Exs. A-1–A-3, B-1–B-2, C-4–C-5. Thus, Plaintiffs agreed to arbitrate "any dispute, claim, or controversy between" themselves and any of the Platforms' affiliates "that arises from or related in any way to this Agreement, the Service, or our relationship with you." *Id.* MGI, as the indirect parent company of the Platforms' operating companies, Flashman Decl. ¶ 4; Greenspan Decl. ¶ 4; Krosnjar Decl. ¶ 4, is plainly an affiliate, and is thus plainly within the scope of counterparties with which Plaintiffs agreed to arbitrate. *See Hajibekyan v. BMW of N. Am., LLC*, 839 F. App'x 187, 188 (9th Cir. 2021) (holding that a parent company is an "affiliate" and can enforce an arbitration agreement between a plaintiff and a subsidiary); *Kaselitz v. hiSoft Tech. Int'l, Ltd.*, No. C-12-5760 MMC, 2013 WL 622382, at *6–7 (N.D. Cal. Feb. 15, 2013) (holding that a non-signatory "parent" of a signatory to the arbitration agreement had standing to invoke the arbitration agreement because the agreement "on its face . . . encompasses entities other than [the signatory], including affiliates thereof").

Even if the TOU did not explicitly mention affiliates, however, equitable estoppel allows MGI to enforce the arbitration agreement against Plaintiffs. "Under California law, a nonsignatory

to a contract may enforce an arbitration provision under the doctrine of equitable estoppel when 'the claims [against the nonsignatory] are "intimately founded in and intertwined with" the underlying contract.'" *Herrera v. Cathay Pac. Airways Ltd.*, 104 F.4th 702, 707 (9th Cir. 2024) (quoting *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013)).[11]

Plaintiffs' claims against MGI are premised on Plaintiffs' subscription purchases on the Platforms. *See* Compl. ¶¶ 23-31. Plaintiffs allege, for example, that they "would not have purchased the Platform subscriptions, would not have paid as much for them, or would have engaged with the Platforms responsibility [sic]," had they known the Platforms are addictive. *Id.* ¶ 33. Plaintiffs even point to their alleged "purchase of the Platform subscriptions"—purchases that were governed by the TOU—as the "transactions" necessary to support their CLRA claim. *Id.* ¶ 127. And they allege a claim for "breach of express warranty," *id.* ¶¶ 302–06 (even though the TOU expressly disclaim any representations or warranties). *See, e.g.*, Ex. A-1 § 12; Ex. B-1 § 11; Ex. C-3 § 8. Thus, Plaintiffs' claims are premised on Plaintiffs' use of and their relationship with the Platforms, all of which are governed by the TOU and the arbitration agreement (and class action waiver) contained within them and implicate the parties' rights and responsibilities under the TOU. In that way, this case is similar to *Herrera*, where the plaintiffs' claim implicated rights and responsibilities under Terms & Conditions between plaintiffs and a third party. 94 F.4th at 1087–88. So too here. Plaintiffs' claims are "intimately founded in and intertwined with" the underlying TOU, so MGI is entitled to enforce the Plaintiffs' agreement to arbitrate their claims.

**C. The Scope of the Arbitration Agreement Is for the Arbitrator to Decide.**

"When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein*, 139 S. Ct. at 528; *see Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022). Under the relevant TOU, arbitrability disputes are delegated to the arbitrator. *See* Section 15c of Exs. A-1–A-3, B-1–B-2, C-4–C-5 (designating issues including the "scope and enforceability" of the arbitration agreement to

---

[11] The Fifth Circuit has held that Texas law, which governs the TOU, also recognizes a form of "intertwined claims estoppel" that allows a nonsignatory to enforce an arbitration agreement against a signatory. *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 630-31 (5th Cir. 2016).

the arbitrator). A provision delegating the question of arbitrability to the arbitrator is enforceable. *See Henry Schein*, 139 S. Ct. at 531; *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010). Accordingly, the Court need not determine whether this case is within the scope of the arbitration agreements, as that determination has been delegated to the arbitrator.

### D. In Any Event, the Agreements to Arbitrate Clearly Encompass These Claims.

Even if the Court were to address the question of arbitrability, it is clear that the arbitration agreements cover Plaintiffs' claims. The relevant TOU provide that "[a]ny dispute, claim or controversy between you and [the Platform] … that arises from or relates in any way to this Agreement …, the Services, or our relationship with you (collectively, 'Dispute'), shall be exclusively resolved through BINDING INDIVIDUAL ARBITRATION." Exs. A-1 §15c, B-1 § 15c; Sections 15a and 15c of Exs. A-2–A-3, B-2, C-4–C-5 (same). The TOU continue that "'Dispute' as used in this Agreement shall have the broadest possible meaning." Exs. A-1 §15c, B-1 § 15c; Section 15a of Exs. A-2–A-3, B-2, C-4–C-5. "This type of language has been interpreted broadly by . . . the Ninth Circuit[.]" *Edwards v. Verizon*, No. CV 14-09394 BRO, 2015 WL 13654015, at *4 (C.D. Cal. Jan. 26, 2015) (compelling arbitration based on provision stating "*any dispute* that in any way relates to or arises out of this agreement" will be resolved through arbitration (emphasis in original)); *Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*, 497 F. App'x 740, 742 (9th Cir. 2012) (broadly construing a provision that stated "[a]ny dispute, controversy or claim arising from or relating to this Agreement shall be submitted to and determined by binding arbitration").

MGI contends that Plaintiffs' allegations are baseless. But regardless of their merits, each of the causes of action relates to "the Services" provided by the Platforms through subscriptions and the "relationship" the Platforms have with Plaintiffs as users. This is so because Plaintiffs' claims involve allegations regarding the way the services are marketed to users like Plaintiffs and purchases Plaintiffs made purportedly in reliance on the Platforms' alleged representations. *See* Compl. ¶¶ 121–346. The TOU require all such disputes to be resolved exclusively through binding individual arbitration. Section 15c of Exs. A-1–A-3, B-1–B-2, C-4–C-5. Therefore, each of these claims fall within the scope of the arbitration agreements contained within the relevant TOU. *See, e.g.*, *Estrella v. Freedom Fin.*, No. C 09-03156 SI, 2011 WL 2633643, at *5 (N.D. Cal. July 5, 2011)

24

(ordering plaintiffs to arbitrate their UCL and CLRA claims where the arbitration clause covered "any controversy, claim or dispute . . . arising out of or relating to" the contract).

**E.  Plaintiffs' Inducement and Duress Allegations Do Not Change This Result.**

After MGI initially moved to compel arbitration, Plaintiffs amended their Complaint to add fraudulent inducement and duress allegations, in an apparent attempt to avoid their repeated agreements to arbitrate. Those allegations do not change the result, because those claims, too, are for the arbitrator to decide. The FAA's "statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006).

Here, Plaintiffs' fraudulent inducement and duress allegations are not specific to the arbitration clause, but instead are directed at the TOU as a whole. Plaintiffs allege, for example, that they were induced to create accounts based on the Platforms' representations that the Platforms are "designed to facilitate real-life interactions and off-app relationships," and that Plaintiffs were under duress because they "felt compelled to purchase Platform subscriptions after being led by [MGI] to believe that no viable alternatives existed for establishing a relationship outside the app." Compl. ¶¶ 23–31. Neither of these allegations have anything to do with the arbitration clause in particular, but rather are attacks on the Platforms and their TOU as a whole. Thus, Plaintiffs' inducement and duress allegations are also for the arbitrator to decide. *See Prima Paint*, 388 U.S. at 404.

**F.  This Case Must Be Stayed Pending Completion of Arbitration.**

Under the FAA, a court "shall" stay further proceedings in a legal action if it finds that "any issue" in the case should be referred to arbitration under an agreement in writing for such arbitration. 9 U.S.C. § 3. Given that Plaintiffs and MGI are mutually bound to arbitration, the Court must stay this litigation pending conclusion of the arbitration of Plaintiffs' claims.

**V.    CONCLUSION**

For the foregoing reasons, MGI respectfully requests that the Court grant its Motion to Compel Arbitration and Stay Proceedings.

1 | Dated: July 22, 2024

Respectfully submitted,

2

3 | SIDLEY AUSTIN LLP

4 | By:  /s/ Amy P. Lally

Amy P. Lally, SBN 198555

5 | alally@sidley.com

SIDLEY AUSTIN LLP

6 | 1999 Avenue of the Stars, 17th Floor

Los Angeles, CA 90067

7 | Tel: (310) 595-9662

Fax: (310) 595-9501

8

9 | Angela C. Zambrano (*pro hac vice*)

angela.zambrano@sidley.com

10 | Chelsea A. Priest (*pro hac vice*)

cpriest@sidley.com

11 | Kathrine Maldonado (*pro hac vice*)

kmaldonado@sidley.com

12 | SIDLEY AUSTIN LLP

2021 McKinney Avenue, Suite 2000

13 | Dallas, TX 75201

Tel: (214) 981-3476

14 | Fax: (214) 981-3400

15

16 | *Attorneys for Defendant Match Group, Inc.*

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MATCH GROUP, INC.'S MOTION TO COMPEL ARBITRATION
CASE NO. 3:24-CV-00888-LB